# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

### Nos. 14-1286, 14-1641

_____

### UNITED STATES OF AMERICA,
### Appellee

### v.

### DANIEL E. CARPENTER,
### Appellant

_____

## ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

_____

## BRIEF OF APPELLANT DANIEL E. CARPENTER

_____

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-8616 (Telephone)**
**(617) 338-9538 (Fax)**
**homanlaw@aol.com**

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE AND STATEMENT OF FACTS . . . . . . . .   2

    I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    II.    PRETRIAL PROCEDURAL BACKGROUND . . . . . . . . . . . .   5

    III.    TRIAL EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

        A.    BPETCO and the Documents at Issue . . . . . . . . . . . . . .   6

        B.    Carpenter's Investment of the Exchangors' Funds . . . .   12

IV.    POST-TRIAL PROCEDURAL BACKGROUND . . . . . . . . . . . . . .   18

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

I.    THE TEN-YEAR DELAY BETWEEN INDICTMENT AND
FINAL JUDGMENT VIOLATED CARPENTER'S SIXTH
AMENDMENT RIGHT TO A SPEEDY TRIAL . . . . . . . . . . . . .   22

    A.    Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

    B.    Sixth Amendment Speedy Trial Standards . . . . . . . . . . . .   24

    C.    Sixth Amendment Standards Applied to the
Circumstances of this Case . . . . . . . . . . . . . . . . . . . . . . . . .   27

        1.    The length of the delay . . . . . . . . . . . . . . . . . . . . . .   27

2. The reasons for the delay . . . . . . . . . . . . . . . . . . . . . 28

    a. The first interlocutory appeal . . . . . . . . . . . . . 29

    b. The district court's delay in deciding the
    new trial motion . . . . . . . . . . . . . . . . . . . . . . . 31

    c. The second interlocutory appeal . . . . . . . . . . 32

3. Carpenter's assertion of the right . . . . . . . . . . . . . . 33

4. Prejudice to Carpenter . . . . . . . . . . . . . . . . . . . . . . . 35

II. THE INDICTMENT MUST BE DISMISSED FOR
VIOLATION OF THE SPEEDY TRIAL ACT . . . . . . . . . . . . . . 37

    A. An Interlocutory Appeal by the Government Does Not
Reset the Speedy Trial Clock, and the Speedy Trial Act
Was, Therefore, Violated in this Case. . . . . . . . . . . . . . . 37

    B. Even assuming *arguendo* that the speedy trial clock
reset after the issuance of this Court's mandate, the STA
was nonetheless violated . . . . . . . . . . . . . . . . . . . . . . . . . 42

III. THE NEWLY-DISCOVERED EVIDENCE OF FALSE
TESTIMONY BY THE MERRILL LYNCH WITNESSES
REQUIRES THE GRANTING OF A NEW TRIAL . . . . . . . . . . 45

    A. The Newly-Discovered Evidence and Its Impact . . . . . . . . 46

        1. New evidence as to Stern and Levine . . . . . . . . . . . 48

        2. New evidence as to Rasmussen . . . . . . . . . . . . . . . 52

    B. The New Evidence Requires the Granting of a
New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

1.   The government's knowing presentation of,
     and failure to correct, Levine's false testimony. . . . .   55

2.   The newly-discovered evidence was unknown
     or unavailable to Carpenter at the time of trial,
     and his failure to learn of it did not result from
     a lack of due diligence on his part . . . . . . . . . . . . . .   55

3.   The new evidence is material and, if available
     upon retrial, would likely bring about an
     acquittal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

IV.   THE EVIDENCE WAS INSUFFICIENT TO CONVICT
      CARPENTER ON THE GOVERNMENT'S NEWLY-
      EMERGED OMISSIONS THEORY, NOR WAS THE
      JURY INSTRUCTED REGARDING THE
      REQUIREMENTS OF FRAUD BY OMISSION . . . . . . . . . . . . .   62

      A.   Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . .   65

      B.   The Failure to Instruct . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

V.    CARPENTER'S SENTENCE WAS SUBSTANTIVELY
      UNREASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

VI.   THE DISTRICT COURT'S FORFEITURE ORDER
      SHOULD BE REVERSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . .   80

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

ADDENDUM

iii

## TABLE OF AUTHORITIES

### **Cases**

*Barker v. Wingo*, 407 U.S. 514 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 30

*Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998) . . . . . . . . . . . .    66

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . .    59

*Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir.  1987) . . . . . . . . . . . . .    26

*Cahaly v. Benistar Property Exchange Trust Co.*,
   2014 WL 2523192 (Mass. App. June 6, 2014) . . . . . . . . . . . . . . . .    45

*Doggett v. United States*, 505 U.S. 647 (1992) . . . . . . . . . . . . . . . . . . . .    27, 36

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . .    55

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . .    56

*Pollard v. United States*, 352 U.S. 354 (1957) . . . . . . . . . . . . . . . . . . . . .    26

*Strunk v. United States*, 412 U.S. 434 (1973) . . . . . . . . . . . . . . . . . . . . .    24, 25

*United States v. Abou-Kassem*, 78 F.3d 161 (5th Cir. 1996) . . . . . . . . . .    26

*United States v. Barnes*, 159 F.3d 4 (1st Cir. 1998) . . . . . . . . . . . . . . . .    38

*United States v. Bishop*, 629 F.3d 462 (5th Cir. 2010) . . . . . . . . . . . . . .    23

*United States v. Bobadillo-Pagan*, 747 F.3d 26 (1st Cir. 2014) . . . . . . . .    65

*United States v. Brennick*, 134 F.3d 10 (1st Cir. 1998) . . . . . . . . . . . . . .    69

*United Stares v. Brice*, 38 Fed. Appx. 898 (4th Cir. 2002) . . . . . . . . . . .    23

*United States v. Brown*, 498 F.3d 523 (6th Cir. 2007) . . . . . . . . . . . . . .    23

*United States v. Bryant*, 523 F.3d 349 (D.C.Cir. 2008) . . . . . . . . . . . . .    43

*United States v. Buchanan*, 987 F.Supp. 56 (D.Mass. 1997) . . . . . . . . . .    71

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012) . . . . . . . . . . . . . . . .    23

*United States v. Callipari*, 368 F.3d 22, 33 (1st Cir. 2004),
  *vacated on other grounds*, 543 U.S. 1098 (2005) . . . . . . . . . . . . . .    61

*United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) . . . . . . . . . . . . . .    65, 66

*United States v. Carpenter*, 405 F.Supp.2d 85 (D.Mass. 2005) . . . . . . . . .    5

*United States v. Carpenter*, 494 F.3d 13 (1st Cir. 2007) . . . . . . . . . . . . .    5, 28, 30

*United States v. Carpenter*, 808 F.Supp.2d 366 (D.Mass. 2011) . . . . . . .    18, 53

*United States v. Carpenter*, 736 F.3d 619 (1st Cir. 2013) . . . . . . . . . . . .5, 18, 29,
                                                                           31, 56

*United States v. Contorinis,* 692 F.3d 136 (2d Cir. 2012) . . . . . . . . . . . .    75, 76

*United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007) . . . . . . .    23

*United States v. Del-Valle*, 566 F.3d 31 (1st Cir. 2009) . . . . . . . . . . . . . .    54

*United States v. Dessesaure*, 527 F.Supp.2d 193 (D.Mass. 2007),
  *rev'd on other grounds*, 556 F.3d 83 (1st Cir. 2009) . . . . . . . . . . .    40

*United States v. Diaz-Maldonado*, 727 F.3d 130 (1st Cir. 2013) . . . . . . .    68

*United States v. Dockray*, 943 F.2d 152 (1st Cir. 1991) . . . . . . . . . . . . .    61

*United States v. Dowdell*, 595 F.3d 50 (1st Cir.2010) . . . . . . . . . . . . . . . .    24, 26, 27

*United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984),
    *rev'd on other grounds*, 473 U.S. 207 (1985) . . . . . . . . . . . . . . . . .    65

*United States v. Elmardoudi*, 501 F.3d 935 (8th Cir. 2007) . . . . . . . . . .    25

*United States v. Ferrario-Pozzi*, 368 F.3d 5 (1st Cir. 2004) . . . . . . . . . .    74, 75

*United States v. Ferreira*, 665 F.3d 701 (6th Cir. 2011) . . . . . . . . . . . . .    27

*United States v. Forchette*, 220  F.Supp.2d 914 (E.D.Wis. 2002) . . . . . .    69

*United States v. Garcia-Pastrana*, 584 F.3d 351 (1st Cir. 2009) . . . . . . .    54

*United States v. Ginyard*, 572  F.Supp.2d 30 (D.D.C. 2008) . . . . . . . . . .    39

*United States v. Gonzalez-Gonzalez*, 258 F.3d 16 (1st Cir. 2001) . . . . . .    55

*United States v. Gregorio*, 956 F.2d 341 (1st Cir. 1992) . . . . . . . . . . . . .    69

*United States v. Hack*, 403 F.3d 997 (8th Cir.  2005) . . . . . . . . . . . . . . .    72

*United States v. Hernandez-Rodriguez*, 443 F.3d 138 (1st Cir. 2006) . . .    58

*United States v. Hills*, 618 F.3d 619 (7th Cir.  2010) . . . . . . . . . . . . . . . .    23

*United States v. Hollnagel*, 2013 WL 5348317 (N.D.Ill. Sept. 24, 2013) .    78

*United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) . . . . . . . . . .    43

*United States v. Innarelli*, 524 F.3d 286 (1st Cir. 2008) . . . . . . . . . . . . . .    75

*United States v. Janik*, 723 F.2d 537 (7th Cir.  1983) . . . . . . . . . . . . . . .    42

*United States v. Jenkins*, 490 F.2d 868 (2d Cir. 1973) . . . . . . . . . . . . . . .    33

*United States v. Joseph*, 743 F.3d 1350 (11th Cir. 2014) . . . . . . . . . . . . .    75

*United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988) . . . . . . . . . . . . . .     56

*United States v. Kington*, 875 F.2d 1091  (5th Cir. 1989) . . . . . . . . . . . .     40

*United States v. LaPage*, 231 F.3d 488 (9th Cir. 2000) . . . . . . . . . . . . .     56

*United States v. Larson*, 627 F.3d 1198 (10th Cir. 2010) . . . . . . . . . . . . 23, 43, 44

*United States v. Lopesierra*, 708 F.3d 193 (D.C.Cir. 2013) . . . . . . . . . . .     23

*United States v. Loud Hawk*, 474 U.S. 302 (1986) . . . . . . . . . . . . . . . .     25, 29

*United States v. Maldonado-Montalvo*, 356 F.3d 65 (1st Cir. 2003) . . .     69

*United States v. Mangual-Garcia*, 505 F.3d 1 (1st Cir. 2007) . . . . . . . .     55, 72

*United States v. Marion*, 404 U.S. 307 (1971) . . . . . . . . . . . . . . . . . . .     25

*United States v. Maryea*, 704 F.3d 55 (1st Cir. 2013) . . . . . . . . . . . . . .     23, 37

*United States v. Mathur*, 624 F.3d 498 (1st Cir. 2010) . . . . . . . . . . . . .     45, 55

*United States v. Miter*, 446 Fed. Appx. 244 (11th Cir. 2011) . . . . . . . . .     26

*United States v. Monserrate-Valentin*, 729 F.3d 31 (1st Cir. 2013) . . . .     22

*United States v. Montilla-Rivera*, 115 F.3d 1060 (1st Cir. 1997) . . . . . .     58

*United States v. Munoz-Amado*, 182 F.3d 57 (1st Cir.1999) . . . . . . . . . .     27

*United States v. Munoz-Franco*, 487 F.3d 25 (1st Cir. 2007) . . . . . . . . .     23

*United States v. Nelson-Rodriguez*, 319 F.3d 12 (1st Cir. 2003) . . . . . . .     26

*United States v. Neto*, 659 F.3d 194 (1st Cir. 2011) . . . . . . . . . . . . . . .     22

*United States v. Pitner*, 307 F.3d 1178  (9th Cir. 2002) . . . . . . . . . . . . .     38, 39

*United States v. Ramos-Gonzalez*, 664 F.3d 1 (1st Cir. 2011) . . . . . . . . .    22

*United States v. Ray*, 578 F.3d 184 (2d Cir. 2009) . . . . . . . . . . . . . . . . . .    26

*United States v. Reeder*, 170 F.3d 93 (1st Cir. 1999) . . . . . . . . . . . . . . .    69

*United States v. Riccio*, 529 F.3d 40 (1st Cir. 2008) . . . . . . . . . . . . . . . .    67

*United States v. Rivera*, 844 F.2d 916 (2d Cir. 1988) . . . . . . . . . . . . . . .    39

*United States v. Rodriguez*, 675 F.3d 48 (1st Cir. 2012) . . . . . . . . . . . . .    45

*United States v. Roen*, 279  F.Supp.2d 986 (E.D.Wis. 2003) . . . . . . . . . .    69

*United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995) . . . . . . . . . . . . . . .    69, 70

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) . . . . . . . . . . . . .    69

*United States v. Salimonu*, 182 F.3d 63 (1st Cir. 1999) . . . . . . . . . . . . .    24

*United States v. Saltzman*, 984 F.2d 1087, 1090 (10th Cir.  1993) . . . . .    42

*United States v. Santiago-Becerril*, 130 F.3d 11 (1st Cir.1997) . . . . . . .    27, 36

*United States v. Santiago-Hernandez*, 493 Fed. Appx. 840
     (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

*United States v. Souza*, ___ F.3d ___, 2014 WL 1613708
     (1st Cir. April 18, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27, 28, 30, 36

*United States v. St. Pierre*, 809 F.Supp.2d 538 (E.D.La. 2011) . . . . . . .    76

*United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012) . . . . . . . . . . . . .    65

*United States v. Summage*, 575 F.3d 864 (8th Cir.  2009) . . . . . . . . . . . .    23

*United States v. Trueber*, 238 F.3d 79 (1st Cir. 2001) . . . . . . . . . . . . . . .    28

*United States v. Valdivia*, 680 F.3d 33 (1st Cir. 2012) . . . . . . . . . . . . . . .     43

*United States v. Velazquez*, ___ F.3d ___, 2014 WL 1410153
    (3d Cir.  April 14, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

*United States v. Villarreal*, 613 F.3d 1344 (11th Cir.2010) . . . . . . . . . .     29

*United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) . . . . . . . . . .     32

*United States v. Williams*, 22 F.3d 580 (5th Cir. 1994) . . . . . . . . . . . . . .     73

*United States v. Wright*, 625 F.2d 1017 (1st Cir. 1980) . . . . . . . . . . . . . .     55, 58

*United States v. Yehling*, 456 F.3d 1236 (10th Cir. 2006) . . . . . . . . . . .     26

*United States v. Yelaun*, 541 F.3d 415 (1st Cir. 2008) . . . . . . . . . . . . . .     23

*United States v. Yelverton*, 197 F.3d 531 (D.C.Cir. 1999) . . . . . . . . . . .     26

*United States v. Young*, 657 F.3d 408 (6th Cir.2011) . . . . . . . . . . . . . .     25

*Zedner v. United States*, 547 U.S. 489 (2006) . . . . . . . . . . . . . . . . . . . . .     43, 44

## **Constitutional Provisions**

Fifth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . .     55

Sixth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . .     *passim*

## **Statutes and Rules**

18 U.S.C. §981(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     73, 74, 75,
                                                                          76,77

18 U.S.C. §3161(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     36

18 U.S.C. §3161(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     38, 40, 41

18 U.S.C. §3161(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

18 U.S.C. §3161(h)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 41, 42

18 U.S.C. §3162(h)(1)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

18 U.S.C. §3161(h)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

18 U.S.C. §3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    73

18 U.S.C. §3731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

Fed. R. Crim. P. 33(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    54

## **Guidelines Provisions**

USSG §2F1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    68

USSG §2F1.1(b)(1)(O) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    68

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal arises from a judgment in a criminal case, of which the district court had jurisdiction under 18 U.S.C. §3231. Judgment entered on March 4, 2014, Add. 1, and Carpenter's timely notice of appeal was docketed on March 17, 2014. App:10. On May 23, 2014, the district court entered an order setting the amount of the forfeiture, Add:58, and Carpenter timely amended his notice of appeal on June 5, 2014. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF ISSUES PRESENTED

1. Whether Carpenter's ten-year ordeal from indictment through sentencing violated his Sixth Amendment right to a speedy trial.

2. Whether the Speedy Trial Act was violated by (1) the district court's resetting the speedy trial clock at zero after the issuance of this Court's mandate in the government's interlocutory appeal rather than simply restarting the clock as it stood before the appeal, and (2) the district court's failure to make sufficient findings sufficient to justify exclusion of time as an ends-of-justice continuance.

3. Whether a new trial should be granted based on newly-discovered evidence of false testimony by Merrill Lynch witnesses regarding matters central to Carpenter's good faith defense.

4. Whether the evidence was sufficient to convict Carpenter on an omissions

theory of fraud.

5. Whether the district court erred in failing to instruct the jury that, to convict Carpenter based on an omissions theory of fraud, it was required to find beyond a reasonable doubt that Carpenter had, and knew he had, a duty to disclose the information.

6. Whether the 36-month sentence imposed on Carpenter was procedurally and substantively unreasonable.

7.  Whether the district court erred in ordering forfeiture.

## STATEMENT OF THE CASE AND STATEMENT OF FACTS

## I.    INTRODUCTION

The theory of fraud set forth in the indictment was that Carpenter defrauded seven real estate investors (the "Exchangors")  who had entered into agreements with Benistar Property Exchange Trust Co., Inc. ("BPETCO") to hold monies to be used in 26 U.S.C. §1031 property exchanges through affirmative false representations about the safety and security of the deposited funds which, in the government's view, were inconsistent with the investment strategies pursued by Carpenter with Exchangors' funds, and which, with the collapse of the stock market in 2000, resulted in substantial trading losses. Carpenter contended at all times that no false representations were made, that he had acted in complete good faith in the belief that

2

he was authorized by the written agreements with the Exchangors to invest the deposited funds at his discretion. There has never been never any allegation that Carpenter ever took, or intended to take, even a penny of the funds which Exchangors entrusted to BPETCO, it being at all times his intent to return the funds to the Exchangors to complete their exchanges, along with the promised interest.

By the time of the second trial in this case, the government, apparently having recognized that there were in fact no false statements in either BPETCO's marketing materials or its exchange documents, had dramatically shifted its theory of fraud, from one predicated upon affirmative false statements to one predicated upon omissions, *i.e.*, Carpenter's failure to apprise the Exchangors who were the subject of the indictment (who had placed their funds with BPETCO in the latter half of 2000) that he was investing their funds in stock options and had incurred substantial losses in the wake of the catastrophic NASDAQ collapse of 2000. Essentially, the government's theory was predicated on the notion that Carpenter had a duty of disclosure to the Exchangors and that, in failing to make the necessary disclosures, he committed mail and wire fraud. The problems with such a theory are myriad, not the least of which are that the jury was never instructed on the requirements for conviction of fraud on an omissions theory, *i.e.*, that the defendant not only have a duty to make the disclosure but know he had that duty. *See* Section IV, *infra.* How

3

was Carpenter, who was located in Connecticut and was not responsible for the marketing aspects of BPETCO's business but only the investment of funds once they were placed with BPETCO, who never met with or spoke to any of the Exchangors at issue and had no material contacts with their attorneys or advisors in all of 2000, who never made a false representation to anyone, to know that he had such a duty or when such duty arose, given that his investment strategy had been successful for more than a year, that BPETCO, until they very end, had continued to successfully complete the planned exchanges – 119 out of 126 – and that he had an undisputed belief that his investment strategy was sound and that the losses would be recouped once the market rebounded?

This case is also unusual for the length of time which elapsed between indictment and sentencing – a period of ten years, during which the government took two separate interlocutory appeals, and the district court took an inexplicable three years to decide Carpenter's new trial motion. The extraordinary length of the delays and the extreme prejudice to Carpenter violated his Sixth Amendment right to a speedy trial. In addition, the Speedy Trial Act was violated when the district court erroneously reset the speedy trial clock to day one after the completion of the government's first interlocutory appeal, an issue which presents a question of first impression in this circuit. *See* Sections I, II, *infra.*

4

The case was a close one, as the district court recognized in describing the evidence as sufficient, "but not overwhelming." The fairness of the trial, and the jury's ability to fairly consider Carpenter's central good faith defense were fatally compromised by a conspiracy by Merrill Lynch ("Merrill") and its three employee-witnesses to withhold exculpatory documents and testify falsely at Carpenter's trial in a concerted campaign to protect their own economic interests at the expense of Carpenter's fundamental right to a fair trial. Only after Carpenter's trial did the new documents come to light in civil litigation against Merrill and additional evidence become available through the depositions of Merrill witnesses in those civil proceedings. The newly-available evidence is both powerfully impeaching of the false testimony of all three Merrill witnesses and, more importantly, provides considerable substantive support for Carpenter's good faith defense. This pattern of concerted deception by Merrill and its witnesses also makes this case an unusual one and one in which a new trial is required in the interest of justice so that Carpenter may have an opportunity to present his defenses in a trial process not tainted by perjury and false and misleading testimony. *See* Section III, *infra.*

## II.     PRETRIAL PROCEDURAL BACKGROUND.

Daniel Carpenter was indicted in February, 2004, on 19 counts of mail and wire fraud. App:6. The case was originally tried in 2005. Carpenter was convicted by the

5

jury on all counts, but the district court granted a motion for new trial based upon its

conclusion that improprieties in the government's closing arguments had tainted the

verdict. *See United States v. Carpenter*, 405 F.Supp.2d 85, 101-03 (D.Mass. 2005).

The government appealed, and this Court upheld the district court. *See United States*

*v. Carpenter*, 494 F.3d 13, 29 (1st Cir. 2007).

The case was tried again in 2008. Prior to that trial, Carpenter moved to dismiss

the indictment for violations of the Speedy Trial Act, App:96, which, following

various responses, replies, and supplements, App:116, 124, 131, 136, was denied by

the district court. Add:9. Carpenter was once again convicted on all counts.

## III.   TRIAL EVIDENCE.

### A.     BPETCO and the Documents at Issue.

Under 26 U.S.C. §1031, owners of investment properties can defer payment of

capital gains tax on the sale of the property if the property is exchanged for another

like-kind property, they designate a replacement property within 45 days, close on the

new property within 180 days, and, in the interim, do not have control of, or access

to, the proceeds of the sale. *See United States v. Carpenter*, 736 F.3d 619, 622 (1st

Cir. 2013). "As a result, exchangors typically rely on 'qualified intermediaries' to

hold and invest the funds until the exchange is completed." *Id.*

Paley and Carpenter, who headed the largest welfare benefit plan

6

administrative firm in the country, App:1608, and Martin Paley, who had been marketing Nationwide's services §1031 intermediary services since 1995, App:1408, formed BPETCO in 1998 to provide §1031 intermediary services. App:1514. Paley was the President of BPETCO, and Carpenter was the Chairman. *Id.* There was a "bright line" between Paley's responsibilities and those of Carpenter: Paley was in charge of marketing, and Carpenter was in charge of investing the Exchangors' funds and had no contact with Exchangors. App:1518-19, 1630. With only one exception in October, 1998, when Carpenter had a conversation with the attorney for a prospective Exchangor, it was Paley alone who had the meetings and conversations which led to the Exchangors' retaining BPETCO as their intermediary. During the course of its existence, BPETCO successfully completed 119 of the 126 exchanges for which its services had been engaged.

In the fall of 1998, Paley prepared BPETCO marketing materials based on those he had used with Nationwide, App:1528, 1610, and sent them to Carpenter to review; Carpenter approved the materials, App:1528-30, but there was no evidence that he ever saw those materials again. It was Paley who presented them to prospective clients and who explained the exchange documents to Exchangors. App:1631. Carpenter never met with prospective Exchangors and had no contacts relative to either the promotional materials or the exchange documents with either the

7

Exchangors or their advisors in 2000. App:331, 434, 563, 811, 1500, 1628-89, 1670, 1784. The marketing materials included a PowerPoint presentation which stated that, in choosing an intermediary, exchangors should "[a]sk about the security of your funds, and find out what guarantees are offered," App:288, 294, 3299, and that "Merrill Lynch Private Bank is used for all our escrow accounts," which "provides 3% - 6% interest on the escrow." App:295, 3299. The marketing materials posed the question, "What will the intermediary do with my money?" and responded that BPETCO "has a long-standing reputation for trustworthiness" with "accounts with major banking and investment firms, such as Merrill Lynch," and that "[e]scrow accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner." App:288, 3317.[1] Paley may also have made oral representations to potential clients, but those did not differ from the written materials. App:1545, 1634.He never told potential Exchangors that their money would be safe or secure or that there was no risk of loss. App:1626-27.[2] The promotional materials recommended that prospective exchangors seek the advice of

---

[1] Examples of the other BPETCO marketing materials may be found at App:3299-3349.

[2] Byron Darling testified that Paley told him that his funds would be perfectly safe. App:408-09, 412.

8

their attorneys and/or financial advisors. App:714, 1644.[3]

Exchangors also signed an Exchange Agreement, which provided until October, 2000:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market account, or 6% per annum in a Merrill Lynch investment account. . . .

App:336, 3228. None of the Exchangors at issue chose the Merrill 3% option. After BPETCO switched its accounts to PaineWebber in October, 2000, the comparable provision of the Exchange Agreement read: "Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with PaineWebber at either 3% per annum or 6% per annum in a PaineWebber account." App:579, 3341.

Some Exchangors also signed an Escrow Agreement which provided that "Benistar shall open an Escrow Custodial Account under Benistar's name at Merrill Lynch for the Exchangor's benefit," App:338, 3334, and that "Benistar shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3%

---

[3] A number of Exchangors or their advisors testified to having reviewed the promotional materials with Paley. *See, e.g.,* App:275-80 (Snider); App:553-65, 590 (Fitzgerald); App:654-64 (Marjorie Adams); App:766-76 (David Eaton); App:1772-75 (Johnston).

Ready Asset Money Market Fund or the 6% Investment Account." *Id.* After the switch to PaineWebber, the escrow agreements read: "Benistar shall open an Escrow Custodial Account under Benistar's name at PaineWebber for the Exchangor's benefit. . . . Benistar shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% or 6% Account." App:570-71, 3347.

Some Exchangors also signed an Exchange Fee Agreement, which provided: "Exchangor and intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested at Merrill Lynch Cash Management account *at the discretion and through financial institutions of the Intermediary.* Interest accruing in said account will accrue to the benefit of Exchangor." App:340, 3337 (emphasis added). After the switch to PaineWebber, the exchange fee agreements continued to state that "cash proceeds received from the disposition of the relinquished property shall be held and invested at PaineWebber *in the discretion and through financial institutions of the Intermediary.*" App:1497 (emphasis added). Finally, Exchangors signed an Account Selection Form on which they indicated their choice of a 3% return or a 6% return. App:340, 3338.

Byron Darling signed the standard BPETCO exchange documents in August, 2000, choosing a 6% return, and in September, 2000, forwarded $322,290.35 to BPETCO. App:412-21. On September 14, 2000, Elliot Snider signed the BPETCO

10

exchange documents,. App:333-39, deposited $3,287,190, and chose a 6% return. App:340-41. He received $50,000 from BPETCO for a deposit on replacement property. App:352. Brian Fitzgerald executed the exchange documents in October, 2000, which specified that the funds would be held at PaineWebber, App:566-80, electing a 3% return and sent $500,000 to BPETCO. App:581-82. He received $400,000 for one of his planned exchanges. App:584-85.

Joseph Iantosca hired BPETCO for four separate exchanges. For the first, Iantosca executed the standard exchange documents naming Merrill as the place where the funds would be held and electing the 3% option, App:665-69, but later changed the selection to 6%. App:717-18. For the other three, Iantosca executed the standard exchange documents in November, 2000, naming PaineWebber as the repository of the funds, again selecting 3%. App:671-86. $1,175,683 was disbursed to Iantosca on December 6, 2000, as was an additional $564,000; $110,000 was disbursed on December 19, 2000. App:730-32.[4]

Albert Bellemore signed the standard exchange documents and sent $444,659.65 to BPETCO to be invested at 6%. App:779-81, 806-07. Gail Cahaly

---

[4] Marjorie Adams, the attorney for Iantosca, testified that Carpenter told her in January, 2001, that he had asked Iantosca to delay his upcoming closings because they had had a "run on the bank" and that there was money coming in in a few days which would enable Iantosca's closings to proceed. App:689-92.

signed the standard fee agreement regarding funds to be held at PaineWebber and gave Paley a check for $2.4 million. App:1498-99. Jeffrey Johnston signed the standard exchange agreements in November, 2000, selecting the 6% option and sending BPETCO $541,930. App:1776-78, 1781.

### B.     Carpenter's Investment of the Exchangors' Funds.

At the inception of BPETCO in 1998, Carpenter opened two accounts at Merrill, a trading account ("the B10 account") and an operating account, which was a linked sub-account ("the B01 account"). App:832, 930-33. At the outset of BPETCO's relationship with Merrill, Carpenter asked Paley to call Jerry Levine, the primary contact for the accounts at Merrill, to explain to Levine the nature of BPETCO's business and the clients' 3% vs. 6% option. App:1568, 1615,1619-20. Paley told Levine that BPETCO was a §1031 intermediary which held funds in escrow pending purchase of replacement property and that clients' money would be wired to Merrill. App:1568, 1616-17. Paley went into some detail regarding the §1031 exchange process with Levine, who said he had some knowledge of property exchanges, and sent him a standard BPETCO fee agreement. App:1618-19.[5]

Also early in BPETCO's relationship with Merrill, David Patterson, the

_____

[5] Levine denied that this conversation took place and denied that he knew that Carpenter was investing clients' funds. App:1017-19, 1023-26. *See* Section III, *infra.*

attorney for one of BPETCO's earliest clients, called Carpenter in October, 1998, with questions aimed at ensuring that the funds would be held in a manner which would satisfy the requirement that the funds not be held in the clients' name. To answer Patterson's questions, Carpenter arranged a conference call with himself, Levine, and Patterson. App:1714. Patterson stressed to Levine that the funds were being held in escrow for his client's benefit but that her name could not be on the account. App:1715, 1735. He also spoke with Levine the next day and, after the closing, faxed him the signed exchange and escrow agreements, as well as sending them by mail. App:1736-48.[6] Thus, from the outset, Carpenter was open with Merrill about the nature of BPETCO's business and that of the funds which he was investing.

Among other investments in the B10 account, Carpenter engaged in options trading. Although the government's theory of fraud rested largely on the nature of the §1031 exchange, and certain of the Exchangors were permitted to testify regarding their subjective expectations as to how their money would be held, the rules governing §1031 exchanges neither require Exchangors' funds to be segregated nor place restrictions on the manner in which they may be invested, nor did the BPETCO

---

[6] As he had with respect to the conversation with Paley, Levine denied that he had ever spoken to Patterson or received any documents from him. App:972, 995-1016. The government conceded that it did not believe that Levine's testimony denying that he had spoken with Patterson was credible. App:1868.

13

exchange documents limit how the funds could be invested. App:1637, 1640-42, 1646-47. The Exchangors at issue in this case – the seven who lost money in 2000 – were all sophisticated business people, yet not one of them ever asked how their funds were to be invested, despite their being aware that the funds would be invested in some fashion.[7]

Carpenter was extremely knowledgeable about options trading, as Merrill financial advisors admitted. App:862-63, 989. Merrill provided Carpenter with written materials an agreements, which Carpenter signed, which addressed the risks of options trading and, in particular, uncovered options trading. App:833, 842-46, 962-63.[8] Most of Carpenter's options trades were "puts," which Merrill witnesses described as "uncovered,"[9] App:854, 865, 904, but Carpenter's strategy included

---

[7] A number of the Exchangors or their advisors admitted knowing that their funds would be invested in some fashion and knowing that investment carried risks, *see, e.g.,* App:373-75, 385-86 (Snider); App:614-16, 630, 632-36 (Fitzgerald); App:795, 798 (Bellemore); App:1792-93 (Johnston), but some Exchangors testified that they did not expect their funds to be invested in stock options. *See, e.g.,* App:391, 400 (Snider); App:427-28 (Darling).

[8] These materials advocated the benefits and flexibility of options trading if done appropriately and recommended selling "puts" as an effective strategy. App:865-68. In particular, it singled out uncovered "puts" as having an undeservedly bad reputation and urged consideration of such investments. App:905-06.

[9] A "put" is an option to buy a stock at a set price within a set period of time; a "call" is an option to buy a stock at a set price within a set period of time. App:835. In an uncovered "put," the investor does not own the stock on which he is selling a

14

making a second trade which limited his risk exposure on the initial "put." App:1130-32. During 1998-99, Carpenter's trading strategy was quite successful, and the B10 account realized a gain for 1999 of $608,408. App:870; Carpenter was down $400,000 in November, 1999, but made a million dollars in December, 1999. App:872, 875.

Through March, 2000, Carpenter's investments were up $800,000, App:877, but then came the catastrophic stock market crash of April, 2000, in which some of the biggest investors in the country lost millions. App:877-78. Carpenter had invested heavily in tech stocks, which, from the late 1990s until March, 2000, were the best performing sector of the market, and these were particularly hard-hit. App:879-81. Merrill urged a less aggressive, more diversified strategy, App:856, 968, but Carpenter believed in his strategy, App:972, 1046,1127, which Merrill witnesses conceded was not irrational. App:882, 1114. Indeed, there were those within Merrill who believed, as Carpenter did, that the market would rebound, App:885, and that the down market represented a good buying opportunity. App:1102. Carpenter was convinced that the downturn in the market was temporary and that he would recoup his losses by continuing with his strategy. App:973,1097. In fact, Merrill's chief investment strategist was recommending tech stocks in 2000,  App:1107, and the

"put." App:967.

account was profitable in June-July, 2000. App:1118-19.

Despite his losses at Merrill, Carpenter never failed to make a margin call, App:950, which he made by transferring funds to the B10 account from the B01 account. App:975-81. By August, 2000, Carpenter had a realized loss of $1,957,852, App:947; as of September, 2000, the year-to-date loss figure was $4,000,383. App:988. Merrill then decided not to permit Carpenter to open any further options positions, App:860, in response to which decision Carpenter insisted that he would be able to recoup the losses once the market rebounded, as he had always done in the past. App:1121-24.[10]

Merrill's Gary Stern referred Carpenter to Mitchell Rock at PaineWebber, whom he had known for some time, telling Rock that Carpenter was a sophisticated and aggressive options trader. App:1143, 1239. As he had at Merrill, Carpenter opened two accounts, a trading account ("the 33 account") and a cash account ("the 34 account"), and his options positions were transferred intact from Merrill. App:883-85, 1155. Like Merrill, PaineWebber provided Carpenter with documents outlining the risks of options trading and recommended that he moderate the risk in the

---

[10] The Merrill witnesses acknowledged that there was litigation pending which accused Merrill of misconduct, that they were likely to be witnesses in those proceedings, and that Merrill's attorney was in the courtroom during their testimony. App:1047-48, 1133.

portfolio. App:1149, 1164, 1169, 1175.

Carpenter began trading with PaineWebber on October 19, 2000, primarily "puts" involving internet stocks with strategies which limited the downside risk. App:1188-89, 1191, 1293. Rock counseled a more conservative approach, App:1190, but at the same time, PaineWebber's chief strategist was saying that the present climate represented the most attractive buying opportunity since 1998. App:1305, 1307. Carpenter, like many investors, believed on a daily basis that the 2000 election would be resolved and believed that BPETCO's investments were positioned to do well as soon as it did. App:1298-99. Even with mounting losses, Carpenter met every margin call, sometimes transferring money to the 33 account from the 34 account and also injecting more than $2 million of his own money. App:1205, 1320-21, 1418-19. The election was not resolved until December, 2000, by which point PaineWebber had decided that it no longer wished to do business with Carpenter because his losses were approximately $5 million, App:1205-06, even though PaineWebber's chief strategist was saying in December, 2000, that the current market represented one of the most attractive opportunities in the last 20 years. App:1329. Carpenter remained convinced that he would recoup millions when the market rallied. App:1323. After PaineWebber closed out Carpenter's positions, the Federal Reserve cut interest rates on January 3, 2001, and the market experienced huge gains from which Carpenter

17

was unable to benefit. App:1327-28. As of November 30, 2000, the combined losses at Merrill and PaineWebber were $6.3 million. App:1472. Even with the losses, BPETCO had not had an unsuccessful exchange through December 14, 2000. App:1469. Subsequent arbitration proceedings, in which Rock testified, resulted in a $12 million award against PaineWebber. App:1329-30.

## IV.  POST-TRIAL PROCEDURAL BACKGROUND.

After trial, Carpenter, who had also moved for a judgment of acquittal at trial, App:1802-39. filed a post-trial motion for judgment of acquittal or, alternatively, a new trial. App:2004-2110. After a delay of almost three years, the district court denied the motion for judgment of acquittal, *United States v. Carpenter*, 808 F.Supp.2d 366, 377-80 (D.Mass. 2011), but again granted a new trial based upon improprieties in the government's closing arguments. *Id.* at 380-86. This Court reversed. *United States v. Carpenter*, 736 F.3d 619 (1st Cir. 2013). One of the central foci of Carpenter's new trial motion was extensive newly-discovered evidence demonstrating that the Merrill witnesses – Stern, Levine, and Rasmussen – testified falsely at trial when they testified that they did not know the nature of BPETCO's business or that the funds being invested were third-party funds, matters striking to the heart of Carpenter's good faith defense. This false testimony substantially and prejudicially compromised the fairness of Carpenter's trial and the reliability of the

18

jury's verdict, yet the district court never actually addressed these critical issues. Add:15-47, 56.

While the government's appeal was pending, Carpenter moved to dismiss the indictment with prejudice for violation of his Sixth Amendment right to a speedy trial, which was denied on jurisdictional grounds. Doc. 392. Prior to sentencing, Carpenter again moved to dismiss on constitutional speedy trial and due process grounds, App:3058-79, which the district court denied. Add:48.

On February 26, 2014, Carpenter was sentenced to a term of 36 months. On May 23, 2014, the district court entered an order setting the amount of forfeiture at $14,053,715.52. Add:58.

## SUMMARY OF ARGUMENT

The extraordinary ten-year delay between indictment and sentencing in this case – caused largely by two interlocutory appeals by the government and an inexplicable three-year delay by the district court in deciding Carpenter's new trial motion – violated Carpenter's Sixth Amendment right to a speedy trial, and the indictment must, therefore, be dismissed with prejudice. In fact, most of the eight-year delay from December 15, 2005, when the first new trial order was granted, until November, 2013, when the second new trial order was overturned, was caused either by the government or the district court. The defendant is not responsible for bringing

19

himself to trial. All of the factors to which courts look in evaluating constitutional speedy trial claims weigh in favor of finding a speedy trial violation. First, the length of the delay is presumptively prejudicial under this Court's caselaw. Second, the reasons for the delay count in Carpenter's favor. Third, Carpenter repeatedly asserted both his rights to have these matters promptly resolved and the ongoing prejudice to him. Fourth, the delay manifestly prejudiced Carpenter by subjecting him to a physically and emotionally torturous ordeal.

The Speedy Trial Act ("STA") was also violated. While this Court has not yet decided the issue, both the Second and Ninth Circuits have held that the speedy trial clock is not reset to  zero following the conclusion of an interlocutory appeal but is instead only resumed at that point. The government agreed below that, were this position to be adopted the STA would have been violated, as 71 days had elapsed. This Court should follow the reasoning of the Second and Ninth Circuits and order the dismissal of the indictment against Carpenter. The STA was also violated because the district court failed to make sufficient findings to support an ends-of-justice continuance, and, accordingly, even were the Court to conclude that the speedy trial clock restarted after the government's appeal, the STA was nonetheless violated.

Newly-available evidence which emerged after the conclusion of Carpenter's second trial demonstrates that Merrill and its three employee-witnesses engaged in

20

a concerted cover-up to protect their own interests which included concealing documents exculpatory to Carpenter and testifying falsely at Carpenter's trial. That false testimony fatally compromised Carpenter's right to a fair trial, as the false testimony of the Merrill witnesses went to the heart of Carpenter's good faith defense. With the new evidence a jury would probably reach a very different result and find that the government had not disproven Carpenter's good faith beyond a reasonable doubt. A new trial should be ordered in the interests of justice.

The theory of fraud on which the government relied at trial rested on Carpenter's omissions to inform the Exchangors that he was investing their funds in stock options and had begun to incur substantial losses. A defendant cannot be convicted on an omissions theory of fraud unless the government proves beyond a reasonable doubt that he had an independent duty to disclose the information *and* that he knew that he had such a duty, which the evidence in this case did not suffice to prove. Moreover, the jury was not instructed regarding the requisites for conviction on an omissions they of fraud.

Carpenter's sentence was procedurally and substantively unreasonable in that the district court failed to properly consider (1) the causes of the loss that were beyond Carpenter's control and (2) the horrendous ordeal to which this 10-year prosecution had already subjected him and improperly considered (1) the impact of

21

the delay on Exchangors, and (2) a Connecticut indictment pending against Carpenter. For these reasons, this matter should, at minimum, be remanded for resentencing.

The district court erred in ordering a $14 million forfeiture because Carpenter did not "acquire" the Exchangors' funds within the meaning of 18 U.S.C. §981(a)(2)(B). The funds at all times remained the property of the Exchangors, and Carpenter never had access to, or control of, them for his personal use. Even should the Court conclude that forfeiture was appropriate, the amount ordered by the district court was excessive, as it did not account for BPETCO's direct costs in providing its services.

## ARGUMENT

## I.    THE TEN-YEAR DELAY BETWEEN INDICTMENT AND FINAL JUDGMENT VIOLATED CARPENTER'S SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL.

### A.    Standard of review.

Constitutional claims are generally reviewed *de novo*. *See, e.g., United States v. Monserrate-Valentin*, 729 F.3d 31, 58 (1st Cir. 2013); *United States v. Neto*, 659 F.3d 194, 200 (1st Cir. 2011). Moreover, this Court reviews *de novo* issues arising under other clauses of the Sixth Amendment. *See, e.g., United States v. Ramos-Gonzalez*, 664 F.3d 1, 4 (1st Cir. 2011) (Confrontation Clause); *United States v.*

*Yelaun*, 541 F.3d 415, 420 (1st Cir. 2008)(jury trial right). This Court also reviews

statutory Speedy Trial Act claims *de novo. See, e.g., United States v. Maryea*, 704

F.3d 55, 63 (1st Cir. 2013).

This Court has, however, said that it reviews a district court's Sixth

Amendment speedy trial ruling for abuse of discretion. *See, e.g., United States v.*

*Munoz-Franco*, 487 F.3d 25, 58 (1st Cir. 2007). In this view, it is joined by the

Second Circuit. *See, e.g., United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012).

Every other circuit reviews *de novo* the district court's legal conclusion regarding

whether there was violation of the defendant's Sixth Amendment speedy trial right

and its subsidiary findings for clear error. *United States v. Lopesierra*, 708 F.3d 193,

203 (D.C.Cir. 2013); *United States v. Velazquez*, ___ F.3d ___, 2014 WL 1410153

at *6 (3d Cir. April 14, 2014); *United Stares v. Brice*, 38 Fed. Appx. 898, 900 (4th

Cir. 2002); *United States v. Bishop*, 629 F.3d 462, 466 (5th Cir. 2010); *United States*

*v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007); *United States v. Hills*, 618 F.3d 619, 629

(7th Cir. 2010); *United States v. Summage*, 575 F.3d 864, 875 (8th Cir. 2009);

*United States v. Corona-Verbera*, 509 F.3d 1105, 1114 (9th Cir. 2007); *United States*

*v. Larson*, 627 F.3d 1198, 1207 (10th Cir. 2010); *United States v. Villarreal*, 613 F.3d

23

1344, 1349 (11th Cir.2010).[11] Given the fundamental nature of the right, Sixth Amendment speedy trial claims should also be reviewed *de novo*. They should not be subject to a more deferential standard of review than are other Sixth Amendment claims and Speedy Trial Act claims.

### B.    Sixth Amendment Speedy Trial Standards.

The indictment in this case was returned on February 4, 2004 – more than four years after the last of the transactions charged – and Carpenter first appeared in the district court on February 24, 2004. App:7. Carpenter was not sentenced until February 26, 2014, more than ten years later.[12] That extraordinary delay in resolution of this prosecution violated the Sixth Amendment speedy trial guarantee.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." "If the government violates this constitutional right, the criminal charges must be dismissed," *United States v. Dowdell*, 595 F.3d 50, 60 (1st Cir.2010), *citing Strunk v. United States*, 412 U.S. 434,

---

[11] In *United States v. Salimonu*, 182 F.3d 63, 69 n.2 (1st Cir. 1999), this Court noted that most circuits review *de novo* the legal conclusion that the Sixth Amendment speedy trial right was not violated but concluded that, as "a newly-constituted panel," it was not "at liberty to revisit the standard of review."

[12] When the preindictment delay from 2000 until 2004 is included, more than fourteen years passed between the date of the alleged offenses and Carpenter's sentencing, fully one-third of Carpenter's adult life.

24

439-40 (1973), and that dismissal must be with prejudice. *See, e.g., United States v. Young*, 657 F.3d 408, 413 (6th Cir.2011); *United States v. Elmardoudi*, 501 F.3d 935, 943 n.7 (8th Cir. 2007).

The speedy trial guarantee of the Sixth Amendment was designed, in substantial part, "to reduce the . . . substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. Loud Hawk*, 474 U.S. 302, 311 (1986). *See, e.g., United States v. Marion*, 404 U.S. 307, 320 (1971)("Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends"); *Strunk*, 412 U.S. at 439 ("The speedy trial guarantee recognizes that a prolonged delay may subject the accused to an emotional stress that can be presumed to result in the ordinary person from uncertainties in the prospect of facing public trial . . . .").

Given these paramount concerns for limiting the duration of the defendant's ordeal which lie at the heart of the Sixth Amendment's speedy trial guarantee, the guarantee should extend from indictment through sentencing. Both the Supreme Court and this Court have assumed, without deciding, that the right to speedy trial

extends to sentencing. *See Pollard v. United States*, 352 U.S. 354, 361 (1957); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 60 (1st Cir. 2003). As this Court noted in *Nelson-Rodriguez*, "most circuits that have addressed this issue have held that the right to a speedy trial extends to [sentencing]." *Id. See, e.g., Burkett v. Cunningham*, 826 F.2d 1208, 1220 (3d Cir. 1987);*United States v. Abou-Kassem*, 78 F.3d 161, 167 (5th Cir. 1996); *United States v. Santiago-Hernandez*, 493 Fed. Appx. 840, 843 (9th Cir. 2012); *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir. 2006);*United States v. Miter*, 446 Fed. Appx. 244, 246 (11th Cir. 2011); *see also United States v. Yelverton*, 197 F.3d 531, 533 (D.C.Cir. 1999)(assuming that Sixth Amendment speedy trial right extends to sentencing); *but see United States v. Ray*, 578 F.3d 184, 198 (2d Cir. 2009)(holding that Sixth Amendment speedy trial guarantee does not apply to sentencing proceedings").

To determine whether Carpenter's Sixth Amendment right to speedy trial was violated by the various delays in the district court proceedings which totaled more than ten years between indictment and sentencing, the Court applies the four-part balancing test established in *Barker v. Wingo*, 407 U.S. 514 (1972), which requires a weighing of: "(1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant resulting from the delay." *Dowdell*, 595 F.3d at 60. *See Nelson-Rodriguez*, 319 F.3d at 60. Courts are

to "weigh all of the factors collectively before deciding whether a defendant's right to a speedy trial has been violated." *Dowdell*, 595 F.3d at 60. A reasoned assessment of these factors under the unusual circumstances of this case compels the conclusion that Carpenter's Sixth Amendment right to a speedy resolution of the criminal proceedings against him was violated.

## C.    Sixth Amendment Standards Applied to the Circumstances of this Case.

### 1.    The length of the delay.

"Length of delay, in addition to factoring into the balance, serves as a triggering mechanism for review, since a court will conduct a Sixth Amendment analysis only after a defendant has shown that the period of time 'has crossed the threshold dividing ordinary from presumptively prejudicial delay.'" *United States v. Souza*, ___ F.3d ___, 2014 WL 1613708 at *3 (1st Cir. April 18, 2014), *quoting Doggett v. United States*, 505 U.S. 647, 651-52 (1992). This Court has recognized that "[g]enerally, delay becomes prejudicial around the one-year mark." *Id. See, e.g., Doggett*, 505 U.S. at 652 n. 1; *United States v. Munoz-Amado*, 182 F.3d 57, 61 (1st Cir.1999)(nineteen months); *United States v. Santiago-Becerril*, 130 F.3d 11, 21 (1st Cir.1997)(fifteen months). *See also United States v. Ferreira*, 665 F.3d 701, 707-08 (6th Cir. 2011)(35-month delay presumptively prejudicial; indictment dismissed).

27

Here, the ten-year delay plainly surpasses by a wide margin whatever line separates "normal delay" from the presumptively prejudicial and triggers analysis of the other three *Barker* factors, as the district court correctly found. Add:50. The extraordinary length of the delay in this case is entitled to substantial weight in the *Barker* balancing analysis.[13]

### 2. The reasons for the delay.

This second *Barker* factor "is often considered the focal inquiry." *United States v. Trueber*, 238 F.3d 79, 88 (1st Cir. 2001). Here, 80 months of the 10 years' delay was attributable to just three events: (1) the government's first interlocutory appeal, which caused the delay from the filing of the government's notice of appeal on January 9, 2006, App:28, until the issuance of this Court's mandate in *United States v. Carpenter*, 494 F.3d 13 (1st Cir. 2007), on September 28, 2007, a process which consumed more than 20 months; the delay from the hearing on Carpenter's new trial motion on December 3, 2008, until the district court's ruling granting a new trial on September 1, 2011, a delay of 34 months, and (3) the delay from the filing of the

---

[13] While the district court found that the delay in this case was "enough to trigger the inquiry into the other factors," Add:50, it does not appear that it weighed the extraordinary length of the delay in this case in the *Barker* balancing process, as it was required to do. *See, e.g., United States v. Trueber*, 238 F.3d 79, 87-88 (1st Cir. 2001). The delay here was at the "extreme end of the spectrum." *Souza*, 2014 WL 1613708 at *4; *see Barker*, 407 U.S. at 534 (terming five-year delay "extraordinary").

government's notice of appeal on September 29, 2011, until this Court's decision in *United States v. Carpenter*, 736 F.3d 619 (1st Cir. 2013), on November 25, 2013, a delay of 26 months. Each of these periods should be assessed separately.

### a.   The first interlocutory appeal.

"Under *Barker*, delays in bringing the case to trial caused by the Government's interlocutory appeal may be weighed in determining whether a defendant has suffered a violation of his rights to a speedy trial." *Loud Hawk*, 474 U.S. at 316. "In *Loud Hawk*, the Supreme Court identified the factors courts may consider in assessing the purpose and reasonableness of an interlocutory appeal: (1) the strength of the government's position on the appealed issue; (2) the importance of the issue in the posture of the case; and (3) in some cases, the seriousness of the crime." *Trueber*, 238 F.3d at 88. The district court found that the government's appeal was not frivolous but was "legitimate and justifiable." Add:51. While the Supreme Court has said that "an interlocutory appeal by the Government *ordinarily* is a valid reason that justifies delay," *id.* at 315 (emphasis added), under the circumstances of this case, it is not.

What distinguishes this case from other cases addressing the impact of an interlocutory appeal by the government on the constitutional speedy trial balance is that the government was, as this Court and the district court concluded, guilty of misconduct in its closing arguments which so tainted the trial as to warrant the

granting of a new trial and then took an interlocutory appeal to defend the indefensible. The government, this Court concluded, made a "calculated decision" to use "provocative" metaphors in its closing arguments, thereby knowingly courting the risk that the district court would conclude that the prejudice to Carpenter required a new trial in the interest of justice. *Id.* The district court found, and this Court agreed, that the government's "repeated references to gambling *were intended to*, and did, inflame the jury's passions against the defendant." *Carpenter*, 494 F.3d at 22 (emphasis added). *Id.* The district court's granting of a new trial "[did] not even approach being an abuse of discretion." *Id.* at 29 (Lynch, J., concurring).

Thus, the government alone was responsible for the intentional misconduct in its closing arguments, and its position on appeal was not a strong one. Confronted with the district court's new trial order, the government had two choices: it could proceed to retry Carpenter or it could pursue its weak interlocutory appeal. It chose the latter course and lost. Given the government's misconduct, this delay should be weighed in favor of the finding of a speedy trial violation. The government bears the responsibility for bringing a case to trial in timely fashion, *see, e.g., Barker*, 407 U.S. at 531; *Souza*, 2014 WL 1613708 at *4, and it should have honored that responsibility rather than squandering more than 20 months in an interlocutory appeal.

Weighing this time against the government is particularly appropriate under the

30

circumstances of this case. Had the government not engaged in deliberate misconduct during final arguments at the first trial, Carpenter would have either been acquitted or convicted in 2005 and sentenced shortly thereafter. Had the government chosen to retry Carpenter after the district court's new trial ruling rather than pursue its fruitless appeal, Carpenter would likely have been retried and either acquitted or convicted and sentenced in 2006. Instead, the case went on for an additional *eight years*, delay which would never have occurred but for the government's first interlocutory appeal. It is, accordingly, appropriate to count the *entire* delay against the government.

### b.    The district court's delay in deciding the new trial motion.

The almost three-year delay between the hearing on Carpenter's new trial motion and the district court's decision on the motion should count heavily in favor of finding a speedy trial violation. The district court termed this delay "regrettable," (as did this Court, *Carpenter*, 736 F.3d at 632 n.10), but sought to blame a substantial portion of the delay on Carpenter. Add:51-52. That assessment should be rejected. In support of its conclusion, the district court listed a number of pleadings filed by Carpenter following the second trial. The first nine pleadings listed were filed *before* the December, 2008, hearing on the motions which began the  period of delay addressed here. As for the remaining pleadings – 12 pleadings over the course of almost three years – they, with only one exception, related to the newly-discovered

31

evidence of false testimony by the Merrill witnesses which is discussed in Section III, *infra*. Those filings do not provide a rational or justifiable basis for blaming Carpenter for the three-year delay, particularly as the court did not even address the Merrill issue in its 2011 order. Moreover, all but two of the filings identified by the district court were filed more than a year before the district court finally issued its ruling,  one a brief discussion of supplemental authorities, Doc. 373, and the other a Status Report, Doc. 374.  The extraordinary delay in deciding the acquittal/new trial motion cannot be attributed to any degree to Carpenter. The reason for this delay weighs heavily in favor of finding a speedy trial violation.

### c.     The second interlocutory appeal.

While the government prevailed in this appeal, that should not end the speedy trial reason-for-delay inquiry, as, even if the government cannot be faulted for taking the appeal, it can be faulted for the glacial pace at which the appellate proceedings moved. 18 U.S.C. §3731 requires that interlocutory appeals "be diligently prosecuted" by the government. In addition, "[t]he courts of appeals [are] expected to dispose of these appeals with despatch so that the interest of justice, both on the part of the defendant and the Government, will be met as quickly as possible." *United States v. W.R. Grace*, 526 F.3d 499, 521 (9th Cir. 2008)(internal quotation marks omitted).

32

As this court's docket in this appeal, No. 11-2131, shows, the appeal was docketed on October 5, 2011, but the government thereafter took no steps to prosecute the appeal diligently, even though Carpenter repeatedly reminded this Court and the district court that the passage of time was deeply prejudicial to Carpenter. *See* Section I(C)(3), *infra.* It did not move for expedited consideration, it did not ask the Court to set a briefing schedule, and it did not file a brief until after this Court set a briefing schedule in May, 2013, *nineteen months* after the appeal was docketed in this Court, and thereafter sought, and was granted, a six-week extension of time to file its brief. *See, e.g., United States v. Jenkins*, 490 F.2d 868, 869 n.2 (2d Cir. 1973)("the Government's notice of appeal was filed on November 21, 1972, but its brief was not filed until June 13, 1973. This scarcely conforms with our notion of diligent prosecution"). Carpenter filed his brief in timely fashion, and the government sought a one-week extension to file its reply brief. Once briefing was completed, this Court heard argument and issued its decision in two months. For these reasons, much of this 26-month delay should weigh in favor of finding a speedy trial violation.

### 3.    Carpenter's assertion of the right.

Contrary to the district court's conclusion, Add:52, this factor should weigh in Carpenter's favor. The district court's discussion omits many of the ways in which Carpenter sought to obtain speedier resolution of the case. On October 28, 2009 –

33

almost two years before the district court issued its ruling on his acquittal/new trial

motion – Carpenter filed a pleading in which he pointed out that he had been awaiting

the district court's acquittal/new trial ruling for more than sixteen months (dating

from the time of the motion's filing) and was suffering from ongoing prejudice

because of the limbo he was in, *see* App:2358, 2383, telling the court that there was

"no need for further delay" because the district court had all the information it needed

to decide the pending motion. App:2365, 2383. On December 2, 2009, Carpenter

asked the court to "promptly rule upon the pending motions for a new trial."

App:2963. On June 17, 2010, Carpenter filed an informational letter which again

urged the district court to act on his pending motions. App:3008-14. On January 11,

2011, Carpenter again asked the court to decide his motions, pointing out the length

of time the case had been ongoing and the continued prejudice to him. App:3035.

Finally, on July 14, 2011, Carpenter filed a motion for a status conference, again

pointing out the length of time the motions had been pending and the ongoing

"emotional and psychological" cost to Carpenter. App:3056. This last filing is the

only one mentioned by the district court. *See* Add:53. By repeatedly reminding the

district court how long the motions had been pending without decision and of the

terrible toll the delay was taking on him, Carpenter did effectively assert his speedy

trial rights, as, until the district court ruled on the motions, the proceedings could not

34

go forward; there could be no new trial until the district court granted one.

Against the long delays caused by the government's two interlocutory appeals and the district court's extraordinary delay in ruling on the new trial motion, the district court set two comparatively brief periods of delay which the defense assented to or sought. The first of these was a continuance of the trial date before the first trial of this case, which resulted in a seven-month delay of the first trial, Add:52-53; the second involved the setting of the date for the second trial. Add:53. The periods of delay involved in these scheduling matters pales into insignificance when compared to the length of the delay attributable to the interlocutory appeals and the decision on the new trial motion.

### 4.    Prejudice to Carpenter.

The district court acknowledged that this factor should weigh in Carpenter's favor, but it erred in the amount of weight attributed to it. The district court's conclusion that the prejudice which Carpenter suffered was no more than the "ordinary" suffering typical of defendants awaiting trial or sentencing, Add:54, is at odds with the reality of a ten-year delay between indictment and sentencing, which inflicted upon Carpenter a protracted ordeal of exponentially increased anxiety and

emotional suffering.[14] As the Supreme Court has stated, "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652. *See Souza*, 2014 WL 1613708 at *4 ("a lengthier delay raises the likelihood that the defendant suffered prejudice"). The extended emotional roller coaster of these proceedings, the prolonged infringement of Carpenter's liberty through restrictions on his ability to travel, the disruption of his career, the lost business opportunities, the public ridicule and obloquy he has suffered, and the tremendous drain on his financial resources in being required to defend not just two trials but also two appeals prior to final judgment, *see* App:2977-79, 3076-78, all remove this case from the ordinary. In 2008, when the PSR was prepared, long before the second new trial was ordered, Carpenter described his life as living in a "state of siege," unable to sleep, suffering panic attacks, and finding his life such a "living hell" that he on a number of occasions contemplated suicide. SApp:45. The "living hell" went on for almost six more years before Carpenter was finally sentenced, with intensified anxiety, extreme weight gain, sleeplessness, waking in the middle of the night, and obsessional thinking about the pending prosecution, as attested by a psychiatrist whose report was submitted to the district court. *See* App:3086; SApp:137. This factor should weigh

---

[14] In *Santiago-Becerril*, 130 F.3d 11, 21 (1st Cir. 1997), relied on by the district court, Add:54, the delay was only 15 months.

36

heavily in the speedy trial balance.

In sum, an appropriate weighing of the *Barker* factors compels the conclusion that Carpenter's Sixth Amendment right to a speedy trial was violated in this case and that the indictment should be dismissed with prejudice.

## II. THE INDICTMENT MUST BE DISMISSED FOR VIOLATION OF THE SPEEDY TRIAL ACT.[15]

### A. An Interlocutory Appeal by the Government Does Not Reset the Speedy Trial Clock, and the Speedy Trial Act Was, Therefore, Violated in this Case.

The question presented here is one of first impression in this Circuit: whether an interlocutory appeal simply suspends the running of the statutory speedy trial clock during its pendency or instead resets the speedy trial clock at zero upon the issuance of the appellate court's mandate. Here, there were, at minimum, according to the government's own calculation, 13 non- excludable days prior to its filing of its notice of appeal on January 9, 2006, and 58 non-excludable days after the issuance of this Court's mandate in *Carpenter*. App:116, 122. Since the Speedy Trial Act ("STA") requires that a defendant be brought to trial in 70 days, 18 U.S.C. §3161(c)(1), not counting days attributable to excludable matters or events specified in §3161(h), if the speedy trial clock restarted, rather than reset, upon the issuance of this Court's

---

[15] These is a legal issue which the Court will review *de novo*. *See, e.g., United States v. Maryea*, 704 F.3d 55, 63 (1st Cir. 2013).

mandate, 71 non-excludable days had accrued, and the indictment was required to be dismissed.[16] *See United States v. Barnes*, 159 F.3d 4, 9 (1st Cir. 1998).

Under §3161(h)(1)(C), the delay resulting from an interlocutory appeal is excluded from the computation of an ongoing speedy trial clock. The issue here is whether the 13 non-excludable days prior to the government's appeal remained on the clock, *i.e.*, whether §3161(e) restarts the speedy trial clock after an interlocutory appeal by the government of the grant of a new trial. The only answer consistent with the policies and purposes of the STA and the structure of the statute itself is that time devoted to interlocutory appeals is governed by §3161(h)(1)(C) and that an interlocutory appeal interrupts, *but does not reset*, the speedy trial clock.

The Ninth Circuit confronted this issue in *United States v. Pitner*, 307 F.3d 1178 (9th Cir. 2002). In that case, the district court and the parties assumed that a new speedy trial clock began at the conclusion of the defendant's interlocutory appeal. This was assumption was mistaken, the Court stated, because "[t]he effect of

_____

[16] In responding to Carpenter's speedy trial motion, the government, while contending that the STA had not been violated, urged the district court that "it would be prudent to dismiss the indictment without prejudice" because, "given the absence of relevant authority in the First Circuit and the split of opinion among other circuits, the government is apprehensive about the prospect that upon the defendant's appeal of his conviction at retrial, this matter might be remanded for a third trial if the First Circuit decides that the clock was not reset upon the issuance of its mandate." App:117, 122. *See* App:3276-77.

this interlocutory appeal was to *interrupt,* not to restart, the running of the 70-day

clock." *Id.* (emphasis in original). The Court rejected the argument that §3161(e)

applies to interlocutory appeals and thus starts a new 70-day period:

> We cannot agree that § 3161(e) permits the Speedy Trial clock to restart upon
> the decision of an interlocutory appeal following a mistrial. An interpretation
> of § 3161(e) that restarted the clock after an appeal would be quite correct
> when the appeal overturned a judgment of conviction entered by the trial court;
> the appellate decision then would have caused a retrial when none would have
> otherwise occurred. *But in the present circumstances, when a retrial was
> already ordered and the interlocutory appeal sought merely to abort it, the
> 'action occasioning the retrial' was the mistrial order, as we and the Second
> and Fourth Circuits have ruled.*

*Id.* The Second Circuit had earlier reached the same conclusion in *United States v.*

*Rivera*, 844 F.2d 916 (2d Cir. 1988), concluding that "the "action occasioning the

retrial' was the district court's grant of the mistrial motion . . . ." *Id.* at 919. The Court

continued:

> In a case where the appellate court orders a new trial after conviction, it is the
> appeal that constitutes "the action occasioning the retrial", and the 70-day
> period begins to run, according to § 3161(e), on the date the appeal becomes
> final. In the situation at hand, however, an interlocutory appeal after the district
> court had declared a mistrial, the 70-day period had already started to run anew
> when the mistrial was declared, and the speedy trial clock resumed on the date
> the exclusion allowed for an interlocutory appeal, §3161(h)(1)(E), ended, i.e.,
> when the appeal became final.

*Id.* (emphasis added). *See, e.g., United States v. Ginyard*, 572 F.Supp.2d 30, 36

(D.D.C. 2008)("An interlocutory appeal interrupts, but does not restart the running

of the clock"); *United States v. Dessesaure*, 527 F.Supp.2d 193 (D.Mass. 2007)(correct STA calculation would have included "the non-excludable days that accrued prior to the government's appeal," because time attributable to an interlocutory appeal "is excluded from the STA calculation . . . , but the clock is not reset to day one"), *rev'd on other grounds*, 556 F.3d 83 (1st Cir. 2009). [17]

The structure of §3161(e) bears out this conclusion. The first sentence of §3161(e) provides: "If the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." The "action occasioning the retrial" here  was the district court's December 15, 2005, order granting Carpenter a new trial, and that order was "final"

---

[17] In *United States v. Kington*, 875 F.2d 1091  (5th Cir. 1989), on which the district court relied in rejecting Carpenter's speedy trial claim, Add:11, the Court reached the opposite conclusion, but that case is distinguishable on its facts. In *Kington*, the district court granted the defendant's suppression motion after the jury was empaneled and declared a mistrial for the specific purpose of permitting the government to appeal that ruling. *See id.* at 1107. The Court concluded that "[w]here, as here, the mistrial is declared for the very purpose of permitting the appeal, it is more reasonable to regard disposition of the appeal, rather than declaration of the mistrial, as the event occasioning retrial" because "[t]here is no doubt when the mistrial is declared that the defendants will be retried, if at all, only following the appeal." *Id.* at 1109. Here, in sharp contrast, there is no question that the "event occasioning retrial" was the district court's new trial order. It is far from clear that the Fifth Circuit would have reached the same conclusion in a case with a different procedural background, such as this one.

as of December 15, 2005. Accordingly, a new speedy trial clock began to run on December 16, 2005. In the next sentence, §3161(e) provides: "If the defendant is to be tried again following an appeal or a collateral attack, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final . . . ." In such cases, the "action occasioning the retrial" is the appellate opinion ordering the retrial, which becomes final upon the issuance of the appellate mandate. These two sentences plainly refer to two different actions – the first to action by the district court and the second to action by an appellate court.

In ruling on Carpenter's STA dismissal motion, the district court construed "becomes final" in the first sentence of §3161(e) to mean the issuance of the appellate mandate, concluding that to do otherwise would render "becomes final" superfluous. Add:11-13. But it does not, as "final" means different things depending upon the actor occasioning the retrial. Where the actor is the district court, "final" refers to the finality of the new trial order itself, the date of which may differ depending upon the circumstances.  For example, a new trial order may be pronounced orally in open court, but it is not "final" until entered on the docket.

The district court's analysis also suffers from the stark inconsistency of its construction with the all-encompassing language of §3161(h)(1)(C), which provides that delay attributable to interlocutory appeals is *excludable*. It is also inconsistent

41

with the purpose of the STA, which is "to implement the Sixth Amendment's right to a speedy trial, . . . a right designed to limit the time during which criminal charges are hanging over a person's head unresolved." *United States v. Janik*, 723 F.2d 537, 542 (7th Cir. 1983). *See, e.g., United States v. Saltzman*, 984 F.2d 1087, 1090 (10th Cir. 1993)("The dual purpose of the Speedy Trial Act is to protect a defendant's constitutional right to a speedy indictment and trial, and to serve the public interest in bringing prompt criminal proceedings"). Were the district court's interpretation correct, the government would be able to circumvent the time constraints of the STA by taking an interlocutory appeal and thereby wipe out the entirety of the non-excludable days which had already accumulated, regardless of how many or how close the speedy trial deadline, a result Congress surely did not intend, as evidenced by the existence of §3161(h)(1)(C).

The STA was violated in this case, and the indictment should be dismissed.

**B.    Even assuming *arguendo* that the speedy trial clock reset after the issuance of this Court's mandate, the STA was nonetheless violated.**

Assuming *arguendo* that the speedy trial clock started anew, the parties and the district court agreed that 58 non-excludable days elapsed between the issuance of this Court's mandate on September 28, 2007, and the status conference on November 26, 2007, at which the district court set a trial date of May 5, 2008. It did so, however,

without making the oral or written on-the-record findings required to exclude the time as a §3161(h)(7)(A) (then §3161(h)(8)(A)) "ends of justice" continuance. Nothing was said at the status conference about the STA until the very end, when government mentioned the STA, and the district court said nothing more than that the time would be excluded.[18] *See* Doc. 228.

18 U.S.C. §3161(h)(7)(A) provides that no delay resulting from a continuance granted by the court under that subsection "shall be excludable . . . unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial); *See, e.g., Zedner v. United States*, 547 U.S. 489, 506-07 (2006); *United States v. Huete-Sandoval*, 668 F.3d 1, 3, 5 (1st Cir. 2011). "[I]f a judge fails to make the requisite findings regarding the need for an ends-of-justice continuance, the delay resulting from the continuance must be counted." *Larson*, 627 F.3d at 1204, *quoting Zedner*, 547 U.S. at 508. *See, e.g., United States v. Bryant*, 523 F.3d 349, 361 (D.C.Cir. 2008); *United States v. Valdivia*, 680 F.3d 33, 40 (1st Cir. 2012)(district court "must articulate clearly the reasons that support an ends-of-justice continuance").

---

[18] While the relevant docket entry, entered the following day, states that "[a]ll time between 11/26/07 and 5/5/08 is excluded in the interests of justice," no findings were made on the record.

Although the Supreme Court indicated in *Zedner* that the district court's findings could be entered on the record as late as the time at which it ruled on the defendant's motion to dismiss on speedy trial grounds, it emphasized that the findings must have been "*made*, if only in the judge's mind, *before* granting the continuance." 547 U.S. at 506-07 (emphasis added). *See, e.g., Larson*, 627 F.3d at 1204 ("These findings may be entered on the record after the fact, but they may not be *made* after the fact" (emphasis in original)).

Here, while the district court did make oral remarks at the time of the hearing on defendant's speedy trial motion, those remarks do not demonstrate that the court actually conducted the necessary balancing *at the time it ordered the continuance. See* App:3281-82, 3285. Nor does the district court's written order demonstrate the requisite contemporaneous balancing. *See* Add:9-11. Thus, the November 26, 2007, continuance did not stop the speedy trial clock, which kept running for another 22 days until December 17, 2007, by which time, even assuming *arguendo* that the speedy trial clock reset to zero after the issuance of this Court's mandate in the government's interlocutory appeal, non-excludable days had mounted to 80. The STA was, accordingly, violated for this reason as well, and the indictment must be dismissed.

44

III.   **THE NEWLY-DISCOVERED EVIDENCE OF FALSE TESTIMONY BY THE MERRILL WITNESSES REQUIRES THE GRANTING OF A NEW TRIAL.[19]**

A central component of the government's case was the testimony of three witnesses who had worked with Carpenter at Merrill – Stern, Levine, and Rasmussen – who testified that they were unaware of the nature of BPETCO's §1031 exchange business and unaware that the funds that were being invested were third-party funds, App:922, 953, 1017-18, and suggested that the information provided by Carpenter when he opened the accounts misled them into believing that the funds were his own. App:958-59. New evidence which emerged during civil litigation against Merrill by certain Exchangors now proves what Carpenter was unable to prove at trial: it conclusively demonstrates that these witnesses conspired to testify falsely at Carpenter's trial to shield themselves and Merrill from allegations of wrongdoing, *see Cahaly v. Benistar Property Exchange Trust Co.*, 2014 WL 2523192 (Mass. App. June 6, 2014)(holding that counsel for Merrill wrongfully withheld documents

---

[19] This Court ordinarily reviews a district court's denial of a motion for new trial for abuse of discretion. *See, e.g., United States v. Rodriguez*, 675 F.3d 48, 58 (1st Cir. 2012). That deferential standard is called for, this Court has also said, because '[t]he trial judge, having seen and heard the witnesses at first hand, has a special sense of the ebb and flow of the recently concluded trial," and, therefore, its "views about the likely impact of newly disclosed evidence deserve considerable deference." *United States v. Mathur*, 624 F.3d 498, 504 (1st Cir. 2010). Here, however, there is nothing to defer *to* – the district court never articulated any reasons for denying the motion for new trial based on the newly discovered Merrill evidence.

45

demonstrating Merrill's knowledge that BPETCO was trading third-party funds and discussing the false testimony by Rasmussen),  and that, from the outset, Carpenter was open and transparent with Merrill about the nature of BPETCO's business and the source of the funds which would be invested.  At trial, the Merrill witnesses provided the jury with substantial reason to discredit Carpenter's good faith defense on the theory that, if Carpenter really believed that his investments were proper, he would not have led Merrill to believe that it was his own money he was investing and would have fully disclosed the nature of BPETCO's business and the fact that the funds it handled were the escrowed funds of §1031 exchanges. The new evidence, however, convincingly demonstrates that Merrill knew from the outset that Carpenter was investing clients' funds and that Carpenter did not mislead Merrill – a reality which would powerfully support Carpenter's ultimate factual defense that he believed in good faith that he had the discretion to invest the §1031 funds.

## A.    The Newly-Discovered Evidence and Its Impact.

The new evidence consists of testimony given by Merrill witnesses in subsequent civil proceedings and Merrill documents which were responsive to the government's grand jury subpoena in this case but were intentionally withheld by Merrill and did not become available until after they were disclosed to the plaintiffs in the civil proceedings. That new evidence demonstrates, beyond peradventure, that

Merrill wilfully engaged in a massive cover-up designed to protect its own interests at the expense of Carpenter's right to a fair trial which encompassed the suppression of thousands of pages of documents and a concerted pattern of perjury and false testimony by Merrill witnesses at Carpenter's trial.

Merrill's concealment first began to emerge in February, 2009, when new counsel for Merrill revealed that he had "found files in the possession of Merrill Lynch that contain documents related to [BPETCO]." App:2252. On March 16, 2009, Merrill's counsel acknowledged that, while some of them had been newly identified, others "had been collected previously, but were not produced." App:2253-54. On March 18, 2009, the government turned over approximately 670 pages of documents received from plaintiffs' counsel to Carpenter. *See* App:2257. Thereafter, roughly 5,000 pages of "newly-discovered" materials were produced to Carpenter, and the Exchangors conducted numerous depositions of Merrill witnesses in the civil litigation. *See* App:2318.

Two of the major thrusts of the government's examination of the Merrill witnesses were to elicit evidence which would lead the jury to believe that Carpenter actively concealed from Merrill the nature of BPETCO's business and the funds being invested and evidence that Carpenter's investment strategy was so risky, and his losses so great, that Merrill felt compelled to cut off his trading. In fact, the new

47

evidence convincingly shows, Carpenter was open and transparent with Merrill from the outset, and Stern and Levine knew that BPETCO was a §1031 intermediary which held and invested clients' funds, and the Merrill compliance chief ordered that the account be closed to further trading not because of Carpenter's investment strategy or his losses but because Merrill feared liability to the clients whose funds had been invested. The testimony of the Merrill witnesses at trial seriously – and manifestly unfairly – undermined Carpenter's defense that he believed in good faith that he could invest the Exchangors' funds as he did. If Carpenter believed that his actions were proper, jurors no doubt asked themselves, why did he conceal from Merrill that he was investing third party funds? The truth is that he did not.

### 1.   New evidence as to Stern and Levine.

At trial, Stern was adamant that he did not know, either at the outset or later in 2000, that Carpenter was trading with third-party funds; although he acknowledged that BPETCO wire transfer requests would have revealed this information, he denied ever looking at them or at the BPETCO website. App:907-08, 922, 952-53. Stern even went so far as to say that he would have thought something "suspicious" was going on had he seen the references to escrow funds on the wire transfer requests. App:947. Stern further testified that he participated in the decision to stop Carpenter's trading because he agreed that Carpenter was taking too many risks and that everyone

48

involved in the decision concurred. App:882-83, 887, 889. As has been previously discussed, Levine categorically denied ever having a conversation with Patterson or receiving documents from him. App:995-1000, 1002-17. Equally emphatically, he denied knowing from October, 1998, that Carpenter was in the property exchange business, App:1017-18, and denied speaking with Paley in October, 1998. App:1018, 1023-25. Like Stern, Levine denied ever having seen any of the wire transfer requests that made it clear that the funds were those of third parties and testified that, had he seen them, he would have assumed that BPETCO was purchasing properties on its own behalf. App:1034-40.

At her subsequent deposition in the civil case, Nancy Sawyer, a Merrill employee who was designated as a Merrill corporate spokesperson and who was responsible for approving BPETCO wire transfers, testified that she learned from Carpenter that BPETCO's business was buying and selling properties on behalf of its clients *and that Levine shared that understanding*. The wire transfer authorizations listed clients' names, and, when a wire transfer was requested, she would ask Levine if it were for a closing. It was clear, she said, from the letters of authorization that BPETCO was acting on behalf of clients. App:2472-73, 2478, 2483-84, 2493-94. In addition, Peter Seale, an assistant vice-president in Merrill's Monetary Control Unit, testified in the civil proceedings that, when he called the branch where BPETCO's

49

account was located (the branch where Stern and Levine worked) in July, 2000, to inquire about a large outgoing BPETCO wire transfer, he was informed that BPETCO was a §1031 intermediary which held clients' funds. App:2498-99. Thus, Levine knew – because Carpenter, Paley, and Patterson told him in October, 1998 – that BPETCO was a §1031 intermediary which held and invested clients' funds – and, if Levine knew, which he did, then it is inconceivable that Stern did not, as the two worked closely together on the account. Moreover, the new evidence shows that Merrill had actual, institutional knowledge that BPETCO was a §1031 intermediary and that Carpenter was investing third-party funds, yet it stood by while the government elicited false and misleading testimony from its witnesses, disclosing the truth to neither the government nor Carpenter.

Also among the new evidence produced by Merrill was a September 28, 2000, email from the branch manager, Hassan Tabbah, to Rasmussen (and from Rasmussen to Stern), stating that compliance officer Marty Malia wanted a letter from Stern and Levine regarding the extent of their knowledge that Carpenter was managing other people's money, App:2624, giving them obvious incentive to falsify the state of their prior knowledge.

In a newly-disclosed December 6, 2000, letter, written two months *after* the BPETCO accounts were transferred to PaineWebber, Levine invited Carpenter to

return to Merrill and trade stock options in the same "risky" technology stocks that Levine and Stern, during their trial testimony, criticized Carpenter for investing in. App:2635. Had this document been available to Carpenter at trial, he would have been able to counter the witnesses' testimony and refute the government's argument that Merrill kicked him out because of "risky" options trading and large losses, given that two months later he was welcomed back to engage in the same "risky" options trading.

Had Levine and Stern testified truthfully, they would have acknowledged that Merrill was at all times aware that BPETCO was a §1031 intermediary and that it was trading third-party funds and would have acknowledged that no one at Merrill ever suggested to Carpenter that this was in any way problematic. Levine adamantly denied having *any* contacts with Patterson, thus creating a conflict of testimony with Patterson and the concomitant uncertainty whether the jury credited Levine's knowingly false testimony to Carpenter's detriment. The new evidence would not only have significantly bolstered Patterson's testimony and not only have impeached the integrity of Stern and Rasmussen's testimony, it would, most pivotally, have provided affirmative, substantive and irrefutable proof that Carpenter was transparent with his brokers – thus proving he did not believe trading with his clients' funds was illegal or even improper. If the jury knew that Levine was lying regarding never

51

having spoken to Patterson, it could, by extension, also have believed that he was lying about never having talked to Paley and, indeed, could have led the jury to disbelieve his entire testimony.

### 2.    New evidence as to Rasmussen.

The false Merrill testimony continued with Thomas Rasmussen, who testified at Carpenter's trial that he believed that Carpenter's description in a September, 2000, letter of Merrill Lynch as a repository for BPETCO's clients referred to "his Benistar relationships"). Rasmussen also testified at his deposition that he "must have" seen printouts of the BPETCO website in September, 2000, that showed that BPETCO was "like an escrow agent type of deal," App:2810, proving that he knew, at least by September, 2000, that Carpenter was trading third-party funds. He also testified that Marty Malia, the head of the Merrill compliance department, wanted the account closed because of Carpenter's trading strategy. App:1120.

In his civil deposition, however, Rasmussen admitted, contrary to his trial testimony, that, whatever he thought Carpenter's reference to Merrill's being a "repository for our clients," he did *not* think it meant other Benistar companies. App:2376.[20] He also admitted at that deposition that he had testified falsely at

---

[20] Rasmussen also admitted at his deposition that he testified falsely at Carpenter's trial about the timing and circumstances under which he and Levine informed Carpenter that the BPETCO accounts were being closed, App:2816, and

Carpenter's trial. App:2828-30. Rasmussen's testimony, and, inferentially, that of

Stern and Levine, was also shown to be false by the later deposition testimony of

Malia, who testified that he visited the BPETCO website in September, 2000, and

immediately recognized that BPETCO was an escrow agent for its clients. He further

testified that his decision, based on Carpenter's trading strategy alone, had been to

limit the account to covered call writing, a more conservative form of options trading.

It was only after he learned that Carpenter was trading third-party funds that he

mandated that the account be closed. App:2813-25.

In addition, Merrill's Assistant General Counsel testified at his civil deposition

that he was "dismayed" when he reviewed the new documents – some of which had

been found behind a credenza in the office of Rasmussen's successor, raising an

inference of deliberate concealment – and found that the testimony of Merrill

employees at Carpenter's trial was inconsistent with the facts evidenced by the

documents. One of the "most significant" inconsistencies, he said, was the testimony

"that no employee at Merrill had had any suspicions that Benistar was trading other

people's money." App:3012. Also inconsistent with the truth was the trial testimony

that "the accounts were closed solely because Mr. Carpenter wouldn't listen to their

---

that Merrill submitted reports regarding the matter to the SEC and the NASD that
were false. App:2550-52.

advice." App:3013.

This testimony contrasts markedly with – and demonstrates the falsity of – the testimony of all three Merrill witnesses which focused exclusively on  – and thus emphasized for the jury – Merrill's assessment of the risky nature of Carpenter's trading and his mounting losses, painting a picture of a decision in which all those concerned at Merrill concurred, when in truth and in fact, the decision was Malia's alone and the decision to close the account stemmed not from Carpenter's trading strategy or losses, but instead Malia's discovery that Carpenter was trading third-party funds, something which at least Stern and Levine had known from the outset and from which they reaped substantial benefit in the form of bonuses based on the more than half a million dollars in commissions which BPETCO paid Merrill, App:889-91, and which they each in tandem concealed from the jury that convicted Carpenter.

### B.     The New Evidence Requires the Granting of a New Trial.

The district court may grant a motion for new trial "if the interest of justice so requires," Fed. R. Crim. P. 33(a). A new trial should be granted "where a miscarriage of justice would otherwise result." *United States v. Garcia-Pastrana*, 584 F.3d 351, 390 (1st Cir. 2009), *quoting United States v. Del-Valle*, 566 F.3d 31, 38 (1st Cir. 2009). This case presents a hybrid of perjured testimony – some knowingly presented

54

by the government, as the district court found, Add:37, and some presented unwittingly by the government because of Merrill's massive withholding of information from it. "To gain a new trial based on newly discovered evidence [where the prosecution did not know that the testimony was perjured], a defendant normally must pass a four-part test: he must show that (i) the evidence in question was unknown or unavailable to him at the time of trial; (ii) his failure to learn of it did not result from a lack of due diligence on his part; (iii) the evidence is material; and (iv) the evidence, if available upon retrial, would likely bring about an acquittal." *United States v. Mathur*, 624 F.3d 498, 503 (1st Cir. 2010). *See, e.g.*, *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980). However, where the government knowingly presented perjured testimony, the latter two elements of the *Wright* test are relaxed, and a defendant need only show that "the false testimony could in any reasonable likelihood have affected the judgment of the jury," *United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007), *i.e.*, whether the trial produced a verdict "worthy of confidence." *United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 20 (1st Cir. 2001), *quoting Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

### 1. The government's knowing presentation of, and failure to correct, Levine's false testimony.

"[A] conviction obtained through the use of false evidence, known to be such

by representatives of the State, must fall under the [Fifth] Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id*. The government had at least two options in response to Levine's false testimony. When Levine denied having any conversation with Patterson, the government could have requested a bench conference to work out "how to inform the jury that the testimony is false." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000). Alternatively, the government could have attempted to correct the false testimony during its redirect of Levine. *See United States v. Kattar*, 840 F.2d 118, 128 (1st Cir. 1988). Doing neither was not an option, yet that is precisely what the government did here. Instead of acting to correct the false testimony, the government elected to leave the matter to the defense cross-examination and then permitted the false testimony to percolate in the jury's minds until it called Patterson as its penultimate witness a week later. Although this Court concluded that the violation was mooted by successful cross-examination, *Carpenter*, 736 F.3d at 630-31, the Court did not have before it the new evidence demonstrating that the false testimony by the Merrill witnesses was far more pervasive – and far more destructive of Carpenter's right to a fair trial – than simply Levine's denial of having spoken to Patterson. The government's knowing elicitation of false testimony from Levine should be reconsidered in the context of all the new

56

evidence of perjury and false testimony by Merrill witnesses and new substantive

evidence of Carpenter's good faith.

> **2.    The newly-discovered evidence was unknown or unavailable to Carpenter at the time of trial, and his failure to learn of it did not result from a lack of due diligence on his part.**

The new information and documents at issue here were either unknown or

unavailable to Carpenter at the time of trial. While Carpenter received the letter from

Levine inviting him to return to Merrill in December, 2000, he did not have the

physical document necessary to prove at trial that it had been sent; had the matter

been available, it is clear from the cross-examination of Levine that it would have

been used at trial. Absent the letter itself, Levine would no doubt have steadfastly

denied its occurrence, as he did with respect to his conversations and correspondence

with Patterson and Paley. As for the testimony of Nancy Sawyer, while Carpenter had

the conversations with her from which she learned the nature of BPETCO's business,

he did not have access to the crucial information that she knew that Levine was also

aware of it, information which emerged only at her later deposition. Moreover, had

he sought information from Sawyer at the time of trial or attempted to call her as a

witness, it is highly likely that she, too, would, have adopted Merrill's party line at

the time, *i.e.*, that Merrill was unaware of the nature of BPETCO's business and of

the funds it held. Given Merrill's intransigence, and its obvious determination to

57

obstruct justice at Carpenter's trial, no amount of diligence on Carpenter's part would have uncovered the information. *See United States v. Montilla-Rivera*, 115 F.3d 1060, 1065-66 (1st Cir. 1997)(*Wright* test satisfied where evidence is known but not available at trial).Thus, the first two components of the *Wright* test are satisfied.

### 3.    The new evidence is material and, if available upon retrial, would likely bring about an acquittal.

The last two components of the *Wright* test are satisfied as well. New evidence is material if it has the potential "to alter the outcome of the lawsuit under the applicable legal tenets." *United States v. Hernandez-Rodriguez*, 443 F.3d 138, 145 (1st Cir. 2006). One of the factors courts look to in assessing the third and fourth *Wright* factors is the strength of the government's case. *Id.* at 147. It is therefore important to stress that the district court here found the evidence sufficient, "but not overwhelming." *Carpenter*, 808 F.Supp.2d at 380. This Court has stated that "where the government's case against a defendant is sufficient, but underwhelming, new, credible testimony 'could lead to a different outcome.'" *Hernandez-Rodriguez*, 443 F.3d at 147, *quoting Montilla-Rivera*, 115 F.3d at 1066. Such is the case here.

As we now know, the duplicity of the Merrill witnesses went much farther than Levine's denial of speaking with Patterson and contaminated a major portion of the government's case. Had Merrill disclosed this information to the government as it

should have, the government would have been forced to restructure much of its presentation of testimony from the Merrill witnesses, and a retrial of this case would look very different from the trial which occurred. A central focus of the government's examination of the Merrill witnesses was to portray Carpenter as a reckless "riverboat gambler" investor who ignored Merrill's pleas to diversify and invest more conservatively until it reached the point that Merrill decided to close the account to further options trades. With the new evidence in the possession of Carpenter and the government (which, under *Brady v. Maryland*, 373 U.S. 83 (1963), the government would have had an obligation to disclose to Carpenter), the government would have been forced to scale back its emphasis on the riskiness of Carpenter's trading (or, alternatively, Carpenter could have exposed the falsity of the testimony, while at the same time eliciting substantive evidence of his good faith). The truth, as we now know, is that Merrill did not close the account because of Carpenter's chosen investment strategy and his mounting losses but because Merrill's compliance department discovered something which had been known to Levine and Stern from the outset – that Carpenter was trading with third-party funds. This new evidence is particularly important in light of the government's closing argument which stressed to the jury, as part of its arguments regarding what Carpenter omitted to tell the Exchangors, that Carpenter did not tell them the reason he was "kicked out of Merrill

59

Lynch," App:1910; *see* App:1922 ("none of the exchangors . . . were ever told what was actually going on with Merrill Lynch . . . .") meaning his options trading and his losses, when in fact that was *not* the reason Merrill closed the account to further trading.

A new trial – one which eliminated the fundamental unfairness introduced into this trial by Merrill's suppression of evidence and the false testimony of its witnesses – would paint a considerably more nuanced picture, one which a rational jury could find consistent with a good faith belief by Carpenter that he was permitted to invest the Exchangors' money as he did. Indeed, given the newly-revealed issues with Levine's testimony, in addition to the perjury which the government already knew about, the government may well not have called Levine as a witness at all and could well not do so at a new trial, thereby eliminating testimony such as Levine's "riverboat gambler" reference which can only have severely prejudiced Carpenter's good faith defense.

The new evidence would also have proven that Carpenter was open with Merrill from the outset regarding the nature of BPETCO's business and the funds which Carpenter was investing and that Carpenter had not, as Levine and Stern testified, led them to believe that the money was his own. The trial testimony of the Merrill witnesses generated the fundamentally incorrect impression that, because

60

Carpenter concealed from Merrill the source of the funds with which he was trading, he could not have been acting with a good faith belief that such trading with the Exchangors' funds was permissible. In fact, the truth would show that Carpenter's dealings with Merrill, far from being duplicitous and misleading, were, from the outset, characterized by complete openness about the nature of BPETCO and its funds, conduct highly probative of a good faith belief that what he was doing was proper.

Good faith is a complete defense to wire and mail fraud charges, and the government bears the burden to disprove good faith beyond a reasonable doubt. *See, e.g., United States v. Callipari*, 368 F.3d 22, 33 (1st Cir. 2004), *vacated on other grounds*, 543 U.S. 1098 (2005); *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991). The district court so instructed the jury in this case. App:1886-87. In ruling on Carpenter's acquittal motion, the district court stated that the Patterson evidence "and other similar circumstantial evidence, could have supported an inference that the defendant acted in good faith and lacked the specific intent to defraud. But the jury could have determined that any inference raised by this evidence was disproved by the other evidence from which the defendant's specific intent to defraud could be inferred." Add:35. Much of that evidence from which the jury might have inferred a specific intent to defraud rested on the false and misleading testimony of the Merrill

witnesses. The concerted pattern of false and/or fundamentally misleading testimony by the Merrill witnesses regarding both the history of Carpenter's relationship with Merrill and what he did and did not tell them regarding BPETCO and its funds was seriously detrimental to the jury's fair consideration of the central component of Carpenter's defense, his good faith belief in the propriety of his investments. With the new evidence, which is both impeaching and substantive, a jury would probably reach a very different result and find that the government had not disproven Carpenter's good faith beyond a reasonable doubt. A new trial without the fundamental unfairness caused by Merrill's obstruction of justice should be ordered in the interests of justice.

## IV. THE EVIDENCE WAS INSUFFICIENT TO CONVICT CARPENTER ON THE GOVERNMENT'S NEWLY-EMERGED OMISSIONS THEORY, NOR WAS THE JURY INSTRUCTED REGARDING THE REQUIREMENTS OF FRAUD BY OMISSION.

The indictment in this case charged mail/wire fraud predicated on the theory that BPETCO fraudulently induced certain Exchangors to use its services through the use of affirmative false statements. *See, e.g.,* App:65, 68-69, 71, 76, 77, 78, 80-87. By the time of the second trial, however, the government's theory had morphed into one relying on Carpenter's omissions to inform the Exchangors that he was investing their funds in stock options and had begun to incur substantial losses, as demonstrated by the government's closing arguments. *See, e.g.,* App:1895 ("Carpenter put the

exchangors' money into options knowing full well that not a single exchangor agreed, *or was even told*, that Carpenter would be risking their money for that purpose"(emphasis added)); App:1903 ("the marketing materials were misleading because they did not give the slightest warning . . . that the funds would go into options . . . ."); App:1906 ("he deliberately did not put those warnings into the Exchange Agreements . . . ."); App:1909 ("what those agreements didn't say and what no one was ever told . . . ."); App:1910 (Carpenter did not tell exchangors why he was "being kicked out of Merrill Lynch"); App:1915 (Carpenter did not tell exchangors "what he was actually doing with the money and what they were exposed to"); App:1922 ("none of the exchangors . . . were ever told what was actually going on with Merrill Lynch and PaineWebber"); App:1964-65 ("The defendant gave them no reason to believe that there was anything else afoot"); App:1966 ("Who didn't know about the options strategy? All the people you heard from who signed these contracts . . . ."); App:1967 ("None of this was told to the exchangors, of course. None. Not a whiff of this"); App:1968 ("He was using the money in a way that had not been disclosed to the exchangors . . . .").

Carpenter never spoke to any of the exchangor-clients who contracted for 126 separate exchanges and transmitted funds to BPETCO, and in particular never spoke to the Exchangors at issue, who sent funds to BPETCO in April-November, 2000. It

63

was the trading losses as of April, 2000, and the receipt thereafter of Exchangors' funds which formed the predicate for the district court's admission of evidence regarding loss as relevant to Carpenter's state of mind. *See* Add:29-30, 35-36. Thus, the essence of the prosecution theory required that Carpenter, who was located in Connecticut and responsible for the funds after they were entrusted to BPETCO, assume the duty, when the NASDAQ became exceptionally volatile and Carpenter's trades were losing money, *i.e.*, beginning in April, 2000, to reach out to the Exchangors – something he had never done in BPETCO's entire existence – and either provide them with additional information regarding the nature of BPETCO's investments and its current negative trading balance or amend the exchange documents themselves to make the disclosure. There are, however, two insurmountable problems with the government's omissions theory of mail/wire fraud: (1) the jury was not instructed on the essential elements of fraud by omission; and (2) the evidence did not suffice to permit conviction on an omissions theory because it failed to prove that a new duty of fuller disclosure was triggered by the market losses beginning in spring, 2000, through November, 2000, the only period charged in the indictment, and further failed to prove that Carpenter had the *mens rea* necessary to support a scheme to defraud based on omissions, as required by circuit precedent.

## A.     Sufficiency of the Evidence.[21]

A scheme premised on Carpenter's failure to notify current or prospective clients that he was trading in options or that he was sustaining substantial losses is insufficient as a matter of law here because the government offered insufficient evidence to demonstrate that Carpenter had an affirmative, legal duty to supplement the contracts, which were literally truthful, either orally or in writing.  Only a person with some fiduciary relationship or legal duty can be held responsible for such half-truths or omissions,[22] and the government failed to establish a factual premise for the jury to conclude any such duty existed here or that Carpenter knew of such a duty if, *arguendo*, one existed.

Silence provides a permissible basis for a finding of criminal fraud *only* where there was an independent duty to disclose.  *See, e.g., United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012); *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993); *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). "There is no general obligation of the seller to

---

[21] This Court reviews sufficiency of the evidence claims "*de novo*, considering the evidence, both direct and circumstantial, in the light most friendly to the verdict." *United States v. Bobadillo-Pagan*, 747 F.3d 26, 32 (1st Cir. 2014).

[22] The district court declined to give the government's proposed fiduciary duty instruction because "there was not a fiduciary duty in the transactions that led to the formation of the Exchange Agreements." App:1841.

65

tell the buyer everything negative that the buyer might be interested in learning about the transaction or item to be purchased;" "it would be a truly revolutionary change to make a criminal out of every salesman . . . who did not take the initiative to reveal negative information about the product and who – a jury might find – harbored in his heart the hope that the buyer would never ask." *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1998). The government's failure to offer sufficient factual evidence to support the existence of such a duty warranted a judgment of acquittal here, whether the predicate for a conviction is described as a pure omission (as contended by the defense) or as a failure to supplement written agreements that are accurate but incomplete, *i.e.*, that include "half-truths."

In addition, the evidence did not suffice to prove that, even if such a new legal duty of disclosure arose, Carpenter knew that a duty which did not exist in 1998-99 had arisen during the course of 2000 and required affirmative action on his part. In sum,  the evidence did not prove that Carpenter had the required *mens rea* for conviction on an omissions theory. *See Cassiere*, 4 F.3d at 1022 (approving instruction).

### B.    The Failure to Instruct.

 Despite the government's open reliance on an omissions theory of fraud, the jury was not instructed that it could not convict Carpenter based on omissions unless

it found that he had an independent duty to disclose the withheld information *and* that

Carpenter knew he had a duty to disclose.[23]   Since Carpenter did not object to the

absence of such instructions, this Court's review is for plain error. Under that

standard, the defendant must show (1) that an error occurred; (2) that the error was

clear or obvious; (3) that the error affected his substantial rights; and (4) that the error

also seriously impaired the fairness, integrity, or public reputation of judicial

proceedings." *United States v. Riccio*, 529 F.3d 40, 46 (1st Cir. 2008).  Given the

government's stress in its presentation of evidence and final argument on Carpenter's

omissions, the absence of a known-duty-to-disclose instruction both affected

Carpenter's substantial rights and impaired the fairness of his trial. In the absence of

such an instruction, the jury was left entirely without guidance as to the resolution of

a critical issue in the case: whether Carpenter, who never met or spoke with any of

the Exchangors, had a duty to either amend the marketing materials (which there is

---

[23] The district court instructed only that the term "false or fraudulent pretenses" encompasses "direct statements that are true in their entirety as well as statements of half-truths that are misleading because of what they omit, though what is said may be literally true," App:1885, and that "[t]o the extent the government asserts that the defendant intended to deceive by the use of half-truths or incomplete statements that omitted material information necessary to keep what was stated from being misleading, the government must prove that the defendant specifically intended those statements to be misleading or deceptive by reason of what they omitted." App:1886. At a later hearing on the issue, the district court stated its belief that the instructions as given covered the issue, App:3123-24, but they clearly did not.

67

no evidence he ever saw again after 1998) and the exchange documents or to orally disclose to prospective exchangors that their money would be invested in stock options and that he knew that he had such a duty. In short, absent such an instruction, the jury may have convicted Carpenter based on conduct that was not in fact criminal.

## V.    CARPENTER'S    SENTENCE    WAS    PROCEDURALLY    AND SUBSTANTIVELY UNREASONABLE.[24]

Carpenter's guidelines were calculated using the 2000 Guidelines Sentencing Manual. Under USSG §2F1.1, the base offense level was 6, to which the district court added 14 levels under §2F1.1(b)(1)(O) based upon a loss of $9,040,686, which resulted, with other adjustments not here relevant, in a total offense level of 24, which corresponds to a 51-63 month guidelines sentencing range ("GSR"). App:3135; Sapp:38-39, 50. The court sentenced Carpenter to a term of 36 months' imprisonment. Even though the district court imposed a sentence below the applicable GSR, the sentence was nonetheless substantively unreasonable because the district court failed to give sufficient weight to (1) the causes of the loss that were beyond Carpenter's control and (2) the horrendous ordeal to which this 14-year prosecution

---

[24] This Court reviews the reasonableness of a sentence for abuse of discretion, first "verify[ing] that the sentence was procedurally sound" and then "ensur[ing] that it was substantively reasonable." *United States v. Diaz-Maldonado*, 727 F.3d 130, 140 (1st Cir. 2013).

had already subjected Carpenter.

The §2F1.1 loss table "presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court." *United States v. Gregorio*, 956 F.2d 341, 347 (1st Cir. 1992). Where, however, the amount of the loss is "the product of several sources (e.g., an economic downturn, a market collapse . . .), in addition to the defendant's conduct," *United States v. Roen*, 279  F.Supp.2d 986, 990 (E.D.Wis. 2003), *quoting United States v. Forchette*, 220  F.Supp.2d 914, 924 (E.D.Wis. 2002), the loss figure based on which the offense level is calculated may overstate the seriousness of the offense. *See, e.g., United States v. Rostoff*, 53 F.3d 398, 406 (1st Cir. 1995)("multiple loss causation [is] a permissible basis for departing downward, and, indeed, [is] a departure-justifying reason that the guidelines encourage"). Such loss overstatement may occur when "[a]ny portion of the total loss sustained by the victim [is] a consequence of factors extraneous to the  defendant's criminal conduct." *United States v. Maldonado-Montalvo*, 356 F.3d 65, 69 (1st Cir. 2003), *quoting United States v. Reeder*, 170 F.3d 93, 109 (1st Cir. 1999). *See, e.g., United States v. Brennick*, 134 F.3d 10, 15 (1st Cir. 1998); *see also United States v. Rutkoske*, 506 F.3d 170, 178-79 (2d Cir. 2007).

The loss in this case was the direct product of a combination of unforeseen and

unforeseeable circumstances: the catastrophic collapse of the stock market and a presidential election which remained unresolved for almost two months, causing uncertainty in the markets and inhibiting market recovery. Carpenter's stock options investments generated sufficient funds to return to 119 of 126 exchangors *all* of their principal *plus* the stipulated 3% or 6% interest. Until January, 2001, all the exchanges were completed successfully. After more than a year of operation, Carpenter's investments had generated a net profit of $600,000, which remained in the BPETCO account and was *not* taken by Carpenter as profit. In fact, there has never been even an allegation that Carpenter took *any* of the exchangors' funds for himself. The losses of 2000 resulted from an unprecedented combination of economic and political forces far beyond Carpenter's control (and, in fact, confounding the predictions of many prominent experts). *See Rostoff*, 53 F.3d at 405 (upholding downward departure based in part on district court's finding that "economic forces not under the control of, or precipitated by, the defendants, especially the sudden, unforeseen collapse of the New England real estate market . . . increased the magnitude of the losses"). Given this reality, the 36 month sentence was substantively unreasonable.

In addition, the district court failed to give appropriate weight to the punishment which had already been inflicted on Carpenter by his 14-year ordeal. Carpenter's physical health suffered substantially over the course of this prosecution;

70

he gained 50-60 pounds due at least in part to stress and now "looks older than his stated age" and suffers from sleep apnea. SApp:137-38. The physical toll on Carpenter, however, pales in comparison with the psychological damage which he suffered from this "never-ending nightmare" during which he was "preoccupied with the criminal prosecution" and tortured by "frequent nightmares, awakening in the middle of the night with 'dark thoughts,'" contemplating suicide, and suffering noticeable deterioration of his long- and short-term memory. *Id.* His emotional turmoil was so great that he "cried repeatedly" and "sobb[ed] openly" while describing the ordeal to an evaluating psychiatrist. *Id. See* Section I(C)(4), *supra*. Moreover, his career has been ruined and his reputation forever tarnished. He lost his license to practice law, was forced to resign from the Avon Farms School Board of Directors, and suffered the ignominy of having his family name removed from the school's  playing fields which he donated. *See United States v. Buchanan*, 987 F.Supp. 56, 59 (D.Mass. 1997)(noting that banker convicted of misapplying funds would probably have been sentenced to probation in the pre-guidelines world because he was a 62-year-old first-offender who had "already been punished; the bank into which he had poured his life is closed and he is ruined" and he "now has the stigma of a felony criminal conviction").

In addition to these important considerations which the district court did not

71

properly consider in determining upon a 36-month sentence, the district court also

improperly predicated the sentence, in part, on two improper considerations. First, the

district court stated:

> I think as both the government and the gentlemen who spoke[25] have emphasized that the harm to the victims goes beyond a simple economic loss . . . and that is something that has to be accounted for. *In that respect, I would note that while the defendant's papers have argued . . . that the length of time the matter has been pending is something that should be considered favorably to the defense, I think we heard from the gentlemen who spoke that it counts on the other side of the ledger as well in terms of prolonging the harm felt by the people who were victims of the offense.*

App:3125-26 (emphasis added). As addressed in Section I, *supra*, the length of time

for which this matter remained pending is not something for which Carpenter can be

faulted and certainly not something which called for a higher sentence than might

otherwise have been imposed. It resulted from government misconduct during closing

arguments in the first trial, which led to the district court's granting of a new trial, to

an interlocutory appeal by the government, and later to the district court's three-year

delay in ruling on Carpenter's new trial a motion, followed by another interlocutory

appeal by the government. In relying on this factor, the district court "[gave]

significant weight to an improper or irrelevant factor," *United States v. Mangual-*

*Garcia*, 505 F.3d 1, 16 (1st Cir. 2007), *quoting United States v. Hack*, 403 F.3d 997,

---

[25] The district court was referring to Exchangors and their relatives who spoke at sentencing. App:3183-93.

1004 (8th Cir. 2005), another reason why the 36-month sentence is unreasonable.

The district court also considered an improper factor in relying on the fact that Carpenter had recently been indicted in the District of Connecticut as part of the deterrence calculus. App:3216-17. Those charges remain at the accusation stage. Carpenter has not yet had an opportunity to contest them, and using the return of the indictment as an indicium that a more severe sentence is called for is inconsistent with the presumption of innocence.

> An indictment is merely a charge and does not constitute evidence of guilt. That elementary rubric has long been a bedrock of instructions provided to jurors on voir dire examination and again in the final charge. It would be ill-advised to discard this principle in sentencing procedures. Grand juries enjoy broad latitude in the conduct of their proceedings, free from restrictive evidentiary rules and other protective incidents of our treasured adversary proceedings.

*United States v. Williams*, 22 F.3d 580, 582 (5th Cir. 1994). Consideration of this factor also renders the sentence unreasonable.

For all these reasons, the 36-month sentence imposed on Carpenter exceeded that which was "sufficient, but not greater than necessary" to serve the purposes of sentencing. 18 U.S.C. §3553(a).

## VI. THE DISTRICT COURT'S FORFEITURE ORDER SHOULD BE REVERSED.[26]

After the entry of judgment in this case, the district court entered an order granting the government's request for forfeiture in the amount of $14,053,715.52. Add:58. The district court, applying 18 U.S.C. §981(a)(2)(B), concluded that Carpenter "acquired" the Exchangors' funds because he "controlled" them for purposes of making investment decisions and the funds were "effectively in his custody." Add:60-61. This was error, as Carpenter never acquired any of the Exchangors' funds which were paid to BPETCO, and there were, therefore,  no "proceeds" subject to forfeiture.

The monies which the government identified as the forfeitable proceeds of the offense were monies entrusted to BPETCO by certain Exchangors. None of that money came to Carpenter. As §1031 funds, they were being held by BPETCO for return to the Exchangors with the chosen accrual of interest; Carpenter had no right to access them for his personal use, nor did he ever do so. There has never been any allegation that Carpenter took or obtained any of the Exchangors' money or that he owned or spent any of that money. The offense alleged here involved omissions

---

[26] This Court "review[s] questions of law de novo, but, to the extent factual issues are intermingled, consider mixed questions of law and fact under the more deferential clear error standard." *United States v. Ferrario-Pozzi*, 368 F.3d 5, 8 (1st Cir. 2004).

regarding how BPETCO would invest the money to generate the promised interest, not a fraud through which Carpenter generated monies which inured to his personal benefit or to which he had, and exercised, access for his personal benefit.

Unlike restitution, which addresses the losses to the victims, forfeiture "is a form of punishment designed to divest the criminal defendant of the profits of the illegal activity for which he has been convicted." *United States v. Ferrario-Pozzi*, 368 F.3d 5, 8 (1st Cir. 2004)(internal quotation marks omitted). *See, e.g., United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014)("While restitution seeks to make victims whole by reimbursing them for their losses, forfeiture is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice"); *United States v. Innarelli*, 524 F.3d 286, 293 n.7 (1st Cir. 2008)("unlike forfeiture, the purpose of restitution is not to disgorge from the defendant the property he gained at the victim's expense"). The forfeiture statutes do not contemplate punishing a defendant to the tune of many millions of dollars based on funds generated by the offense to which neither the defendant nor any coconspirators ever had access for his personal use.

In *United States v. Contorinis,* 692 F.3d 136 (2d Cir. 2012), a case involving forfeiture under §981(a)(2)(B), the Second Circuit considered whether the defendant could be required to forfeit monies which had been obtained through his insider

trading by the fund by which he was employed. The question turned on whether the defendant had "acquired" the money within the meaning of §981(a)(2)(B), and the Court found it "difficult to square the statute with the forfeiture order" because the proceeds sought by the government "were 'acquired' by the Fund over which appellant lacks control." *Id.* at 146. "While property need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture, *the property must have, at some point, been under the defendant's control* or the control of his co-conspirators in order to be considered 'acquired' by him." *Id.* at 147.  Because "extending the scope of a forfeiture to include proceeds that have never been acquired either by a defendant or his joint actors would be at odds with the broadly accepted principle that forfeiture is calculated based on a defendant's gains," *id.*, the Court reversed the forfeiture judgment because "the district court erred in ordering appellant to forfeit funds that were never possessed or controlled by himself or others acting in concert with him." *Id.* at 148. *See United States v. St. Pierre*, 809 F.Supp.2d 538, 545 (E.D.La. 2011)("[A]lthough his criminal actions produced the contract revenues, portions of those proceeds were diverted to his business partners before they ever could have been acquired by him. Accordingly, on these facts it is unreasonable and inconsistent with the purpose of forfeiture to require St. Pierre to forfeit funds which he neither

directly or indirectly acquired").

By the same token here, the funds were "acquired" by BPETCO, not Carpenter, who had no power or authority to assert dominion and control over the Exchangors' funds for his personal gain or any entitlement to them. The funds at issue were not BPETCO corporate funds but instead remained the property of the Exchangors which Carpenter invested; they were not taken by the company as profits but were instead held for the benefit of the Exchangors. Carpenter could not and did not access or use any of them for his personal benefit. Even if Carpenter controlled BPETCO's profits or other corporate assets, he did not "acquire" the Exchangors' funds held in BPETCO's §1031 investment accounts, either directly or indirectly. Those funds are not, accordingly, subject to forfeiture under §981(a)(2)(B).

Should, however, this Court conclude that forfeiture was properly ordered, the amount of the forfeiture should be reduced. 18 U.S.C. §981(a)(2)(B), the provision applicable here, provides that "proceeds" means "the amount of money acquired through the illegal transactions resulting in the forfeiture, *less the direct costs incurred in providing the goods or services*." Carpenter argued at sentencing that under §981(a)(2)(B), forfeiture could, at most, be approximately $9 million, as the monies returned to the Exchangors at issue were part of the direct costs of providing BPETCO's services and should, therefore, be deducted from the forfeiture amount

77

sought by the government. App:3145-57. *See United States v. Hollnagel*, 2013 WL 5348317 (N.D.Ill. Sept. 24, 2013). The district court found that Carpenter had not satisfied his burden of proof on this issue. Add:60. This was error. The forfeiture figure which Carpenter contended was the maximum amount of forfeiture which could be ordered, if forfeiture could properly be ordered at all, which he contested, was $9,040,686, the amount based on which the loss figure was calculated, *see* Section V, *supra*, which differed from the $14 million forfeiture sought by the government by an amount which had been returned to Exchangors to complete their exchanges. Thus, the district court had all the proof it needed to reduce the amount of the forfeiture by BPETCO's direct costs, as required under §981(a)(2)(B).[27]

## CONCLUSION

For the reasons addressed in Section I, *supra*, this Court should order that the indictment against Carpenter be dismissed with prejudice for violation of Carpenter's Sixth Amendment speedy trial right. Alternatively, for the reasons addressed in Section II*, supra*, the Court should order the indictment against Carpenter dismissed for violation of the Speedy Trial Act. Failing that, this Court should reverse

---

[27] Carpenter recently filed a motion for reconsideration with the district court, providing additional data regarding BPETCO's direct costs, which in fact exceeded the forfeiture amount ordered. *See* App:3289. The motion remains pending in the district court.

Carpenter's convictions for insufficient evidence, as addressed in Section IV(A), *supra*. If the convictions are not reversed, this Court should order a new trial for the reasons addressed in Sections III, IV(B), *supra*. If Carpenter's convictions are upheld, the Court should remand for resentencing for the reasons addressed in Section V, *supra*, and vacate the district court's forfeiture order for the reasons addressed in Section VI, *supra*.

                              Respectfully submitted,
                              By his attorneys,

**/s/ Kimberly Homan**                    **/s/ Martin G. Weinberg**
Kimberly Homan                           Martin G. Weinberg
20 Park Plaza, Suite 1000                20 Park Plaza, Suite 1000
Boston, Massachusetts 02116              Boston, Massachusetts 02116
Tel: (617) 227-8616                      Tel: (617) 227-3700
Fax: (617) 338-9538                      Fax: (617) 338-9538
homanlaw@aol.com                         owlmgw@att.net

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

Nos. 14-1286, 14-1641

_____

UNITED STATES OF AMERICA,
Appellee
v.

DANIEL E. CARPENTER,
Appellant

_____

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS

_____

This brief has been prepared using:

> 14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:

> Wordperfect Office X4, 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, appellant's Brief contains, in total:

18,987 words, as permitted by this Court's order dated June 10, 2014.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

**/s/ Kimberly Homan**
Kimberly Homan

80

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 13th day of June, 2014, I caused one copy of the Brief of Appellant Daniel E. Carpenter to be served on all parties of record via this Court's ECF system.  I further caused one copy of the Appendix and Sealed Appendix to be served by first-class mail, postage prepaid, on Christopher J. Smith, United States Department of Justice, 950 Pennsylvania Ave. NW, Suite 1264, Washington, DC 20530.

**/s/ Kimberly Homan**
Kimberly Homan

# ADDENDUM

## TABLE OF CONTENTS

Judgment, Dkt. 438…………………………………………………………… .    1

Order, Dkt. 242………………………………………………………….    9

Order, Dkt. 376………………………………………………………….    14

Opinion and Order, Dkt. 377………………………………………….    15

Opinion and Order, Dkt. 431………………………………………….    48

Opinion and Order, Dkt. 471………………………………………….    58

🔖AO 245B(05-MA)      (Rev. 06/05) Judgment in a Criminal Case
                     Sheet 1 - D. Massachusetts - 10/05

# UNITED STATES DISTRICT COURT
## District of Massachusetts

UNITED STATES OF AMERICA
### V.
### DANIEL CARPENTER

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **1: 04 CR 10029 - 001 - GAO**

USM Number:

MARTIN WEINBERG, ESQUIRE

Defendant's Attorney

☑ Additional documents attached

☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P.36)

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1s-19s ( Date of Verdict: 6/18/08 )
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:        Additional Counts - See continuation page ☑

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC Sec. 1343 | Wire Fraud | 09/08/00 | 1s ,2s |
| 18 USC Sec. 1343 | Wire Fraud | 08/08/00 | 3s |
| 18 USC Sec. 1343 | Wire Fraud | 08/09/00 | 4s |
| 18 USC Sec. 1343 | Wire Fraud | 11/22/00 | 5s |
| 18 USC Sec. 1343 | Wire Fraud | 09/14/00 | 6s |

The defendant is sentenced as provided in pages 2 through ___12___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   1-19 _____ ☐ is  ☑ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

02/26/14

Date of Imposition of Judgment

Signature of Judge

The Honorable George A. O'Toole

Judge, U.S. District Court

Name and Title of Judge

3/4/14

Date

✎AO 245B(05-MA)      (Rev. 06/05) Judgment in a Criminal Case
                     Sheet 1A - D. Massachusetts - 10/05

DEFENDANT: **DANIEL CARPENTER**

CASE NUMBER: **1: 04  CR  10029   - 001 - GAO**

Judgment—Page ___2___ of ___12___

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC Sec. 1343 | Wire Fraud | 08/16/00 | 7s |
| 18 USC Sec. 1343 | Wire Fraud | 12/01/00 | 8s,9s |
| 18 USC Sec. 1343 | Wire Fraud | 12/01/00 | 10s,11s |
| 18 USC Sec 1343 | Wire Fraud | 11/13/00 | 12s |
| 18 USC Sec. 1343 | Wire Fraud | 11/16/00 | 13s,14s |
| 18 USC Sec. 1341 | Mail Fraud | 11/08/00 | 15s |
| 18 USC Sec. 1341 | Mail Fraud | 11/21/00 | 16s |
| 18 USC Sec. 1341 | Mail Fraud | 09/14/00 | 17s |
| 18 USC Sec. 1341 | Mail Fraud | 09/20/00 | 18s |
| 18 USC Sec. 1341 | Mail Fraud | 12/14/00 | 19s |

✎AO 245B(05-MA)      (Rev. 06/05) Judgment in a Criminal Case
                     Sheet 2 - D. Massachusetts - 10/05

Judgment — Page   3   of   12

DEFENDANT:  **DANIEL CARPENTER**
CASE NUMBER: **1: 04  CR  10029  - 001 - GAO**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:      36      month(s)

on each of counts 1s-19s, all to be served concurrently with each other.

[✓] The court makes the following recommendations to the Bureau of Prisons:

The court recommends to the Bureau of Prisons that they take into consideration the defendant's family circumstances when designating a facility.

[ ] The defendant is remanded to the custody of the United States Marshal.

[ ] The defendant shall surrender to the United States Marshal for this district:

   [ ] at _____ [ ] a.m.  [ ] p.m.   on _____ .

   [ ] as notified by the United States Marshal.

[✓] The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   [✓] before 2 p.m. on   04/25/14 _____ .

   [✓] as notified by the United States Marshal.

   [ ] as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

3

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 - D. Massachusetts - 10/05

| | Judgment—Page 4 of 12 |
|---|---|

DEFENDANT:  **DANIEL CARPENTER**                    ⊞
CASE NUMBER:  **1: 04 CR 10029  - 001 - GAO**

## SUPERVISED RELEASE

☑ See continuation page

Upon release from imprisonment, the defendant shall be on supervised release for a term of :     36   month(s)

on each of counts 1s-19s all to be served concurrently with each other.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed  104  tests per year, as directed by the probation officer.

☑ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer.  (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

✎AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
                   Sheet 4A - Continuation Page - Supervised Release/Probation -10/05

DEFENDANT:   **DANIEL CARPENTER**                        Judgment—Page ___5___ of ___12___
CASE NUMBER:  **1: 04  CR  10029   - 001 - GAO**

## ADDITIONAL ☑ SUPERVISED RELEASE ☐ PROBATION TERMS

The defendant is to pay the balance of the restitution according to a schedule set by probation, or, if necessary, by the court after a hearing.

Defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

The defendant is to provide the probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the US Attorney's Office.

**Continuation of Conditions of ☐ Supervised Release ☐ Probation**

Case 1:04-cr-10029-GAO   Document 438   Filed 03/04/14   Page 6 of 21

AO 245B(05-MA)   (Rev. 06/05) Judgment in a Criminal Case
Sheet 5 - D. Massachusetts - 10/05

| | | |
|---|---|---|
| DEFENDANT: **DANIEL CARPENTER** | | Judgment — Page __6__ of __12__ |
| CASE NUMBER: **1: 04 CR 10029 - 001 - GAO** | | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** $ | $1,900.00 | $ $100,000.00 | $ $310,033.96 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Brian Fitzgerald | | $65,701.94 | |
| Estate of Byron Darling | | $244,332.02 | |

☐ See Continuation Page

| **TOTALS** | $ ____ $0.00 | $ ____ $310,033.96 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☑ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

6

Case 1:04-cr-10029-GAO    Document 438    Filed 03/04/14    Page 7 of 21

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 6 - D. Massachusetts - 10/05

Judgment — Page ___7___ of ___12___

DEFENDANT: **DANIEL CARPENTER**
CASE NUMBER: **1: 04 CR 10029  - 001 - GAO**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  ☐  Lump sum payment of $ _____ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☒  Special instructions regarding the payment of criminal monetary penalties:

    Payment of the fine and restitution is to begin immediately according to the requirements of the federal Bureau
    of Prisons' Inmate Financial Responsibility Program while the defendant is incarcerated and according to a
    court-ordered repayment schedule during the term of supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

☐  See Continuation Page

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States:

    If there are any proceeds, they are to be forfeited. The court to scheduled a hearing to determine the amount to be forfeited.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

℘AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
                    Sheet 5A - D. Massachusetts - 10/05

| | | Judgment—Page __8__ of __12__ |
|---|---|---|

DEFENDANT:     **DANIEL CARPENTER**
CASE NUMBER:   **1: 04  CR  10029   - 001  - GAO**

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

Any payments made, that is not payment in full, shall be divided proportionately among Brian Fitzgerald and Byron Darling until their restitution is fully satisfied.

The restitution shall be paid immediately or according to a payment scheduled set down by probation, or, if necessary, by the court after a hearing. Payments shall be made to the Clerk, U.S. district Court for transfer to the named victims.

The assessment fee is due forthwith.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 04-10029-GAO

UNITED STATES OF AMERICA

v.

DANIEL E. CARPENTER,
Defendant.

ORDER
April 8, 2008

O'TOOLE, D.J.

This order resolves the defendant's motion to dismiss the superseding indictment with prejudice for claimed violations of the Speedy Trial Act of 1974, as amended, 18 U.S.C. §§ 3161–3174 ("STA"). I conclude that no violation of the STA has occurred. The events relevant to my conclusion are as follows:

On December 15, 2005, I entered an order granting the defendant's motion for a new trial. The government filed a notice of appeal on January 9, 2006 and pursued an interlocutory appeal of the new trial order. The First Circuit affirmed that order and issued its mandate to that effect on September 28, 2007. On November 26, 2007, the parties appeared before this Court for a status conference, where a date for the new trial was discussed. At the conference, trial counsel for the defendant stated that he could not "try this case in March, April or May [2008] given my present commitments in other cases," and suggested a trial date in July 2008 was necessary for him to "prepare meaningfully" for a retrial. (Tr. of Status Conference 5, 8, Nov. 26, 2007.) The government was willing to accommodate defense counsel's schedule to some degree, but stated that "July seems

a little far off. So if there's something before July that the Court can do, all the better." (Id. at 6-7.)
A trial date was set for May 5, 2008.

At the close of the status conference, the government inquired as to the STA, and, with no objection from defense counsel, I responded that the time until trial would be excluded. (See id. at 11.) At the time, neither the Assistant United States Attorney nor I articulated the reason for excluding the time between the conference and the May 5 trial date, but the reason is apparent from the context of the entire discussion. See United States v. Barnes, 251 F.3d 251, 256 (1st Cir. 2001) ("[T]he trial court ordinarily must elucidate its reasons for approving such a continuance, save for cases in which those reasons are readily apparent from the circumstances." (citations omitted)). Trial counsel for the defendant was asking for sufficient time for him to prepare for the retrial, given his commitments in other cases. In any event, I set a date *earlier* than the defendant's trial counsel was seeking.

Implicit in the interchange at the conference was that setting the trial date beyond the time permitted by the existing status of the STA clock served the ends of justice because defense counsel required the time provided in order to adequately prepare and try the case. See 18 U.S.C. § 3161(h)(8)(A), (B). It may be noted that, although that particular attorney has since withdrawn his appearance, he was the principal trial attorney in the prior trial, so that accommodating his schedule was plainly to the defendant's benefit. To make explicit what was obviously implicit, I detailed this reasoning for the record when the parties appeared before me for a hearing on the defendant's motion to dismiss on March 26, 2008. See Zedner v. United States, 547 U.S. 489, 506–07 (2006) ("Although the Act is clear that the findings must be made, if only in the judge's mind, before granting the continuance … the Act is ambiguous on precisely when those findings must be 'se[t] forth, in the

2

record of the case.' However this ambiguity is resolved, at the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2).").

In the event of an order for a new trial, the STA requires that a retrial "shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). The "action occasioning the retrial" is the order granting the new trial. See id. To determine the appropriate date from which the STA clock begins to run, the question is when such action has become "final." See id.

The question is not directly answered either by the statutory text or interpreting precedent, but the most sensible reading of § 3161(e) is that the order granting the new trial became final on the date that the mandate issued from the Court of Appeals after conclusion of the government's appeal. See United States v. Rush, 738 F.2d 497, 509 (1st Cir. 1984) (noting that, in the context of an interlocutory appeal, "[c]ourts which have considered the question of when an appeal ends and the clock begins to run again for speedy trial purposes have generally held that the applicable date is the date on which the appellate court issues its mandate."); United States v. Mack, 669 F.2d 28, 29, 33 (1st Cir. 1982) (stating that, where the First Circuit reversed the district court's denial of a § 2255 motion, "[f]or computing speedy trial time limits, the date the 'action occasioning retrial becomes final' has been construed to mean the date on which the mandate of the court of appeals becomes final."); United States v. Kington, 875 F.2d 1091, 1108–09 (5th Cir. 1989) (viewing the "disposition of the appeal, rather than declaration of mistrial, as the event occasioning retrial."); United States v. Gilliss, 645 F.2d 1269, 1275–76 (8th Cir. 1981) (holding that an order granting a motion to vacate a sentence pursuant to 18 U.S.C. § 2255 became final under § 3161(e) when the time for appeal had

3

11

passed ten days later.) Interpreting the statute otherwise would render superfluous the statutory words "becomes final." Something more than just the trial court's allowance of the new trial motion – the "action occasioning the retrial" – is clearly required by a plain reading of § 3161(e) to reset the STA clock; that order must have become "final." That phrase usually is employed to signify the completion of any appellate review of the trial court's order.

This understanding of the language of § 3161(e) is also consistent with the legislative history of the STA. An early version of the bill that resulted in the statute would have required a retrial after mistrial or grant of a new trial to commence "within sixty days from the date of the mistrial, order granting a new trial, or remand." See S. 895, 92d Cong. § 3161(b)(3) (1971), reprinted in Anthony Partridge, Legislative History of Title I of the Speedy Trial Act of 1974, at 288 (1980). This language was later changed in a Senate subcommittee version of the bill to require a trial to commence "[i]f the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, within sixty days from the date the action occasioning the retrial becomes final." See S. 754, 99th Cong. § 3161(e) (1973), reprinted in Partridge, supra, at 297. The impetus for this change is not entirely clear, but the legislative history includes testimony of Judge Albert Lee Stephens, Jr. which addresses the issue:

> [I]f the defendant is to be tried again following a mistrial, and so forth, I think the provision which was made in the rule adopted by the Second Circuit, that it should be after these actions have become final, would be more appropriate there. Otherwise, you may have a trial in progress while the case is still subject to some appellate process.

See Partridge, supra, at 82. The problematic possibility of beginning a second trial while the order granting the new trial could still be reversed and the guilty verdict reinstated suggests that this change in language was not accidental, but rather was intended to delay the restart of the clock until after the

4

completion of any appellate review of the trial court's new trial order.     Accordingly, I conclude

that the STA clock did not reset until the order granting the new trial became final by reason of the

issuance of the mandate of the Court of Appeals on September 28, 2007. As of November, 26, 2007,

58 days of the allowed 70 days had elapsed. The time from November 26, 2007 to the present, and

further until the date for the commencement of trial, May 5, 2008, has properly been excluded under

§ 3161(h)(8)(B)(ii) and/or § 3161(h)(8)(B)(iv), as I stated at the motion hearing and have reaffirmed

here.

There has been no violation of the STA, and the defendant's motion to dismiss (dkt. no. 229)

is DENIED. The case stands for trial as scheduled.

It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
    United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 04-10029-GAO

UNITED STATES OF AMERICA

v.

DANIEL E. CARPENTER,
Defendant.


ORDER
September 1, 2011

O'TOOLE, D.J.

The defendant's motion for a mistrial (dkt. no. 283) regarding the testimony of Gerald

Levine is DENIED.

While it is clear to me that Levine testified falsely with respect to whether he had any

interaction with David Patterson, the government did not violate its obligations under Napue v.

Illinois, 360 U.S. 264 (1959). The government did not withhold, and in fact disclosed to the

defendant, information which impeached Levine's testimony about Patterson. The defendant

vigorously cross-examined Levine on the point. Moreover, the government later called Patterson

and elicited from him testimony that contradicted Levine's false testimony. The remedy of a

mistrial is not warranted.

It is SO ORDERED.


     /s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 04-10029-GAO

UNITED STATES OF AMERICA

v.

DANIEL E. CARPENTER,
Defendant.

OPINION AND ORDER
September 1, 2011

O'TOOLE, D.J.

The defendant, Daniel E. Carpenter, was, for the second time, tried before a jury on a

Superseding Indictment that alleged fourteen counts of wire fraud in violation of 18 U.S.C. § 1343

and five counts of mail fraud in violation of 18 U.S.C. § 1341. Following his first trial and

conviction in July 2005, this Court granted the defendant's motion for a new trial pursuant to

Federal Rule of Criminal Procedure 33 on the basis of several prejudicial inflammatory remarks

made by the government during its closing argument. United States v. Carpenter, 405 F. Supp. 2d

85, 101-03 (D. Mass. 2005). That order was affirmed on appeal, United States v. Carpenter, 494

F.3d 13, 24 (1st Cir. 2007), and subsequently the defendant was re-tried. After a very brief period

of deliberation, the second jury found the defendant guilty on all counts. He then moved again for

a judgment of acquittal or in the alternative for a new trial.

For the reasons discussed below, the evidence was sufficient to sustain a conviction on all

counts, and therefore the defendant is not entitled to a judgment of acquittal. However, because

there is a very substantial possibility that the jury's verdict was based on a theory of the case that

was not sufficient to support a conviction on any count, the interest of justice requires that the defendant's conviction be vacated and a new trial be ordered.

## I.    General Background

The defendant was the Chairman of Benistar, Ltd., a corporation headquartered in Simsbury, Connecticut. Benistar Property Exchange Trust Company, Inc. was a Benistar subsidiary located in Newton, Massachusetts. Martin Paley was its President. Because the corporate formalities are not significant for the issues at hand, these entities will both be referred to as "Benistar." The defendant and Paley formed the subsidiary to serve as a qualified intermediary in property exchanges performed pursuant to Section 1031 of the Internal Revenue Code. See 26 U.S.C. § 1031.

The functions necessary to Benistar's property exchange business were divided between the Newton office and the Simsbury office. Paley and the Newton office handled the marketing of Benistar's property exchange services to potential exchangors, as well as the logistical details of arranging the property exchange transactions. The defendant and the Simsbury office then handled the exchange funds, once obtained. These funds were placed in accounts at Merrill Lynch and, later, at PaineWebber, through which the defendant invested in securities, including stock options.

A property exchange, also known as a "like kind exchange," allows the seller of property—in this case, real estate—to defer the payment of capital gains tax when that property is exchanged for property of like kind—here, another piece of real estate. See id. § 1031(a)(1). When properly completed, this exchange allows the exchangor to delay recognizing a gain on the property sold. See id. The tax basis of the relinquished property carries forward to the replacement

2

16

property, and the recognition of a gain and payment of the attendant capital gains tax are thereby delayed until occasioned by some future event. See id. § 1031(d).

For the replacement property to qualify as "like kind" it must be identified within forty-five days and be purchased within one hundred and eighty days of the sale of the relinquished property. See id. § 1031(a)(3). The exchangor also must not receive the proceeds from the sale of the relinquished property, either actually or constructively, during the prescribed period. See 26 C.F.R. § 1.1031(k)-1(a). A qualified intermediary can be used to hold the sale proceeds in the interim, preventing the exchangor's receipt of the funds. See id. § 1.1031(k)-1(g)(4). The tax provisions contain no requirement or restriction as to how the qualified intermediary is to hold the proceeds, and, so far as the tax code is concerned, the intermediary may invest the proceeds or not in ways that it may see fit. The attributes of the relationship between the qualified intermediary and the exchangor are generally set by their private agreement.

## II.    The Superseding Indictment

The Superseding Indictment charged the defendant with fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 and five counts of mail fraud in violation of 18 U.S.C. § 1341. These statutes proscribe substantially the same conduct, the difference generally being in the use of either the mails or interstate wire communications. To convict the defendant of mail or wire fraud, the government had to prove beyond a reasonable doubt the defendant's knowing and willful participation in a scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises as to a material matter or matters, with the specific intent to defraud, and the use of the mails or interstate wire communications in furtherance

3

17

Case 1:04-cr-10029-GAO   Document 977   Filed 09/01/11   Page 4 of 35

of the scheme. See United States v. Woodward, 149 F.3d 46, 54 (1st Cir. 1998) (quoting United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996)).

Generally, the government alleged in the Superseding Indictment, and argued to the jury, that although Benistar represented to seven exchangors that their exchange funds would be held safely and securely in an interest-bearing account, instead the defendant was investing the exchange funds in risky stock options. It was a necessary part of the government's case to argue that the defendant specifically intended to obtain the exchangors' money by making false representations. The government's theory was that the defendant specifically intended to obtain the exchange funds on the basis of representations to the exchangors that the exchange funds would not be subjected to any risk and would simply be "parked" in an escrow account, when he knew that these representations were false because his investment strategy was in fact extremely risky.

Each of the nineteen counts of mail or wire fraud alleged represents an instance when funds were obtained by Benistar for a property exchange transaction between August 8, 2000 and December 14, 2000 with one of seven exchangors: Bellemore Associates, Joseph Iantosca, Byron Darling, Eliot Snider, Gail Cahaly, Brian Fitzgerald, and Jeffrey Johnston. Most of the exchangors entered into more than one transaction during this period, hence the nineteen counts.

**III.    Summary of Pertinent Evidence**

    A.    Representations

When soliciting potential exchangors, Paley routinely presented them with Benistar's standard marketing materials (the "marketing materials"). When Paley's marketing pitch proved successful, he presented the exchangors with the agreements necessary to effectuate the property exchange (the "exchange documents") and executed them on behalf of Benistar. The marketing

4

materials and exchange documents, and the allegedly false representations contained therein, were crucial pieces of evidence in the government's case against the defendant. Although the defendant was never directly involved in presenting these documents to the exchangors, the government connected these documents to him by evidence that he reviewed and approved all of the documents used by Paley, had authored some parts of them, and therefore had knowledge of and authorized the representations being made to the exchangors. An examination of the content of these documents is important.

### 1. The Marketing Materials

#### a. *PowerPoint Presentation Slides*

Paley prepared a PowerPoint presentation entitled "Benistar Presents: 1031 Tax-Deferred Property Exchanges," which explained the mechanics of a § 1031 exchange, its tax advantages, and the role of a qualified intermediary. It also provided guidance in choosing an intermediary and suggested why Benistar should be an exchangor's choice:

- Your selected qualified intermediary should have a lot of experience with exchanges. They should have an exemplary reputation among real estate and legal professionals. Examine their track record, and be sure to check references.

- Because unexpected details can have major ramifications, the intermediary should be able to manage the entire 1031 process, from beginning to end.

- A good benchmark for any proposed intermediary is their experience with reverse exchanges. Any firm which lacks this experience may not have what it takes to properly manage your exchange.

- Ask about the security of your funds, and find out what guarantees are offered. The intermediary should be bonded, and carry Errors & Omissions insurance coverage.

- This is a place where quality is imperative! Do not select an intermediary on the basis of price alone.

5

- With more than \$100MM in exchanges successfully completed since 1995, Benistar has the experience you need in a qualified intermediary.

- Benistar can manage your exchange from start to finish, because we know the entire process.

- Benistar routinely handles reverse exchanges.

- Merrill Lynch Private Bank is used for all our escrow accounts. This provides 3% – 6% interest on the escrow. Funds transfer is accomplished in a state-of-the-art environment, utilizing electronic wire transfers for security and timeliness.

(Trial Ex. 1 at 14-15.) These slides were shown or provided in paper form to Eliot Snider, (id.; Trial Tr. 2:113-114), Brian Fitzgerald, (Trial Ex. 59; Trial Tr. 4:119-124), an advisor to Bellemore Associates, (Trial Tr. 6:19), Jeffrey Johnston, (Trial Ex. 119; Trial Tr. 12:96-97), and Joseph Iantosca's attorney, (Trial Ex. 75; Trial Tr. 5:51-52). There was no evidence at trial that these slides were provided to Byron Darling or Gail Cahaly.

### b.     Frequently Asked Questions About 1031 Property Exchange

Paley provided to exchangors a document entitled "Frequently Asked Questions About 1031 Property Exchanges," which provided brief answers to such questions as "Why can't I just do this myself?," "Can't my attorney act as my Qualified Intermediary?," "My attorney or accountant isn't familiar with 1031. What can I do?," "Why shouldn't I use a title company to do my exchange?," "Will a Property Exchange flag me as Audit Bait?," "What type of property can I use as a replacement?," and "What if I cannot complete the exchange, or if the value of the replacement property falls short of the requirements?" (Trial Ex. 2 at 19-20.) It also answered the question, "What will the intermediary do with my money?":

> One important factor to consider in your selection of an intermediary is how they will handle your money. BENISTAR Property Exchange has a long-standing reputation for trustworthiness, and is part of BENISTAR LTD, the largest 419 trust plan administrator in the nation.

6

Case 1:04-cr-10029-GAO   Document 577   Filed 09/01/11   Page 7 of 33

> Benistar has accounts with major banking and investment firms, such as Merrill Lynch. As required under the Safe Harbor provisions for exchanges, these accounts are under our sole control. Escrow accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner. Written request is required for any disbursements.

(Id. at 20.) Paley provided this document to Eliot Snider, (Trial Ex. 2; Trial Tr. 2-114), the advisor to Bellemore Associates, (Trial Ex. 26), Brian Fitzgerald, (Trial Tr. 4:127), Joseph Iantosca's attorney, (Trial Ex. 76), and Jeffrey Johnston, (Trial Ex. 118). There was no evidence at trial that this document was provided to Byron Darling.

Gail Cahaly was provided with a different version entitled "IRC §1031 Property Exchanges: Frequently Asked Questions." (Trial Ex. 37.) This document similarly provided brief answers to questions such as "Why Can't I Do This Myself?," "How is BENISTAR Property Exchange Different from a Title Company Intermediary?," "Is Exchanging an 'Audit Trigger'?," "Can I Buy Any Type [sic] Investment Property as a Replacement?," "What If My Attorney or Accountant Is Not Familiar with Exchanges?," "Why Can't My Attorney or Accountant Act as My Qualified Intermediary?," "Where is Nationwide Property Exchange? Who is BENISTAR Property Exchange?," and "What If I Cannot Complete an Exchange, or Fall Short of the Required Amount of Replacement Value?" (Id. at 1-2.) It posed the question "Can I Trust BENISTAR Property Exchange with My Money?" to which it gave the answer:

> First, understand that BENISTAR Property Exchange is a part of BENISTAR, LTD., the largest 419 Welfare Benefit Plan Administrator in the country. Next, take a look at the steps we take:
> - We have set up accounts with major banking and investment firms - accounts under our sole control, as required for these exchanges (We must take possession of the sale proceeds to satisfy the "Safe Harbor" rules outlined in §1031.)
> - Our accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner.
> - None of our personnel have access to your account to withdraw money.

7

(Id. at 1.) There was no evidence at trial that this document was provided to any other exchangor than Gail Cahaly.

### c. 1031 Property Exchange: An Overview

A one-page document entitled "1031 Property Exchange: An Overview" explained the various circumstances under which one could benefit from a § 1031 exchange. It explained the benefits of a § 1031 exchange in summary form, and stated that "BENISTAR, Property Exchange Trust Company has a proved [sic] track record in all forms of property exchange. . . . Our solid experience and depth of knowledge makes BENISTAR the premier choice as qualified intermediary . . . ." (Trial Ex. 3.) This was provided to Eliot Snider, (id.), the advisor to Bellemore Associates, (Trial Ex. 24), Joseph Iantosca's attorney, (Trial Ex. 79), and Jeffrey Johnston, (Trial Ex. 120). There was no evidence at trial that it was provided to Byron Darling, Gail Cahaly, or Brian Fitzgerald.

### d. 1031 Property Exchange: Legal Authority

Paley provided some of the exchangors a document entitled "1031 Property Exchange: Legal Authority," which contained a list of cases it suggested provided legal authority for the exchanges, and a brief explanation of the relevant IRS Code provisions and regulations. (See Trial Ex. 4.) This document was provided to Eliot Snider, (id.), Brian Fitzgerald, (Trial Ex. 62), Joseph Iantosca's attorney, (Trial Ex. 77), and Jeffrey Johnston, (Trial Ex. 122). There was no evidence that this document was provided to the other exchangors.

### e. Identifying a 1031 Exchange Opportunity

Some of the exchangors were given a document entitled "Identifying a 1031 Exchange Opportunity," which gave examples of various scenarios in which one might want to use a § 1031 property exchange. (See Trial Ex. 5.) This was provided to Eliot Snider, (id.), the advisor to

8

Bellemore Associates, (Trial Ex. 25), Brian Fitzgerald, (Trial Ex. 63), Joseph Iantosca's attorney, (Trial Ex. 78), and Jeffrey Johnston, (Trial Ex. 121). There was no evidence at trial that it was given to Byron Darling and Gail Cahaly.

### f.    *New England Real Estate Journal Article*

Copies of an article entitled, "These are the ABCs of Tax Deferred Exchanges," which was written by Paley and published in the New England Journal of Real Estate, were provided to some of the exchangors. This article explained what a property exchange was, why one would consider doing an exchange, the different types of exchanges that are possible, the rules surrounding an exchange, and the mechanics of an exchange. (See Trial Ex. 6.) In the final section, entitled "Selecting an Exchange Facilitator," the article stated:

> Ask about the security of your funds, and what assurances you will have to assure that your funds and your exchange status will be protected.
> Safeguarding your exchange should translate directly to your personal peace of mind. A good rule of thumb is to evaluate an intermediary primarily based upon their interest in your exchange – not your exchange fee, your closing fee, or an associated title insurance premium.

(Id. at 29.) This article was provided to Eliot Snider, (id.), the advisor to Bellemore Associates, (Trial Ex. 27), Brian Fitzgerald, (Trial Ex. 61), and Joseph Iantosca's attorney, (Trial Ex. 80). There was no evidence at trial that the article was given to Byron Darling, Gail Cahaly, or Jeffrey Johnston.

### 2.    Exchange Documents

### a.    *Exchange Agreement*

Evidence was presented at trial that, other than Gail Cahaly, each exchangor was given, and signed, a document entitled "Exchange Agreement." During the period in which Benistar placed the exchange funds in accounts at Merrill Lynch, Elliot Snider, Bellemore Associates,

9

Byron Darling, and Joseph Iantosca signed substantially identical versions of the Exchange Agreement. (See Trial Exs. 10, 29A, 52, 84A.) Paley testified that paragraph ten was authored by the defendant. (Trial Tr. 11:14-15.) In the Merrill Lynch version of the Exchange Agreement, that paragraph stated:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market account, or 6% per annum in a Merrill Lynch investment account. This latter account cannot be liquidated for 30 days whereas, the Ready Asset Money Market account can be liquidated at any time upon 48 hours written notice during the next business day. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. By the terms hereof, Intermediary shall only be required to participate in the withdrawal of funds when instructed by Exchangor and only when the instructions involve the acquisition of the replacement property of the disposition of said proceeds by Intermediary to Exchangor pursuant to the terms of paragraph 2(c) above.

(Trial Exs. 10 ¶ 10,[1] 29A ¶ 10, 52 ¶ 10, 84A ¶ 10.)

After the accounts were moved to PaineWebber, paragraph ten of the Exchange Agreement read:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with PaineWebber at either 3% per annum, or 6% per annum in a PaineWebber account. This latter account cannot be liquidated for 30 days whereas, the former account can be liquidated at any time upon 48 hours written notice during the next business day. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. By the terms hereof, Intermediary shall only be required to participate in the withdrawal of funds when instructed by Exchangor and only when the instructions involve the acquisition of the replacement property of the disposition of said proceeds by Intermediary to Exchangor pursuant to the terms of paragraph 2 (c) above.

---

[1] Paragraph ten of the Exchange Agreement, signed by Eliot Snider, continued "or as otherwise provided in paragraph 2 (c) above," which was removed from the later documents. (Compare Trial Ex. 10 ¶ 10, with Trial Exs. 29 ¶ 10, 52 ¶ 10, 84 ¶ 10.)

10

(Trial Exs. 66 ¶ 10, 90 ¶ 10, 95 ¶ 10, 100 ¶ 10, 105 ¶ 10, 123 ¶ 10.) The PaineWebber version of the Exchange Agreement was signed by Brian Fitzgerald, Joseph Iantosca, and Jeffrey Johnston. (Trial Exs. 66, 90, 95, 100, 105, 123.)

### b.   Escrow Agreement

Similarly, the evidence at trial established that, other than Gail Cahaly, all of the exchangors signed a document entitled "Escrow Agreement." Paley testified that this document was authored by the defendant. (Trial Tr. 11:14-17.) The Merrill Lynch version of the Escrow Agreement, signed by Eliot Snider, Bellemore Associates, Byron Darling, and Joseph Iantosca, contained the following relevant provisions:

1.   BENISTAR shall open an Escrow Custodial Account under BENISTAR's name at Merrill Lynch for the Exchangor's benefit;

2.   BENISTAR shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% Ready Asset Money Market Fund or the 6% Investment Account;

3.   Only upon the Exchangor's written direction and authorization shall the funds leave the BENISTAR account. Upon the written direction of the Exchangor shall the funds be released and then the funds shall be delivered to one of only two places at the Exchangor's written direction:

   a.   Directly to the Exchangor's account; or
   b.   Directly to the Escrow account for the closing on the Replacement Property to be purchased pursuant to the Exchange Agreement.

(Trial Exs. 11, 29B, 51, 84B.)

The PaineWebber version of the Escrow Agreement was signed by Brian Fitzgerald, Joseph Iantosca, and Jeffrey Johnston, and stated:

1.   BENISTAR shall open an Escrow Custodial Account under BENISTAR's name at PaineWebber for the Exchangor's benefit;

11

2.   BENISTAR shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% or the 6% Account;

3.   Only upon the Exchangor's written direction and authorization shall the funds leave the BENISTAR account. Upon the written direction of the Exchangor shall the funds be released and then the funds shall be delivered to one of only two places at the Exchangor's written direction:

   a.   Directly to the Exchangor's account; or
   b.   Directly to the Escrow account for the closing on the Replacement Property to be purchased pursuant to the Exchange Agreement.

(Trial Exs. 67, 96, 101, 106, 124.) There was no evidence introduced at trial that Gail Cahaly signed or was given an Escrow Agreement.

<em>c.   Exchange Fee Agreement</em>

Most of the exchangors also signed a document entitled "Exchange Fee Agreement." Eliot Snider and Brian Fitzgerald signed the Merrill Lynch version of the Exchange Fee Agreement, which stated:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested at Merrill Lynch at the direction and through the financial institutions of Intermediary. Interest accruing in said account will accrue to the benefit of Exchangor. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. . . .
> . . . .
> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested with Merrill Lynch Private Client Group in either a 3% per annum account or 6% per annum account, with interest accruing as of the third day after receipt. The 6% per annum account can not be liquidated without written thirty (30) days notice, whereas the 3% account can be liquidated by 72 hours written notice. The 6% per annum account will generate 3% interest for the final 30 days after notification.

(Trial Exs. 12, 68.)

12

The PaineWebber version of the Exchange Fee Agreement was signed by Gail Cahaly and Jeffrey Johnston. It similarly stated:

> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested at PaineWebber in the discretion and through financial institutions of Intermediary. Interest accruing in said account will accrue to the benefit of Exchangor. Said investment account shall be in the name of Intermediary and shall require the signature of an authorized officer of Intermediary to permit the withdrawal of any portion thereof. . . .
>
> . . . .
>
> Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the relinquished property shall be held and invested with PaineWebber in either a 3% per annum account or 6% per annum account. The 6% per annum account can not be liquidated without written thirty (30) days notice, whereas the 3% account can be liquidated by 72 hours written notice.

(Trial Exs. 40, 125.) There was no evidence at trial as to an Exchange Fee Agreement signed by Bellemore Associates or Byron Darling.[2]

### d.    *Account Selection Form*

With the exception of Gail Cahaly, a document entitled "Account Selection Form" was presented as having been filled out and signed by each exchangor. The Merrill Lynch version of this form was signed by Eliot Snider, Albert Bellemore, Byron Darling, and Joseph Iantosca. (Trial Exs. 13, 29C, 84C, 89.) On the Account Selection Form, each exchangor indicated a choice of either a "(3% per Annum) Merrill Lynch Ready Asset Money Market Account" or a "(6% per Annum) Merrill Lynch Investment Account." (See Trial Exs. 13, 29C, 84C, 89.) The PaineWebber version of this form was signed by Brian Fitzgerald, Joseph Iantosca, and Jeffrey Johnston. (Trial Exs. 69, 92, 97, 102, 107, 126.) It similarly asked the exchangors to mark their choice between a

---

[2] There was no evidence at trial that Joseph Iantosca signed an Exchange Fee Agreement for any of the charged exchanges, although the defense introduced into evidence a similar Exchange Fee Agreement signed by Iantosca in February 2000, pertaining to a previous property exchange not at issue in the trial. (See Trial Ex. 252.)

13

"(3% per annum) Account" and a "(6% per Annum) Account." (Trial Exs. 69, 92, 97, 102, 107, 126.)

   3. Paley's Oral Representations

  There was also some evidence about Paley's oral statements to exchangors. Byron Darling testified that Paley told him "that they were honorable people, he repeated that several times, and the money would be perfectly safe." (Trial Tr. 3:104; see also id. at 3:107, 124.) Joseph Iantosca's testimony from the first trial was read into evidence, and included his testimony that Paley told him "give the money and his people can double the money from whatever we have done." (Id. 6:10.) Paley, however, testified that the defendant never authorized him to say anything other than what was in the written agreements. (Id. 11:95.) The government did not rely on these statements in its opening statement or closing argument, and instead focused on the representations contained in the documents as well as the context of a § 1031 exchange.

  B. Carpenter's Trading

  When the exchangors sold a property, the proceeds from the sale were wired or mailed to Merrill Lynch and, later, to PaineWebber, for deposit into an account maintained by Benistar. At each institution, the exchange funds were transferred into a trading account from which they were invested by the defendant.

  The defendant's trading included investing in stock options, most of which constituted selling a particular kind of stock option known as a "put." The buyer of a put acquires an option to sell a stock at an agreed-upon exercise price. For this right, the put buyer pays a premium to the put seller, or "writer," who then becomes obligated to purchase that stock for the agreed-upon price at the put buyer's direction (i.e., to have the stock "put" to him). If the stock's market value remains above the exercise price, the holder of the put option will not exercise it, and when the option

14

expires, the put seller retains the premium. If the stock's market value dips below the exercise price, the holder of the put option would likely exercise it, thus requiring the put seller to purchase the stock at a price greater than its market value, or to instead simply pay the difference without acquiring the stock. Accordingly, the seller of put options hopes that the particular stock will maintain or increase its price, but stands to lose money if the stock price declines.

The defendant's trading strategy was successful for a time, but as the stock market began to decline in March 2000, his losses began to mount. In mid-September 2000, Merrill Lynch notified the defendant that he would no longer be able to open any new option positions. The defendant then moved his accounts to PaineWebber, where he continued similar trading and sustained increasing losses. On December 19, 2000, PaineWebber notified the defendant that his trading privileges were discontinued.

Some evidence of the defendant's trading loss was admitted at trial. This evidence was not directly relevant to crimes charged. The crimes alleged in the Superseding Indictment—each count alleged a particular instance of use of the mails or wires to execute a scheme to defraud—were complete upon Benistar's having obtained the exchangor's funds in response to Benistar's solicitation and advertising. In each count, the relevant wire or mail transaction alleged was either the transfer of the exchangor's funds to Benistar's custody as intermediary or a related ancillary communication. When the exchangors sent the funds to Benistar, the "obtaining money or property by means of false or fraudulent pretenses, representations, or promises" condemned by the relevant statutes (18 U.S.C. §§ 1341, 1343) had been accomplished. The subsequent risky trading by Carpenter was evidence of the falsity of the prior representations, but it was not itself the *actus reus*. Indeed, on the government's theory, the defendant would not be saved from criminal liability even if his trading strategy had proved lavishly successful if the original

15

representations about how the exchange funds would be held were shown to have been false and intended to induce the exchangors to enter into the transaction. The evidence of loss was admitted for the rather limited purpose of showing that the defendant knew that his investment strategy was resulting in substantial losses. The government's theory was that the defendant knew the content of the marketing materials and exchange documents were being given to exchangors and therefore knew that it was represented to the exchangors that their funds would be held safely in designated Merrill Lynch or PaineWebber accounts. The evidence of the trading loss therefore tended to show the defendant's knowledge that these representations were false, from which his specific intent to defraud could be inferred.

**IV.  Jury Deliberations**

The trial transcript reflects that the jury recessed to the jury room to deliberate following the Court's instructions at 2:35 p.m. (Trial Tr. 13:142.) At 4:41 p.m. the jury re-entered the courtroom and delivered its verdict, finding the defendant guilty on all nineteen counts. (Id.) Thus, the maximum amount of time that the jury could have been deliberating was slightly more than two hours.[3]

**V.  Motion for a Judgment of Acquittal or a New Trial**

The defendant has moved for a judgment of acquittal pursuant to Federal Rule of Criminal

---

[3] The defendant contends that the jury received the many documentary exhibits from the trial no earlier than 3:00 p.m., an assertion which the government has not disputed. (See Def. Daniel E. Carpenter's Mem. of Law in Supp. of Mot. for J. of Acquittal Pursuant to Fed. R. Crim. P. 29(c) (After Jury Verdict) and in the Alternative for New Trial Pursuant to Fed. R. Crim. P. 33(a) at 2 [hereinafter Def.'s Mem.].) As a practical matter, there also would have been time elapsed between when the jury actually agreed on a verdict and notified the court officer of that fact and when all parties had been assembled in the courtroom for the announcement of the verdict. Accordingly, a reasonable estimate would be that the jury actually spent less than two hours deliberating.

Procedure 29(c) and, in the alternative, for a new trial in the interest of justice under Federal Rule of Criminal Procedure 33(a).

    A.    <u>Sufficiency of the Evidence</u>

The defendant argues that the government presented insufficient evidence to prove beyond a reasonable doubt the elements of mail and wire fraud as to each count alleged in the Superseding Indictment.

A district court's "power to set aside a jury verdict [is] very circumscribed." <u>United States v. Rothrock</u>, 806 F.2d 318, 320 (1st Cir. 1986). Rule 29 of the Federal Rules of Criminal Procedure requires that a judgment be entered acquitting the defendant "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. In considering whether the evidence at trial was sufficient, the Court must view all of the evidence in the light most favorable to the verdict. <u>United States v. Duclos</u>, 214 F.3d 27, 32 (1st Cir. 2000). In doing so, the Court takes into account all reasonable inferences that could be drawn from the evidence and resolves credibility disputes in favor of the verdict. <u>Id.</u> The defendant must show that "no rational jury could have found him guilty beyond a reasonable doubt." <u>United States v. Scharon</u>, 187 F.3d 17, 21 (1st Cir. 1999). If the evidence equally or nearly equally supports a theory of guilt and a theory of innocence, then "'a reasonable jury must necessarily entertain reasonable doubt,'" and the evidence is therefore insufficient to sustain a conviction. <u>Woodward</u>, 149 F.3d at 57 (quoting <u>United States v. Adjujar</u>, 49 F.3d 16, 20 (1st Cir. 1995)).

The evidence at trial was sufficient to sustain the conviction as to all counts charged in the Superseding Indictment. A rational jury could have concluded, based on the evidence, that the defendant knew that Paley was soliciting exchangors for Benistar using the marketing materials and exchange documents; that he knew of and approved the contents of those documents; that he

17

intended that a material false representation made in those documents would induce the exchangors to enter into a property exchange transaction using Benistar as their qualified intermediary; and that a reasonably foreseeable consequence of the scheme to defraud was the use of the mails or interstate wire communications.

More specifically, there was evidence that each exchangor was given one or more documents that the jury could have found contained false representations that the exchange funds would be placed in a specifically identified account at Merrill Lynch or PaineWebber. On the basis of such representations, the exchangors would have been justified in inferring that it was Merrill Lynch or PaineWebber, and not Benistar, who would be supervising the investment and paying the stipulated rate of interest. For example, Paley's PowerPoint presentation stated that "Merrill Lynch Private Bank is used for all our escrow accounts. This provides 3% - 6% interest on the escrow." (Trial Ex. 1 at 15.) The Merrill Lynch version of the Exchange Agreement stated that the exchange funds "shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market Account, or 6% per annum in a Merrill Lynch investment account." (Trial Ex. 10 ¶ 10.) The PaineWebber version stated that the exchange funds "shall be held and invested with PaineWebber at either 3% per annum, or 6% per annum in a PaineWebber account." (Trial Ex. 66 ¶ 10.) The Escrow Agreement stated that Benistar "shall open an Escrow Custodial Account under BENISTAR's name" at either Merrill Lynch or PaineWebber, respectively. (Trial Exs. 11, 67.) The Merrill Lynch version stated that Benistar "shall have full control over the Exchangor's funds to invest as the Exchangor directs in either the 3% Ready Asset Money Market Fund or the 6% Investment Account." (Trial Ex. 11.) The PaineWebber version similarly stated that the funds would be invested in "either the 3% or the 6% Account." (Trial Ex. 67.) The Exchange Fee Agreements stated that the exchange funds would

18

32

be "held and invested with Merrill Lynch Private Client Group in either a 3% per annum account or 6% per annum account" or "with PaineWebber in either a 3% per annum account or 6% per annum account." (Trial Exs. 12, 40.) The Account Selection Form asked exchangors to choose between a "(3% per Annum) Merrill Lynch Ready Asset Money Market Account" and a "(6% per Annum) Merrill Lynch Investment Account," and later between a "(3% per Annum) Account" and a "(6% per Annum) Account." (Trial Exs. 13, 69.)

The jury could easily have found such representations to have been material. It is surely understandable that exchangors could be reassured that their funds would be held in stable-sounding accounts at large, established financial institutions, rather than left in the custody of Benistar, a newly introduced and relatively unknown entity. The jury further could have found that the defendant had the requisite specific intent to defraud the exchangors—that he specifically intended for Benistar to obtain their money by false pretenses. His specific intent to defraud could be inferred from his knowledge of the representations made in the documents combined with his knowledge of what he was actually doing with the exchange funds. The jury could have determined instead that the defendant intended to obtain the exchange funds on the basis of the representation that Merrill Lynch or PaineWebber would be investing the exchange funds and promising to pay interest, when in fact he knew that Benistar was the one doing so, and that his aggressive investment strategy made this distinction an even more important one.

The defendant argues that he is entitled to a judgment of acquittal because the government failed to disprove his good faith. The concepts of good faith and the specific intent to defraud are opposite sides of the same coin. See United States v. Mueffelman, 470 F.3d 33, 36 (1st Cir. 2006) (specific intent to defraud "excludes false statements honestly believed to be true and promises or predictions made in good faith"); United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991);

19

33

Carpenter, 405 F. Supp. 2d at 93. If the defendant held an honest belief in the truth of the representations, then he necessarily lacked the specific intent to defraud that must be proven to convict him. Good faith is therefore a complete defense to the charges of mail and wire fraud, and, once raised, must be disproved by the government beyond a reasonable doubt. See Dockray, 943 F.3d at 156; Carpenter, 405 F. Supp. 2d at 93.

The defendant offers several reasons why he believes the government failed to sustain its burden of disproving his good faith, but none of them is persuasive. He argues that the evidence established his honest belief that under the terms of the exchange documents he had unfettered discretion to invest the funds as he wished. The Court rejected this same argument following the defendant's first trial, and rejects it again for the same reasons. See Carpenter, 405 F. Supp. 2d at 93-94. The defendant's intent to deceive the exchangors would not necessarily be negated by an honest belief that, as a purely contractual matter, he had unlimited discretion to invest the funds. For example, it would not be necessarily inconsistent for the defendant to have intended the marketing and exchange documents to mislead the exchangors while at the same time providing him with investment discretion as a matter of contract law. The defendant also points to evidence that he believed in his trading strategy. This is neither relevant nor remarkable. The government did not have to prove that the defendant intended to harm the exchangors by losing their money, and it was not disputed that the defendant wanted the scheme to succeed. Indeed, the defendant's desire to successfully invest the exchange funds so as to enrich himself was a central part of the government's theory. See infra pp. 28-30.

The defendant further contends that the government failed to disprove his good faith because the defendant "believed in good faith that he had made no misrepresentations to the investing Exchangors, and did not cause any representations other than those in the Agreements to

20

34

be made to the Exchangors," and "therefore had a good faith belief that the Exchangors were never misled by him or caused to be misled by him into believing that their funds would be 'safe' or 'secure' from investment loss." (Def.'s Mem. 11.) This is, of course, only the defendant's interpretation of the evidence. As already discussed, there was sufficient evidence for the jury to find that he intended to obtain the exchange funds on the basis of representations he knew to be false or misleading.

The defendant cites evidence at trial that tended to support his good faith argument. (See Def.'s Mem. 19, 24-28, 35-38.) For example, there was evidence that the defendant was forthright in answering questions posed to him by David Patterson, an attorney representing an exchangor in an earlier (uncharged) transaction, and that he put Patterson directly in touch with Benistar's primary broker at Merrill Lynch. Although the defendant was never asked how the funds would be invested, his willingness to answer other questions and to put Patterson in touch with Merrill Lynch where he ostensibly could have learned the details of Benistar's trading were circumstantial evidence of his good faith. This, and other similar circumstantial evidence, could have supported, but did not require, an inference that the defendant acted in good faith and lacked the specific intent to defraud. But the jury could have determined that any inference raised by this evidence was disproved by the other evidence from which the defendant's specific intent to defraud could be inferred.

Lastly, the defendant points out that part of the government's theory was that the shortfall in the Benistar accounts caused by the trading losses was probative of the defendant's specific intent to defraud. The government suggested that because the defendant obtained the exchange funds despite knowing that he had lost substantial amounts, he was, by extension, aware that it was becoming increasingly less likely that Benistar would be able to make good on its obligations to

21

the new exchangors. This, in turn, would make crucial whether that obligation was Benistar's or the much larger financial institutions. The defendant argues, however, that the government never introduced evidence that the defendant was aware of any specific shortfall at the precise time the funds were obtained from each exchangor.

As the government points out in its opposition to the defendant's motion, the defendant overstates the importance of this evidence. (See Gov't's Opp'n to Def.'s Mot. for Acquittal and Alternatively for a New Trial 10.) It was relevant only as circumstantial evidence of the defendant's specific intent to defraud. The defendant's knowledge of a shortfall was probative of his more general knowledge that his trading strategy subjected the funds to substantial risk. Ample other evidence established that the defendant understood his own trading strategy. There was sufficient evidence to sustain a conviction on all counts without any evidence of trading losses or the defendant's awareness of those losses and the resulting shortfall.[4]

The government presented evidence sufficient to sustain each count of conviction for mail or wire fraud. The defendant is therefore not entitled to a judgment of acquittal under Rule 29.

### B. New Trial

The defendant alternatively seeks an order granting a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. That rule provides that a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Here, the interest of justice does require a new trial—again—because the government encouraged the jury to convict based upon

---

[4] Furthermore, the government introduced sufficient evidence to use the defendant's awareness of a shortfall for its limited purpose. There was evidence that quantified the losses at various points during the relevant time period. There was evidence that quantified Benistar's obligations to exchangors at other points in time during that period. And there was evidence from which a jury could infer that the defendant was generally aware of both.

22

impermissible reasons in addition to its proper theory that would support a conviction of mail or wire fraud.

The interest of justice requires a new trial where there has been improper comment and argument by the government and the improper comments have so "poisoned the well" that the trial's outcome was likely adversely affected. United States v. Azubike, 504 F.3d 30, 38-39 (1st Cir. 2007); Carpenter, 494 F.3d at 22-23. In making the latter assessment, factors to be considered include the extent of the improper remarks, the context, the likely effect of any curative instructions, and the weight of the evidence against the defendant. Carpenter, 494 F.3d at 23; see also Azubike, 504 F.3d at 39.

Previously, this Court ruled after Carpenter's first conviction that confidence in that verdict was undermined by the prosecution's repeated use of gambling references and metaphors to the degree that a new trial was necessary. Carpenter, 405 F. Supp. 2d at 103. In the second trial, the prosecution stayed away from the gambling references,[5] but in their place repeatedly called to the jury's attention the high profits Carpenter hoped to make using the exchangors' money. In addition, the prosecutors repeatedly mischaracterized the contents of the marketing materials and exchange documents. In doing so, they suggested that Carpenter had violated obligations to the exchangors that neither the documents nor applicable legal principles imposed on him. The cumulative effect of these tactics in a case where the evidence of mail or wire fraud was ample but not overwhelming was to taint the integrity of the verdict. The possibility that the verdict was the product in substantial part of improper argument is especially concerning in light of the short

---

[5]  For the most part, that is. The government still insisted on eliciting testimony from its witness Gerald Levine that Carpenter referred to himself as a "riverboat gambler." (Trial Tr. 7:77.) Levine's testimony in other respects was perjurious in this Court's judgment, and the government knew it. (See id. 13:15.)

23

period of time the jury spent deliberating.[6]

             1.      Representations of Safety and Security

      The government stated on numerous occasions that Benistar had represented to the exchangors that their money would be safe and secure. In particular, in its closing argument, the government said that the defendant "took in millions of dollars in real estate exchangors' money based on false and fraudulent pretenses that Benistar would protect the security and safety of the exchangors' money," (Trial Tr. 13:41-42), and that "[t]he marketing documents . . . emphasized the safety and security of the money," (id. 13:45). It argued that "[t]he representations that the money is going to be held for the exchangors' benefit and that it will be held safe and secure is false because he can't meet the obligations that he owes to other exchangors." (Id. 13:61.)

      This was an overstatement of the evidence. There were no explicit representations of safety and security in the marketing materials or the exchange documents.[7] Rather, this was actually an inference that the government believed should be drawn from other, less direct statements in those documents, such as reference to the Merrill Lynch and PaineWebber accounts. Instead of arguing

---

[6] The defendant has made additional arguments in support of his contention that a new trial must be granted because of what he describes as government misconduct, none of which I find persuasive to the extent they go beyond the reasons discussed in this Opinion and Order. (See Def.'s Mem. 38-52.) The defendant also takes issue with a number of the Court's rulings on evidence during the trial, (see id. at 52-66), which I continue to adhere to. I also consider the defendant's argument based on Brady v. Maryland, 373 U.S. 83 (1979), regarding a civil complaint that was raised in his reply brief, (see Def. Daniel E. Carpenter's Reply to the Gov't's Opp'n to Def.'s Mot. for Acquittal and Alternatively for a New Trial 16-25), to have been resolved in light of the government's response and defense counsel's statement at the hearing on the present motions that he accepts the government's representation that it was not aware of the complaint. (See Mot. Hr'g Tr. 106, Dec. 3, 2008.)

[7] The defendant would only be responsible for Paley's oral statements to the extent they were consistent with the documents he approved, see United States v. Ranney, 719 F.2d 1183, 1187 n.7 (1st Cir. 1983), so the focus still has to be on the documents. Furthermore, because the jury found the defendant guilty as to all counts, and not only the ones as to which Paley had made oral representations, Paley's statements are of minimal significance.

24

to the jurors why they should draw the inference, the government characterized the assurances as if they had been expressly made. In some contexts, this might seem a matter of small significance, but the difference between an explicit promise by the defendant of safety and security, on the one hand, and an inference by the jury of the existence of such a promise from more oblique references, on the other, is potentially very important in a case where the principal defense argument was the absence of specific intent to defraud. Moreover, a proper argument that explicitly asked the jury to infer a representation of safety and security from language in the documents, such as the language that urged exchangors to "[a]sk about the security of your funds"[8] or that referred to the Merrill Lynch accounts as "escrow accounts," (see Trial Ex. 1 at 14-15.), may have encouraged the jury to carefully examine the marketing materials and exchange documents in detail. The critical questions for the jury to determine were whether the documents were false or misleading and, if so, whether the defendant intended them to be so and thus intended to deceive the exchangors. The manner in which the government referred to representations of safety and security encouraged the jury to bypass most of the first inquiry: if the jury started from the premise that the documents actually made explicit representations as the government claimed, it would be easy then to conclude they were intentionally false.

2.    Reliance on Assumptions and Generalities

In support of its contention that Benistar had promised the exchangors safety and security, the government placed undue reliance on assumptions about what the inherent attributes of a § 1031 property exchange or an escrow account must necessarily be. This encouraged the jury to

---

[8] Interestingly, there was no evidence that any of the exchangors, nor any attorney, accountant, or advisor interacting with Benistar on their behalf, ever asked where exactly the funds would end up, nor what Benistar's interest in the exchange was.

25

convict based on those assumptions rather than on a careful consideration of the exchange documents which set forth the attributes of each particular exchange as agreed upon between each exchangor and Benistar. The government argued that since the only purpose of a § 1031 exchange was to defer the payment of a tax, there was implicit in the transaction itself a representation that the funds would simply be "parked" and not be subject to any risk whatsoever. In its closing argument, the government stated that the defendant "knew that the exchangors had come to Benistar for one reason: to engage in a property exchange, not to engage in options trading. . . . Benistar was supposed to be -- at all times supposed to be a temporary parking place for their money until they identified a replacement property for purchase." (Trial Tr. 13:44.) The government further argued that "[r]isking all of the funds to be held in short term for real estate purposes is simply inconsistent with the business Carpenter represented Benistar Property Exchange Trust Company to be," and that the defendant knew that the exchangors "were led to believe that Benistar would act in a way that was consistent with the overriding purpose of the exchange, a secure and safe place to park the money until the exchange was complete." (Id. 13:45.)

Similarly, the government theorized that the use of the word "escrow" amounted to a representation that the funds would be held in a particular way. The government even attempted to elicit testimony from Eliot Snider and David Eaton as to the typical attributes of an escrow account, but the defendant's objections were sustained. (See id. 3:18, 6:22.)

The implication throughout was that by using the titles "Escrow Account" and "Escrow Agreement" Benistar had effectively represented to the exchangors that the exchange funds would be "parked" and not invested. This played upon a common general understanding of the word "escrow," but the actual documents established specific terms for the escrow accounts that the exchangors and Benistar contracted for. Those attributes included the payment of interest on the

26

exchange funds, which necessarily meant the funds would have to be invested, whether by Benistar or one of the brokerage houses.

The problem stems from the imprecise way that people sometimes speak about money and bank accounts. It is common to say that there are X dollars in one's account. This is a manner of description that sacrifices accuracy for convenience. It has a tendency to create the false impression that the bank holds each person's money in some sort of safety deposit box, where perhaps once a month a teller makes the rounds depositing a few dollar bills into each box as interest. In reality, the number of dollars in an account simply quantifies the amount that the bank promises to pay the account holder. It is easy to forget that the very reason a bank is willing and able to pay interest on the account is that it is taking the money and putting it to other uses. The exchangors, all relatively sophisticated in business, must all have expected that their funds would be invested during the period they were in Benistar's custody. Indeed, they were given the choice between a lower return (three percent) and a higher (six percent). It was an obvious inference that the latter would be invested more aggressively than the former. In any event, the funds were not "parked" in the sense that they would not be invested at all.

In giving these general assumptions about escrow accounts undue emphasis, the government invited the jury to ignore the Court's instruction that the tax code placed no limitations or restrictions on how a qualified intermediary may invest the exchange funds, and further, that in the absence of a promise not to invest the proceeds in a certain way, no general statutory authority imposed limits on how they may be invested. The government essentially intimated that common sense dictated that the exchange funds could not be invested in stock options, regardless of what

27

the documents said.[9] In fact, it was *not* a violation of the escrow agreements to invest the exchange funds in any particular way; the documents gave Benistar complete discretion as to that judgment. The government's argument thus invited the jury to focus on the wrong question: whether the defendant violated supposedly restrictive terms of an escrow agreement, rather than whether he induced the Benistar-exchangor relationship by false or fraudulent pretenses, representations, or promises.

### 3.    References to Carpenter's Greed

More important than the government's glib overcharacterization of the nature and contents of the documents described above, however, was the prosecution's repeated invitation to the jury to be outraged at the defendant's desire and attempt to profit from Benistar's investment of the exchangors' funds. The government emphasized the defendant's selfish motive to make a fortune investing the exchange funds while only paying the exchangors a three or six percent return.

In particular, the government stated in its opening that if the defendant's scheme "had kept

---

[9] For example, in its closing argument, the government referred to the trial testimony by Iantosca's attorney, Marjorie Adams, to counter the defendant's argument that the exchange documents provided Benistar with full discretion to invest the exchange funds. The government stated:

> The discretion language didn't authorize Benistar to do whatever it wanted with the money so long as it could conceivably be characterized as an investment. As Marjorie Adams testified -- you may recall that she said that Benistar couldn't take the money and go buy a building with it. A building is an investment, but they couldn't go do that.

(Id. 13:54.) As a practical matter, this type of investment may have been outside the bounds of common sense if there were not other funds available to satisfy obligations to exchangors. But there was no legal reason why the exchange funds could not be invested in a building unless a reason was provided by the agreements between Benistar and the exchangors.

The government's argument might have been a good one had Congress or some regulatory authority restricted the manner in which a qualified intermediary could hold the funds. If that were the case, then simply offering to act as a qualified intermediary in a § 1031 exchange could be considered to be a representation that the money would be held according to those restrictions. But in the complete absence of any statutory or regulatory restrictions, no such representation can be implied.

28

up, he would have made a fortune while still paying the people who entrusted their money to him three or six percent," (Trial Tr. 2:80), and that "[w]hat he was after was an opportunity to strike it rich in the options market without any risk to his own personal funds and while paying the people whose money he was trading a measly three or six percent," (id. 2:83). In closing, the government repeated this argument that the defendant "decided to take the exchangors' money and give them a measly 3 or 6 percent while using that money to speculate, to make a killing for himself in the options market." (Id. 13:70.)

The government specifically highlighted as one aspect of the fraud, aside from "the way in which the exchangors were misled as to the true risks Carpenter was taking with their funds," that "Mr. Carpenter was secretly using the funds to enrich himself and Mr. Paley." (Id. 13:55-56.) In support of this point the government referred to a letter sent by the defendant to Paley explaining why the options trading strategy was necessary for them to profit. In the letter, he said that they could have earned a return of two to three percent per month, which would have amounted to over a million dollars of profits to be split between them. (Id. 13:56.) The government stated that "Mr. Carpenter, while he was paying the exchangors a flat, capped rate of 3 percent or 6 percent, was actually using their money, and intended to use their money, to enrich himself and Mr. Paley." (Id.)

Like the gambling metaphors used by the government in the defendant's first trial, these arguments encouraged the jury to convict Carpenter for a reason unrelated to the wire and mail fraud charges, namely, that he was trying to reap a benefit for himself by investing the exchangors' funds. The government chastised him for acting selfishly. Whatever moral judgment might be made about the defendant's trading behavior, that trading was not expressly foreclosed by the parties' agreements or otherwise and therefore was not itself unlawful. The agreements with the

29

exchangors purported to give Benistar discretion over the investment of the exchange funds while in Benistar's custody. (E.g., Trial Exs. 11, 29B, 51, 67, 84B, 96, 101, 106, 124 (Escrow Agreements giving Benistar "full control" over the exchangors' funds); see also Trial Exs. 2 ("[T]hese accounts are under [Benistar's] sole control."), 37 ("We have set up accounts . . . under our sole control . . . .").)

The government's focus on the disparity between the defendant's intended profits and the "measly" return to the exchangors was thus doubly wrong. It was not an accurate depiction of the contracts between Benistar and the exchangors, and it was not relevant to the defendant's intent to defraud at the most relevant time—when the contracts were entered into. Nevertheless, the argument that the defendant was trying to make lots of money for himself by misusing the exchangors' funds had a significant potential to inflame the passions of the jury.

This argument about the defendant's greed dovetailed with the argument, at least implied by the government, that Benistar breached its promise to the exchangors to deposit the funds into the interest-bearing accounts at Merrill Lynch or PaineWebber. Such a breach alone could not be the basis for criminal liability on the charges set forth in the indictment, and the government did not suggest otherwise. But it is easy, especially for lay jurors, to miss the significant difference between a failure to live up to a promise after it has been made and a fraudulent intent in making the promise never to live up to it. The latter would be the basis for a finding of specific intent to defraud; the former would not be. The government's approach in emphasizing the defendant's intent to profit, instead of his intent to deceive, very likely supported and encouraged any confusion the jury might have had between the two.

### 4. The Speedy Jury Deliberations

A jury is not required to deliberate for any specific amount of time before reaching a

30

verdict. The speed of the jury's deliberations certainly could not be an independent factor justifying the grant of a new trial motion. However, the brevity of the deliberations in this case raises a serious concern that the jury was led into adopting a global theme that allowed it to resolve all nineteen counts in a short time. There were no doubt some parts of the evidence that applied with equal force to each of the counts. But each count also required consideration of evidence specific to that count. For example, different exchangors were exposed to different Benistar marketing materials and signed different exchange documents. Some exchangors entered into the transactions in the Merrill Lynch era, and some in the PaineWebber era.[10] Most exchangors chose a three percent interest account, but some chose a six percent account. The most dramatic example of the variation among exchangors is the case of exchangor Gail Cahaly (Count 15). There was no evidence that she saw any marketing materials other than Paley's "Frequently Asked Questions," whereas others had received the PowerPoint slides, Paley's articles, and other materials. Similarly, there was no evidence that Cahaly signed either an Exchange Agreement or Escrow Agreement with Benistar, while an Exchange Fee Agreement signed by her was in evidence. To consider and decide the significance, if any, of these variations—especially deciding what representation in what documents influenced the particular exchangor—would have required considering the issues at least exchangor by exchangor. If the twelve jurors had spent an equal amount of time on the transactions of each of the seven exchangors over the roughly two hours they spent deliberating, they would have spent a little more than fifteen minutes on each. It is possible that a diligent and efficient jury could have given adequate consideration to the matters in that time, but the possibility is too palpable to ignore that the jury instead took a more generalized view in response

---

[10] One thing the government faulted Carpenter for was omitting to tell exchangors that he had been "kicked out" of Merrill Lynch. Obviously, that factor could only be relevant to the contention that subsequent PaineWebber era exchangors were deceived by the omission.

31

to the government's meta-narrative of Benistar's breaches of promises of safety and security driven by the defendant's greed.

As in the first trial, the government focused too much on what the defendant did with the exchangors' money, rather than how he obtained it from them. Evidence of his risky trading strategy was certainly relevant to whether he had the specific intent to defraud the exchangors and mislead them into entering the exchange transactions. Even so, however, its probative force likely varied from transaction to transaction. If knowledge of trading losses tended to highlight to the defendant the contrast between the "safety" being assured to a potential exchangor and the reality of the actual risk, and thus serve to support an inference of willful deception on his part, the force of the inference was stronger in December than it was in August because the losses were so much greater and more sustained.

It is possible the jury carefully focused on the proper questions and thoroughly examined the evidence in its variations with respect to each of the exchange transactions. If so, the verdict would be soundly based. It is also possible, however, that the government's repeated emphasis on the defendant's having broken his promises to the exchangors in order to enhance his own wealth by using their money distracted the jury from their proper inquiry and led them to render a quick verdict that was not based on the necessary conclusions about fraud, most especially specific intent to defraud. Reluctantly, this Court concludes that the government's arguments "poisoned the well" to the extent that the verdict was likely affected. It must be set aside.

## VI.   Conclusion

Because the evidence at trial, viewed in the light most favorable to the verdict was sufficient to sustain a conviction for each count of mail and wire fraud alleged in the Superseding Indictment, the defendant is not entitled to a judgment of acquittal. However, for the reasons set

32

forth above, because there is a strong likelihood that the jury rendered its verdict on the basis of inappropriate and insufficient grounds that cannot sustain the convictions, the interest of justice requires that the defendant's conviction as to each count be set aside and a new trial ordered. Accordingly, the defendant's motion (dkt. no. 308) is DENIED to the extent it seeks a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and GRANTED to the extent it seeks a new trial pursuant to Federal Rule of Criminal Procedure 33(a).

The Defendant's Supplemental Motion for Judgment of Acquittal (dkt. no. 311), the Supplemental Motion for a New Trial (dkt. no. 312), the Defendant's Motion for a New Trial Based on Newly Discovered Evidence Involving the Federal Trade Commission (dkt. no. 324) and the Defendant's Motion for a New Trial Based on Newly Discovered Evidence Regarding Iantosca's "Availability" (dkt. no. 333) are DENIED.

It is SO ORDERED.

　　　　　　　　　　　　　　　　　/s/ George A. O'Toole, Jr.
　　　　　　　　　　　　　　　　　United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 04-10029-GAO

UNITED STATES OF AMERICA

v.

DANIEL E. CARPENTER,
Defendant.

OPINION AND ORDER
February 21, 2014

O'TOOLE, D.J.

The defendant was indicted in February 2004 on charges of wire fraud and mail fraud. Two trials have been held, and the defendant was twice convicted by a jury. Following each trial this Court granted the defendant's new trial motion based on improper closing arguments by the government, and the government appealed each new trial order. The first order was upheld. United States v. Carpenter, 494 F.3d 13, 29 (1st Cir. 2007). The First Circuit reversed the second new trial order, reinstated the jury's verdict, and remanded for sentencing. United States v. Carpenter, 736 F.3d 619, 622 (1st Cir. 2013) (see opinion for full procedural and factual background). Currently pending before the Court are the defendant's motions to dismiss for violation of his right to a speedy trial (dkt. no. 406) and for reconsideration of the denial of his prior motion to set aside the verdict new trial motion based on a theory of constructive amendment or material variance of the indictment (dkt. nos. 312 and 404).

## I.    **Speedy Trial Rights**

The defendant contends that the lapse of ten years between indictment and sentencing violates his constitutional right to a speedy trial. The Sixth Amendment provides that all criminal defendants "shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. If the

48

government violates a defendant's right to a speedy trial, the criminal charges must be dismissed. Strunk v. United States, 412 U.S. 434, 439-40 (1973). "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." United States v. MacDonald, 456 U.S. 1, 8 (1982).

The government argues that the Court should follow the Second Circuit's decision in United States v. Ray that the Sixth Amendment right to a speedy trial does not apply to sentencing. 578 F.3d 184, 190-99 (2d Cir. 2009). If Ray is followed, the delay between the second trial and sentencing would be analyzed in light of the Fifth Amendment right to due process. In that event, the defendant would have to show an unjustified reason for the delay and prejudice. Id. at 199. If a due process violation were to be found, the remedy would not be an automatic dismissal; rather the court would "fashion relief that counteracts the prejudice caused by the violation." Id. at 202.

While the First Circuit has not decided the issue directly, it has, like the majority of circuits, assumed that the Sixth Amendment right to a speedy trial does apply to sentencing. See United States v. Nelson-Rodriguez, 319 F.3d 12, 60 (1st Cir. 2003) (collecting cases). In light of this, I will make the same assumption and assess the defendant's motion under Sixth Amendment standards.

The Supreme Court has established a four-part balancing test to determine whether a Sixth Amendment speedy trial violation has occurred. The court must weigh: "(1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant resulting from the delay." United States v. Dowdell, 595 F.3d 50, 60

(1st Cir. 2010) (citing Barker v. Wingo, 407 U.S. 514, 520 (1972)). "None of these factors is a necessary or sufficient condition to the finding of a deprivation of the right to a speedy sentencing." Nelson-Rodriguez, 319 F.3d at 60.

As to the first factor, the ten years since indictment and the more than 5 years between conviction and sentencing is enough to trigger the inquiry into the other factors. Cf. Barker, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.").

The second factor, the reasons for the delay, "is often considered the focal inquiry." United States v. Trueber, 238 F.3d 79, 88 (1st Cir. 2001) (internal quotation marks omitted). In examining the reasons for delay, the Supreme Court has prescribed different weights to different reasons.

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

Barker, 407 U.S. at 531. "Given the important public interests in appellate review it hardly need be said that an interlocutory appeal by the Government ordinarily is a valid reason that justifies delay." United States v. Loud Hawk, 474 U.S. 302, 315. In this case, the defendant points to three periods of delay: (1) the government's interlocutory appeal following the first trial, (2) the delay between the second trial and the Court's order on the defendant's post-trial motions, and (3) the government's interlocutory appeal following the second trial.

The delay caused by the two interlocutory appeals should not weigh against the government. In assessing the purpose and reasonableness of an interlocutory appeal, courts look to: "(1) the strength of the government's position on the appealed issue; (2) the importance of the

3

issue in the posture of the case; and (3) in some cases, the seriousness of the crime." Trueber, 238 F.3d at 88. The government's appeals were not frivolous; the first appeal was decided by a divided panel, and the second appeal resulted in a reversal of the grant of a new trial. The interlocutory appeals were legitimate and justifiable, and the delay entailed in their prosecution should not be held against the government.

The delay between the second trial and this Court's order declaring a mistrial was regrettable and I accept any criticism that I contributed to the delay, but the defendant's own filings also contributed substantially to it by repeatedly expanding the scope of the issues bearing on the pending new trial motion. Post-trial filings by the defendant that necessitated deliberation by the Court included:

> 7/3/08 – Motion for Acquittal or New Trial (dkt. no. 308)
> 7/3/08 – Supplemental Motion for Acquittal (dkt. no. 311)
> 7/3/08 – Supplemental Motion for a New Trial (dkt. no. 312)
> 8/14/08 – Reply to Response to Supplemental Motion for Acquittal (dkt. no. 321)
> 8/15/08 – Reply to Response to Motion for Acquittal or New Trial (dkt. no. 322)
> 9/30/08 – Motion for New Trial Based on Newly Discovered Evidence (dkt. no. 324)
> 11/10/08 – Motion for New Trial Based on Newly Discovered Evidence (dkt. no. 333)
> 11/14/08 – Reply to Response to Motion for New Trial Based on Newly Discovered Evidence (dkt. no. 334)
> 11/25/08 – Reply to Response to Motion for New Trial Based on Newly Discovered Evidence (dkt. no. 338)
> 3/19/09 – Emergency Motion for Release of Brady Materials (dkt. no. 344)
> 3/23/09 – Supplemental Motion for Release of Brady Materials (dkt. no. 344)
> 4/2/09 – Reply to Response to Emergency Motion for Release of Brady Materials (dkt. no. 346)
> 6/10/09 – Memorandum Regarding Post-Trial Developments (dkt. no. 349)
> 6/24/09 – Second Memorandum Regarding Post-Trial Developments (dkt. no. 350)
> 7/31/09 – Status Report No. 3 (dkt. no. 353)
> 10/28/09 – Supplemental Memorandum in Support of Motion for Acquittal or New Trial (dkt. no. 355)
> 12/2/09 – Reply Response to Supplemental Memorandum (dkt. no. 359)
> 1/13/10 – Second Memorandum in Support of Motion for Mistrial, Acquittal or New Trial, and Release of Brady Materials (dkt. no. 360)
> 6/17/10 – Letter Regarding Recent Developments (dkt. no. 371)
> 1/6/11 – Notice of Supplemental Authorities (dkt. no. 373)
> 2/3/11 – Status Report (dkt. no. 374)

Each of these filings amended or added to the defendant's arguments and therefore required additional attention. The defendant certainly has the right to choose his litigation strategy; however, "[h]aving sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon." Loud Hawk, 474 U.S. at 316-17.

The defendant's assertion of his rights, the third Barker factor, does not weigh in his favor. A brief history will help. The defendant was arraigned on February 24, 2004. The case was referred to a magistrate judge for pretrial supervision. The magistrate judge excluded some periods from the Speedy Trial Act ("STA") calculations, and counted some others against the "clock." A few months into the case, the defendant filed two motions to dismiss the indictment. After those motions were denied, at a status conference held on November 15, 2004, the Court set a trial date for December 6, 2004, the timing influenced principally by STA considerations. Two days later, the parties *jointly* moved to continue the trial until the end of March, 2005. At the scheduled pretrial conference held November 19, the Court set the trial for April 4, 2005, with no objection from the defendant. The parties also jointly moved to exclude the intervening time. Conferences that were held on March 24 and 28 led to a further postponement, at the defendant's request, with trial reset for May 9, 2005. On March 31, the defendant filed an "emergency" motion for a continuance, which was granted, and the trial was reset again for July 11, 2005. On April 29, the defendant again moved to postpone the trial over the government's objection, this time to November. That motion was denied, and the first trial commenced on July

11. As this timeline shows, prior to the first trial, the defendant was a proponent of the continuances from the original December trial date and the ultimate actual trial date.[1]

The defendant's post-trial motions for a judgment of acquittal or for a new trial were argued on October 31, 2005, and the Court denied the former and granted the latter by an order entered December 15, 2005. The government's notice of appeal was filed January 6, 2006, and the defendant's notice of cross-appeal was filed February 6, 2006. The mandate from the Court of Appeals affirming the grant of a new trial was entered on the docket on October 1, 2007. At a conference held on November 26, 2007, a trial date on May 5, 2008 was set. The defendant's counsel had asked for a trial in June 2008. Later, on April 29, the Court granted the defendant's request and continued the case to June 2, which is when the second trial began. Again, there was no genuine objection to the length of the continuances; they were consistent with what defense counsel requested.[2]

After the second trial and while the post-trial motions were pending, the defendant did not express any speedy trial objections until his request for a status conference filed July 14, 2011. In that filing (dkt. no. 375), he noted how long the post-trial motions had been pending. He also called attention to two new decided cases and argued their significance for some of the pending issues. The Court did not hold a status conference; the order granting the second motion for a new trial was entered about a month and a half later on September 1, 2011.

---

[1] Notwithstanding the fact that the defendant's chief trial counsel was a sponsor of the postponements, shortly before trial another lawyer for the defendant, Mr. Robinson, separately objected to the exclusion of time for the continuances and moved to dismiss on speedy trial grounds. See docket nos. 70 and 79. The objection was overruled and the motion denied. See clerk's notes dated May 17, 2005, and June 30, 2005.

[2] Once again, the right hand and the left hand were not in synch. Despite primary defense counsel's interest in a mid-2008 trial date, Mr. Robinson filed a motion to dismiss on speedy trial grounds on January 28, 2008 (dkt. no. 229), which was denied on April 8, 2008 (dkt. no. 242).

6

Thereafter, the defendant filed a motion (dkt. no. 387) to dismiss on speedy trial grounds in this Court while the government's second appeal was pending in the Court of Appeals, which this Court denied (dkt. no. 392) for lack of jurisdiction. Following the recent First Circuit decision, the defendant filed three more motions to dismiss on speedy trial grounds; docket number 406 which is the subject of this order; docket number 415 which was denied from the bench at the motion hearing; and docket number 426, which is a rehash of 415 and an earlier motion (dkt. no. 229) and is therefore denied.

This history shows that the defendant's assertion of speedy trial interests has been spotty at best. In contrast, over the course of the case he either requested or consented to significant continuances and to the exclusion of those periods from the STA calculation.

The fourth Barker factor, prejudice, weighs in the defendant's favor. The speedy trial right protects three interests of the defendant: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532. Only the second – anxiety and concern – is pertinent here. While these impacts are not to be taken lightly, this interest is often regarded as the least serious of the three interests protected by the speedy trial right. See id. at 533; United States v. Santiago-Becerril, 130 F.3d 11, 23 (1st Cir. 1997) ("In respect to [the defendant's] anxiety and concern in awaiting trial, we do not weigh this heavily. . . . While this type of prejudice is not to be brushed off lightly, considerable anxiety normally attends the initiation and pendency of criminal charges; hence only undue pressures are considered."). While the defendant has suffered through an extended ordeal, he points to no undue pressures that are not typical of a defendant awaiting trial or sentencing, and the defense points to no case where anxiety and concern alone supported a finding of a constitutional violation of the speedy trial right.

7

Under <u>Barker</u>'s balancing test, the defendant's constitutional right to a speedy trial was not violated, and his motion to dismiss on that ground (dkt. no.406) is denied.

## II.   Variance/Constructive Amendment

The defendant asks the Court to reconsider the denial of his Supplemental Motion for a New Trial (dkt. no. 312). Specifically he asks the Court to reconsider whether there was either a constructive amendment or a variance of the indictment created by the evidence presented by the prosecution. The defendant claims that the government's theory at trial was misrepresentation by omission, while the indictment charged affirmative misrepresentations.

"A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." <u>United States v. Dowdell</u>, 595 F.3d 50, 58 n. 4 (1st Cir. 2010). The Superseding Indictment generally alleged that the defendant represented to seven exchangors that their exchange funds would be held safely and securely in an interest-bearing account; instead the defendant invested the exchange funds in risky stock options. <u>See, e.g.</u>, Superseding Indictment at ¶¶ 25-29 (dkt. no. 34). The misrepresentations were made through written statements provided to the exchangors and submitted at trial.

The government's evidence at trial and its argument to the jury did not vary from or amend the indictment. The government argued that the material provided by the defendant was either plainly false or were "half-truths" that made that statements materially misleading. This theory was well within the scope of the indictment.

The "omissions" that the defendant complains of deal with the government's contention that the defendant failed to inform the exchangors that he was using their funds that were represented to be in "escrow" accounts to actively trade in options for his own profit. The

8

affirmative representations that the funds were deposited in accounts maintained at Merrill Lynch and later Paine Webber were true as far as they went, but what they omitted made them misleading. Arguing that the defendant omitted material information necessary to make the affirmative statements not misleading did not transform the case from one of affirmative misrepresentations to a case of misrepresentations solely by reason of omission. There was no constructive amendment of the indictment.

### III. Supplemental Memorandum, Docket Number 355

At oral argument on the pending motions, the defendant asked the Court to treat his "Supplemental Memorandum in Support of Defendant Daniel E. Carpenter's Motion for Declaration of a Mistrial and his Motion for Acquittal and in the Alternative for a New Trial and Request for Expedited Hearing" (dkt. no. 355) as a motion for a new trial under Federal Rule of Criminal Procedure 33. In its response to that Supplemental Memorandum, the government had suggested that, though it was not denominated a motion, it was in substance just that and should be considered under the standard applicable to such motions. See Government's Resp. to Def.'s "Supplemental Mem." Concerning New Evidence at 2 (dkt. no. 357). The defendant objected, insisting that the supplemental memorandum was not an independent motion for a new trial but further support for the then pending post-trial motions. See Def.'s Reply in Supp. of Supplemental Mem. Concerning New Evidence at 4-5 (dkt. no. 359). Those prior pending motions were addressed in the Court's order that, among other things, granted a new trial. The defendant's argument now that the Supplemental Memorandum should be treated as an unaddressed motion for a new trial is inconsistent with his express prior position and untenable in the circumstances.

**IV.**    **Conclusion**

For the reasons stated herein, the defendant's Motion for Reconsideration (dkt. no. 404)

and Motions to Dismiss (dkt. nos. 406 and 426) are DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 04-10029-GAO

UNITED STATES OF AMERICA

v.

DANIEL E. CARPENTER,
Defendant.

OPINION AND ORDER
May 23, 2014

O'TOOLE, D.J.

The defendant was convicted by a jury of nineteen counts of mail and wire fraud.[1] The Superseding Indictment included a forfeiture count, and prior to sentencing the government moved for forfeiture of property in the sum of $14,053,715.52 pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461(c). The defendant was sentenced to incarceration and ordered to pay restitution and a fine. At the sentencing hearing, I requested further briefing from the parties on the forfeiture issue. This Opinion and Order now addresses that issue.

In addition, the defendant has moved for bail pending appeal and to stay the payment of the fine and restitution, matters also resolved by this Order.

**I.      Forfeiture**

After a defendant is convicted of mail and/or wire fraud, the sentencing court may order the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds

---

[1] The history of this prosecution and a summary of the evidence supporting the conviction are detailed in United States v. Carpenter, 736 F.3d 619 (1st Cir. 2013).

traceable to [the] violation." 18 U.S.C. § 981(a)(1)(C).[2] There are two possible definitions of

"proceeds" that may be applicable in this case. Section 981A(a)(2)(A) provides:

> In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

Alternatively, section 981(a)(2)(B) provides:

> In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(B).

Mail and wire fraud might arguably be called "unlawful activities" and thus fall within

the former definition, but that section immediately follows the words "unlawful activities" with

two specific categories of "fraud schemes." That would be unnecessary, of course, if the generic

term "unlawful activities" had been intended to be broad enough to encompass fraud schemes.

The latter definition seems more apt in the circumstances of this case, which broadly described

involved the "lawful services" of a Section 1031 intermediary being "provided in an illegal

manner," that is, by means of mail and wire fraud. I conclude, therefore, that for purposes of this

case, "'proceeds' means the amount of money acquired through the illegal transactions resulting

---

[2] Section 981(a)(1)(C) allows a court to order forfeiture for "any offense constituting 'specified unlawful activity' [ ]as defined in [18 U.S.C. § ] 1956(c)(7)." Section 1956(c)(7)(A) incorporates "any act or activity constituting an offense listed in [18 U.S.C. § ] 1961(1)." And § 1961(1)(D) lists mail fraud and wire fraud. While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c). This circuitous statutory mechanism authorizes a court to order forfeiture in mail fraud and wire fraud proceedings. United States v. Contorinis, 692 F.3d 136, 145 n.2 (2d Cir. 2012).

in the forfeiture, less the direct costs incurred in providing the . . . services." Id. Consequently, I agree with the government that the "amount of money acquired through the illegal transactions" is the amount an exchangor committed to the custody of Benistar, as alleged in the respective counts[3] (and, per the jury verdict, proved at trial). Any reduction to account for "direct costs" of the legal activity would have to be proved by the defendant, id., and no evidence has been offered in that respect.

The defendant argues that forfeiture is not appropriate because the exchangors' funds were not "acquired" by him within the meaning of the forfeiture statute. Rather, he asserts, the funds were only held temporarily by Benistar for the benefit of the exchangors in a Merrill Lynch or Paine Webber account. Accordingly, he says, he personally never acquired the funds and they are thus not forfeitable as "proceeds" of his unlawful activity.[4]

The argument is unconvincing. For property to be "acquired" by the defendant in the necessary sense, it "must have, at some point, been under the defendant's control." United States v. Contorinis, 692 F.3d 136, 147 (2d Cir. 2012). It is clear in this case that the defendant exercised control of the exchangors' funds not only by causing Benistar to be the nominal custodian of the funds for purposes of the tax law but also by himself using the funds in his options trading. To have the benefit of the 1031 exchange, the exchangors had to relinquish control to the intermediary. The defendant's control of the property was obtained through the fraud of which he was convicted. He personally controlled the investment of the funds while in

---

[3] The government seeks forfeiture under Counts One, Two, Five, Six, and Eight through Nineteen, the amounts obtained by Benistar under these counts totaled $14,053,715.52.

[4] It is well established that dissipating the funds would not be a reason to not order forfeiture. See United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006).

3

Case 1:04-cr-10029-GAO    Document 471    Filed 05/23/14    Page 4 of 5

the Merrill Lynch and Paine Webber accounts. The funds were effectively in his custody, and that satisfied the "acquired" requirement in the definition of "proceeds."

The defendant next argues that the amount of forfeiture sought by the government would violate the Eighth Amendment's excessive fines clause.

> A forfeiture will violate the Eighth Amendment's prohibition only if it is grossly disproportional to the gravity of the defendant's offense The case law invites us to consider as pertinent factors (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant.

United States v. Heldiman, 402 F.3d 220, 223 (1st Cir. 2005) (internal quotation marks and citations omitted).

The defendant first contends that the amount of forfeiture is disproportionate to his criminal conduct and that he, as an individual, never personally acquired the money. But, as discussed above, that is not the case. According to the verdict, he, acting for his company, obtained the exchangors' money by fraud. The forfeiture amount is exactly proportionate to the amount thus "acquired" by reason of his criminal conduct.

Second, the defendant claims that the forfeiture amount would deprive him of his livelihood. The argument is made in gross and without particulars, and is thus properly rejected. See United States v. Aguasvivas-Castillo, 668 F.3d 7, 16 (1st Cir. 2012) (upholding a $20 million forfeiture order where defendant put forth no facts to support proposition that amount would deprive him of his livelihood).

The defendant has not shown a violation of the Eighth Amendment's proscription.

Lastly, the defendant argues that the amount of his criminal forfeiture must be determined by a jury rather than the Court. In light of recent developments in the law involving sentencing this argument has some appeal. In Apprendi v. New Jersey, 530 U.S. 446 (2000) the Supreme

4

Court held that any fact, other than prior conviction, that increases a criminal penalty beyond the statutory maximum must be decided by a jury. In <u>Southern Union Co. v. United States</u>, 132 S. Ct. 2344 (2012), the Supreme Court applied the <u>Apprendi</u> rule to the imposition of criminal fines. Recently, in <u>Alleyne v. United States</u>, 133 S. Ct. 2151 (2013), the Supreme Court held that any fact that increases the mandatory minimum sentence must be submitted to a jury. Taken together, these three cases may support the proposition that facts supporting a criminal forfeiture order must be found by a jury. Since district courts have no discretion to reduce forfeiture, <u>see United States v. Phillips</u>, 704 F.3d 754, 769 (9th Cir. 2012), the statute requires to be forfeited whatever amount the court finds to be forfeitable, making that amount arguably the substantial equivalent of a minimum mandatory punishment, and thus governed by the <u>Alleyne</u> rule.

Nonetheless, notwithstanding the potential appeal of the defendant's argument, it runs directly contrary to existing Supreme Court precedent. In <u>Libretti v. United States</u>, 516 U.S. 29, 48–49 (1995), the Court expressly held that there is no Sixth Amendment right to a jury in a criminal forfeiture proceeding. This Court remains bound by that precedent. <u>See Rodriguez de Quijas v. Shearson/Am. Express, Inc.</u>, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). As the law stands, the defendant has no jury trial right on the issue of forfeiture.

For the reasons stated herein, the government's Motion for Forfeiture (dkt. no. 433) is GRANTED.

5

## II.    **Bail / Stay Pending Appeal**

The defendant has moved for bail pending appeal and for an order staying the imposed fine and order of restitution. Motions for bail pending appeal are governed by 18 U.S.C. § 3143(b):

> (1) . . . [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal . . . be detained, unless the judicial officer finds—
>
>> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>>
>> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>>
>>> (i) reversal,
>>>
>>> (ii) an order for a new trial,
>>>
>>> (iii) a sentence that does not include a term of imprisonment, or
>>>
>>> (iv) a reduced sentence to a term of imprisonment less than . . . the expected duration of the appeal process.
>
> If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title. . .

Under the statute, detention is the default setting, but it can be avoided if the court finds the enumerated conditions that warrant an exception to the norm. The First Circuit has made clear that the Bail Reform Act of 1984 creates

> no presumption in favor of release pending appeal; on the contrary, even when the conviction does not involve a crime of violence or drug offense, detention (following conviction and sentencing) is mandatory unless the judicial officer finds *inter alia* 'that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in' a reversal, new trial, or reduced term of imprisonment that would expire during the expected duration of the appeal process.

6

United States v. Colon-Munoz, 292 F.3d 18, 20 (1st Cir. 2002) (quoting 18 U.S.C. § 3143(b)(1)). A defendant seeking the benefit of the exception has the burden of establishing the factual predicate for the exception. See Morison v. United States, 486 U.S. 1306, 1306–07 (1988) (Rehnquist, Circuit Justice). See also Fed. R. Crim. P. 46(c).

I find that the defendant is unable to carry his burden under the statute. As to the finding required under § 3143(b)(1)(A), the defendant has shown through the course of this case that he is not a flight risk. However, he has not shown by clear and convincing evidence that he does not pose a danger to the safety of the community.  Viewing only its text, the statute itself could be understood to mean that "safety" is to be considered only with respect to possible physical harm to persons, but courts have held that the term can be understood to refer to the prevention of pecuniary or economic harm as well. See United States v. Reynolds, 956 F.2d 192 (9th Cir. 1992); United States v. Madoff, 586 F. Supp .2d 240, 252 (S.D.N.Y. 2009); United States v. Jinwright, 2010 WL 2926084 at *2 (W.D.N.C., July 23, 2010). The defendant was recently indicted in Connecticut for mail and wire fraud offenses, the same category of offenses as he was convicted of in this case. That indictment alleges acts committed through 2010. Additionally, in a civil case in the Southern District of New York, the district judge issued a written opinion detailing her conclusions that the defendant had engaged in fraudulent acts involving a life insurance policy. At the very least, those matters prevent a conclusion "by clear and convincing evidence" that the defendant poses no risk of safety to the community.

The defendant has also failed to persuade me that he meets the criteria of § 3143(b)(1)(B) – that his appeal presents one or more substantial issues which, if decided favorably to him, would likely result in reversal, a new trial, or a favorable adjustment of his sentence. See United States v. Bayko, 774 F.2d 516, 522-23 (1st Cir. 1985). The defendant identifies issues he will

present on appeal, all of which have, of course, been previously addressed here: violation of the Speedy Trial Act as to both trial and sentencing; constructive amendment of the indictment or prejudicial variance; insufficiency of the evidence; and governmental reliance on perjured testimony. (The Court of Appeals has already rejected at least the last argument. United States v. Carpenter, 736 F.3d 619, 631 (1st Cir. 2013).)

I have carefully reviewed and discussed each issue when it was presented and resolved at this level. I have twice rejected the defendant's argument regarding the sufficiency of the evidence. United States v. Carpenter, 405 F. Supp. 2d 85, 93-96 (D. Mass. 2005); United States v. Carpenter, 808 F. Supp. 2d 366, 376-80 (D. Mass. 2011). I have also considered and rejected his argument about a variance or constructive amendment of the indictment. 405 F. Supp. 2d at 92. I have also previously discussed why he has not shown a violation of his right to a speedy trial. United States v. Carpenter, 542 F. Supp. 2d 183 (D. Mass. 2008); Opinion and Order (Dkt. No. 431) (Feb. 21, 2014). For the reasons stated in those prior orders, I do not believe that any of the issues he proposes to appeal present a "close" question in the necessary sense. See Bayko, 774 F.2d at 523 (defining "close" as where "there is some question that very well could be decided the other way").

As to the motion to stay the fine and restitution, that motion is likewise denied. I agree with the government that the defendant's course of conduct in this case and the more recent cases in other jurisdiction referenced above creates a risk of the dissipation of the defendant's assets that cannot be ignored.

Case 1:04-cr-10029-GAO   Document 471   Filed 05/23/14   Page 9 of 5

### III.     Conclusion

For the reasons stated herein, the government's Motion for Forfeiture (dkt. no. 433) is GRANTED. The defendant's Motions for Bail Pending Appeal (dkt. no. 452) and to Stay the Fine and Restitution (dkt. no. 458) are DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge