DANIEL E. CARPENTER
18 PONDSIDE LANE
WEST SIMSBURY, CT 06092

2014 JUN 13 P 3: 32

FILED IN CLERKS OFFICE
US COURT OF APPEALS
FOR THE FIRST CIRCUIT

June 12, 2014

Judge George A. O'Toole
United States District Judge
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

**Re:    Update Regarding Carpenter Case 1:04-cr-10029-GAO**

Dear Judge O'Toole:

I write to inform the Court of a major development in the tandem civil case regarding my criminal case, reported Friday evening in the Mass Lawyers Weekly in *Cahaly v. Benistar Property Exchange Trust Co.*, 2014 WL 2523192 (Mass. App. June 6, 2014), from the Massachusetts Court of Appeals. The June 6, 2014 opinion makes it clear that not only did all three Merrill witnesses at my two trials commit perjury, but that there was a decade-long pervasive fraud on the court carried out by Merrill's lead attorneys including John Snyder of Bingham McCutcheon. Neither Snyder nor Bingham fare well in the Appeals Court opinion, but as Your Honor will recall, Attorney Snyder and other Merrill attorneys sat right behind the government's prosecutors at both of my trials as if Merrill's attorneys were coaching and instructing the government. Attorney Snyder was present at all of the interviews of Merrill witnesses for the FBI 302 reports, and all three investigations conducted by the SEC which we did not learn about until 2012 when BPETCO sued Merrill Lynch after Merrill fought going to arbitration. Now we know without a doubt that the government investigation of BPETCO and Carpenter was rotten to the core, and a frame-job by Merrill and its attorneys to protect Merrill from its culpability in an $8 million loss while suborning perjury, withholding key exculpatory

1

evidence, obstructing justice in several different investigations, and destroying key evidence that this Court is well aware of because of my attorneys reporting to the Court of Merrill's malfeasance from 2009-2011. *See* Court's list of letters of supplemental authority listed in its Opinion of February 21, 2014. While Your Honor mentioned all of the filings about the mountains of newly-discovered evidence from Merrill in discussing the time period between December 3, 2008 and September 1, 2011, when my second new trial order was granted, the sheer volume of the newly-discovered evidence is 36,000 pages including 48 depositions and thousands of previously withheld documents and new letters and statements from Merrill's General Counsel that everyone at Merrill lied, and even Thomas Rasmussen admits he lied at both of my trials in his depositions in 2010 and 2011.

As the Court is well aware, Your Honor and I are the last witnesses that I did not receive a fair trial in a decidedly "unfriendly" forum. *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004). "Carpenter has persistently-opposed venue in Massachusetts." *United States v. Carpenter*, 405 F.Supp.2d 85, at *2 (D.Mass. 2005). Your Honor is also my only witness that the egregious prosecutorial misconduct of my first trial that was reported in the USA Today study of September 22, 2010 (*see Prosecutors' Conduct Can Tip Justice Scales*, USA Today, September 22, 2010) was surpassed only by the prosecutorial misconduct in my second trial. The Court reported that Paley committed perjury in my first trial and the term "Riverboat Gambler" clearly prejudiced Carpenter, and the First Circuit agreed with this Court. Now that we know that virtually all of the witnesses lied at my second trial, and the government had reason to know that they **all** lied, not just Levine, I would urge this Court to use its supervisory powers to dismiss my Indictment to prevent a miscarriage of justice.

Now, the Massachusetts Court of Appeals' opinion makes it clear that all of the Merrill witnesses lied; not just Levine, and not just Stern, but the worst of all is Rasmussen who was the "believable" compliance officer that kept "secret notes" of all of his conversations with me and was allowed to criticize me and praise Merrill, leaving the jury to believe that if Carpenter would lie or deceive Merrill, then perhaps he would deceive the Exchangors as well. This is critical to Carpenter receiving a fair trial, because the Court asked the government if they were going to use any statements from Levine in their closing arguments. They lied to you when they said they would not. Instead, the government did use all of Levine's "derogatory statements" about me, but attributed those statements to Stern and Rasmussen.

The pattern of Merrill lies started in January 2001 and this pernicious perjury on the part of Attorney Snyder and the Merrill witnesses allowed Snyder to tell the civil jury in *Cahaly* in 2002 that "Carpenter was the Master of Deception." That moniker has stuck with me throughout the decade, because as you can see, in June 2013, Justice Souter made the following comments:

> This is the latest of over a decade of state and federal cases arising out of the **financial misconduct of BPE and its owner Daniel Carpenter**.[1] In what the parties refer to as the *Cahaly* litigation, the following evidence led to findings that BPE, Carpenter, and other defendants were liable for various forms of financial misconduct. See generally *Cahaly v. Benistar Prop. Exch. Trust Co.*, 864 N.E.2d 548, 552-53, 559-60 (Mass. App. Ct. 2007); *Cahaly v. Benistar Prop. Exch. Trust Co.*, 885 N.E.2d 800, 807-09 (Mass.), *cert. denied*, 555 U.S. 1047 (2008).
>
> > [1] *See, e.g., Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24 (1st Cir. 2010); *United States v. Carpenter*, 494 F.3d 13 (1st Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008); *United States v. Carpenter*, 405 F. Supp. 2d 85 (D. Mass. 2005); *Cahaly v. Benistar Prop. Exch. Trust Co.*, 885 N.E.2d 800 (Mass.), *cert. denied*, 555 U.S. 1047 (2008); *Cahaly v. Benistar Prop. Exch. Trust Co.*, 864 N.E.2d 548 (Mass. App. Ct. 2007); *Cahaly v. Benistar Prop. Exch. Trust Co.*, 2003 WL 21246167 (Mass. Super. Ct. Feb. 25, 2003).

In November 2013, Judge Swain in New York mentioned Judge Botsford's opinions from 2002 and 2003 (two trials in which I neither appeared nor testified) to find "badges of

fraud" for my alleged activities in 2009 involving a civil dispute in 2013 over a certain life insurance policy from 2007 that I literally had nothing to do with except providing the funding for its purchase. So the same lies by Merrill's attorney to the Massachusetts jury in 2002 came back to haunt me in 2013 with Justice Souter and with Judge Swain's negative comments about me, based on lies from 2002 which were cited by the government at my sentencing and by this Court in denying my bail pending appeal motion. But, now it appears that Attorney Snyder is the real "Master of Deception," and he will be facing the BBO and renewed lawsuits for the next few years.

Therefore, if the Court could possibly arrange a "beers-in-the-Rose-Garden" meeting with Justice Souter and Chief Judge Lynch, which is what I understand happens when someone from Harvard is wrongly-accused of a crime, I would like to share with Justice Souter and Chief Judge Lynch the lawsuit kept from us all that was filed by the "*Cahaly* Plaintiffs" under the guise of Joe Iantosca who was not "well enough" to testify at my trial in June 2008, but was competent enough to sue Merrill in February 2008 and negotiate a payment from me of $15 million at the end of May 2008 (my arbitration victory over PaineWebber), attached hereto as Exhibit One. This lawsuit is not mentioned by Justice Souter in the long litany of describing the "*Cahaly* litigation."

While reading the Iantosca testimony from my first trial at my second trial clearly violated my Sixth Amendment rights under the Confrontation Clause, the real crime here is that the government attorneys violated their responsibilities under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Bagley*, 473 U.S. 667 (1985), as well as *Napue v. Illinois*, 360 U.S. 264 (1959) ("[A] conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the

4

[Fifth] Amendment."). As the Court can see from the "Iantosca filing" by the same famous *Cahaly* plaintiffs listed in Justice Souter's unflattering opinion of me, my name is not even mentioned once, and they have totally focused on Merrill as the "bad actor" and that BPETCO was completely transparent and up-front with Merrill on the key issue of BPETCO being a "1031 qualified intermediary," investing client funds, not "Carpenter's money" as both Rasmussen and Stern falsely testified twice, as well as Levine's obvious perjury in both trials. If they lied about one thing, a new jury should hear that they lied about many things, or everything. This lawsuit from February 2008, that the government should have known about or heard about from their FBI 302 reports, would have been crucial to cross-examining the Exchangors as well as the Merrill witnesses.

Respectfully, I would like to quote from this Court's own opinion in *Carpenter* One, describing "Paley's perjury" in Trial One, not Levine's in Trial Two while thinking of the recent decision in *Cahaly* and the hidden lawsuit of *Iantosca v. Merrill Lynch* from February of 2008:

> Carpenter contends that the government failed to disclose information it knew about Martin Paley that had potential exculpatory value. While the background to this argument is the case law emanating from Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), Carpenter's argument is more particularly based in this Court's Local Rules. Local Rule 116.2 (captioned "Disclosure of Exculpatory Evidence") establishes a timetable for the disclosure by the government of potentially exculpatory material. It begins with a definition of exculpatory information:
>
> > (A) Definition. Exculpatory information includes, but may not be limited to, all information that is material and favorable to the accused because it tends to:
> >
> > > (1) Cast doubt on defendant's guilt as to any essential element in any count in the indictment or information;
> > >
> > > (2) Cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress or exclude, which would, if allowed, be appealable pursuant to 18 U.S.C. § 3731;

(3) Cast doubt on the credibility or accuracy of any evidence that the government anticipates offering in its case-in-chief; or

(4) Diminish the degree of the defendant's culpability or the defendant's Offense Level under the United States Sentencing Guidelines.

L.R. 116.2(A).

Two preliminary observations about this definition are in order. First, the categories of information listed in the Local Rule as potentially exculpatory are consistent with the applicable case law, covering matters that may be directly exculpatory in that they tend to negative an inference of the defendant's guilt, as well as matters that are indirectly exculpatory in that they impeach or call into question some of the government's inculpatory evidence. Second, it is worth noting the important qualification in the Rule's preamble, as in the case law: to be exculpatory, information must be both "material" and "favorable to the accused."

Assessing the materiality of potentially exculpatory information is guided by the principles outlined by the Supreme Court in Kyles v. Whitley, 514 U.S. 419 (1995) and United States v. Bagley, 473 U.S. 667 (1985). Materiality is not judged simply by asking whether the information might be favorable to the defendant in some degree. Put the other way around, not all information favorable to the defendant is necessarily material. Kyles, 514 U.S. at 437; Bagley, 473 U.S. at 675 & n.7. The touchstone of materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. **The materiality of the undisclosed information is to be assessed not in isolation, but in the context of the entire record at the trial.** See United States v. Agurs, 427 U.S. 97, 112 (1976).

Based on the above reasoning from *Carpenter* One as to Paley's perjury, I would respectfully request the Court to review the new ruling in *Cahaly* from last week as it applies to the Exchangors' own lawsuit against Merrill Lynch in February of 2008, which I did not receive a copy of until July of 2009. The Court has already mentioned in several rulings all of the letters that we have sent to the Court detailing the decade-long pervasive fraud committed on this Court by Merrill and its attorneys. The government has not lived up to its duties under *Brady*, *Giglio*, and *Bagley*.

Similarly, discovery in BPETCO's lawsuit against Merrill in 2012 revealed Jerry Levine's letter of December 6, 2000, welcoming the "Master of Deception" Carpenter back to Merrill with open arms. Note that Levine and Stern's option choices are even more "risky" and "aggressive" than the stocks that I was excoriated for in both of my "not-so-fair" trials. Levine's choices included the doomed Lehman Brothers and the devastated Citibank. Others like Sun and AETH no longer exist.

I also want to remind the Court that Paley was not the only person to lie at both trials. Your Honor stopped Lorie Enright's testimony to read her her rights and to warn her to be careful as to how she would testify. Similarly, Your Honor commented that Mitch Rock might have "13 million reasons" to lie, referring to my arbitration victory over PaineWebber and referring to Bucky Dent's inability to get a fair trial in Boston. I would respectfully submit that Carpenter is also a "Connecticut Yankee in a Boston Court." Furthermore, Gail Cahaly lied, saying that she knew that I prepared the BPETCO marketing material, when she and her husband drew up their own agreement with Paley and did not even review the standard BPETCO agreements or the Paley PowerPoint that allegedly speaks of safety (which is not true either).

Perhaps the best example after the broker perjurers (Levine, Stern, Rasmussen, Tabbah, and Rock) of the government taking false information – not gray – but absolutely false information and presenting it to the jury, is the testimony of Marjorie Adams; Iantosca's attorney who testified in both trials that she had not one, but two, phone calls with me discussing the possibility of doing a "reverse exchange" for Iantosca. The government, in its closing argument, said the following: "Remember Marjorie Adams...she said that BPETCO couldn't buy a building...so BPETCO's investment choices were not unlimited...."

7

The real truth of the matter is that **all** of Adams' phone records were subpoenaed before both trials. She had two chances to identify any phone call to Carpenter in Connecticut from either her office, home, or cellular phone. She could not even prove one phone call to me, much less two. Despite that fact, Marjorie Adams was held out to the jury in closing arguments as an "expert" in property exchanges; the government "vouched" for the truthfulness and accuracy of her testimony, and worst of all, the government's statements based on Adams' were absolutely false, because a "reverse exchange" would literally involve BPETCO "investing" in or buying a building before Iantosca sold his property. This "trifecta" of prosecutorial misstatements in the closing arguments requires a new trial in and of itself, even without the newly-discovered "broker witnesses'" perjury – which permeates throughout the closing statements.

Therefore, I would like to respectfully appeal to the Court's supervisory powers, as well as Chief Judge Lynch's supervisory powers, to issue an Order to Show Cause under the All Writs Act as to why my Indictment should not be dismissed due to this egregious prosecutorial misconduct that has now come to light, because the only relevant testimony to the Grand Jury that indicted me was provided by an FBI Agent that merely read to the jury the lies told to him by the Merrill broker witnesses that were coached by Attorney Snyder as well as by Paley, the Pernicious Perjurer, who was given a hidden "immunity" deal through his attorney Jeff Denner, who was at the time a partner of Attorney Tony Zelle, who has been the hard-charging attorney behind the Exchangors for the past 14 years and who argued in this case against Bingham and Snyder that was decided last Friday.

Finally, it is extremely doubtful that my indictment from 2004 would today survive a motion to dismiss a RICO mail and wire fraud claim under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), or even the "who, what, where

8

and when of pleading fraud with particularity under Rule 9(b)." Not only are the words "specific intent to defraud" or "scienter" or "*mens rea*" totally missing from my Indictment, nowhere does the government mention that I had a duty to disclose, and in fact accuses me of making false material oral and written statements. At this late date the government has failed to even identify one false statement made by me anywhere. Even Your Honor realizes that I had nothing to do with Paley's PowerPoint that he created three years before he even met me. And no one from the government has ever told me, what could I have invested in, lost all of the money like LandAmerica did with $400 million invested in municipal bonds, and not have been indicted?

Furthermore, at my appeal hearing, Judge Howard asked the question that "didn't I have a duty to disclose once I started to lose money in 2000?" This is contrary to the law in the First Circuit. See, for example, Judge Howard's own opinion in *Sanchez v. Triple-S*, 492 F.3d 1 (1st Cir. 2011), dealing with the failure of someone to plead mail and wire fraud with particularity under Rule 9(b). In *Triple S*, the First Circuit upheld the dismissal of the plaintiffs' claims as well as its decision in *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1998), that there is no "legal, professional or contractual duty," nor even a "general obligation" to disclose any **negative information** without a legal duty to disclose. The First Circuit went on to reaffirm its decision in *Bonilla* that:

> "[w]hether or not this would bring business in the United States to a standstill might be debated; but it is a change, if it is ever to be made, that should be undertaken by legislatures and not by courts....[and], if the disclosure was omitted in good faith, there was no fraud. *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir.1991) (holding that good faith is an "absolute defense" to mail and wire fraud)."

With these thoughts in mind, the First Circuit in *Triple S* also went on to state:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about

9

the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask."

Therefore, one need only replace the names in *Triple-S*, and my case parallels it exactly:

> The [government] do[es] not say whether [Carpenter] ha[d] a duty to disclose "the actual manner in which the [funds] were [invested]" or, if so, what the source of that duty is; they do not say whether the defendant "fail[ed] to disclose" or "conceal[ed]" this information with the intent to deceive the plaintiffs. Instead, they proceed on the assumption that nondisclosure alone can support mail and wire fraud claims. As we have discussed, **that is not the law, in this circuit or elsewhere**.

*Id.* at 11. (emphasis added).

In addition, the evidence adduced at my second trial did not come close to suffice to prove that, even if such a new legal duty of disclosure arose in 2000, that I **knew** that I had such a new duty which did not exist in 1998-99. The evidence did not prove that I had the required *mens rea* for conviction on an omissions theory. *See United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir. 1993). The offense of fraud requires both a deceptive act **and** the knowledge that the act is deceptive. *Cassiere*, 4 F.3d at 1011. Your Honor said as much yourself in *Baron v. Smith*, 285 F. Supp. 2d 96, 109 (D. Mass. 2003):

> "The plaintiff's argument that the defendants are liable because they "knew or should have known" of the alleged omissions misapprehends the high standard for scienter the First Circuit imposes on securities fraud cases."

So why is it that I am being held to a higher standard in a criminal case from well-known and reported First Circuit cases that were dismissed under summary judgment?

Therefore, I would respectfully request that Your Honor exercise this Court's supervisory powers to dismiss my Indictment for perjury in the grand jury, or order a new trial under Rule 33 based on the "interests of justice" because the three year rule regarding newly-discovered evidence does not prevent this Court from issuing such a ruling, declare a mistrial, or, at the very

least, issue an Order to Show Cause to the government to investigate the *Brady-Giglio-Bagley* violations that are now apparent for all to see in the June 6, 2014 ruling in *Cahaly*.

Thank you for your thoughtful consideration of my requests in the interest of justice. I have prepared this as a letter requesting that the Court use its supervisory powers to dismiss the Indictment, rather than do a motion to which the government would say this Court lacks jurisdiction while my case is on appeal to the First Circuit.

Respectfully Submitted,

Daniel E. Carpenter

11

# EXHIBIT ONE

## COMMONWEALTH OF MASSACHUSETTS
## BUSINESS LITIGATION SESSION

SUFFOLK, ss.                                    **SUPERIOR COURT DEPARTMENT**

| | |
|---|---|
| JOSEPH IANTOSCA, Individually and as Trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust, BELRIDGE CORPORATION, GAIL A. CAHALY, JEFFREY M. JOHNSTON, BELLEMORE ASSOCIATES, LLC, and MASSACHUSETTS LUMBER COMPANY, INC. | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MERRILL LYNCH PIERCE FENNER & SMITH, INC., | ) ) |
| Defendant. | ) |

CIVIL ACTION NO. **08-0775-D**

### COMPLAINT AND JURY DEMAND

### PARTIES

1.      Joseph Iantosca is a natural person and a resident of the Commonwealth . of Massachusetts.  Mr. Iantosca brings this action individually and as trustee of plaintiffs Faxon Heights Apartments Realty Trust and Fern Realty Trust.

2.      Belridge Corporation is a Massachusetts Corporation with a principal place of business in Weymouth, Massachusetts. Mr. Iantosca is the President and sole shareholder of Belridge.

3.      Gail A. Cahaly is an individual residing in Westwood, Massachusetts.

4.      *Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.*

4.      Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.

5.      Bellemore Associates, LLC is a limited liability company organized under the laws of New Hampshire.

6.      Massachusetts Lumber Company, Inc. is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

7.    Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrll Lynch") is a Delaware corporation with a usual place of business at 125 High Street in Boston Massachusetts.

## FACTS

8.    By letter dated January 16, 2008, the plaintiffs presented Merrill Lynch with a written demand for relief in accordance with Massachusetts General Laws Chapter 93A, § 9 (3).

9.    Merrill Lynch did not respond with a reasonable offer within 30 days.

10.    Merrill Lynch opened and operated brokerage accounts for Benistar Property Exchange Trust Company, Inc.

11.    As its name suggests, Benistar Property Exchange Trust Company, Inc. held money in trust for its clients.  Specifically, Benistar Property Exchange Trust Company, Inc. had Escrow Agreements with its clients, including plaintiffs, under which it agreed to hold its clients funds in escrow.

12.    Gerald Levine, one of the Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. was informed by the President of Benistar and by an attorney for one of Benistar's clients that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistar's clients.

13.    The Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. were informed in writing that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistars clients.

14.    The documents provided to Merrill Lynch included the Escrow Agreement used by Benistar to establish its contractual and fiduciary duties with its clients.

2

15.    The documents provided to Merrill Lynch included the Exchange Agreement that described in detail Benistar's contractual and fiduciary duties as an intermediary in accordance with Section 1031 of the Internal Revenue Code.

16.    As described in the Escrow and Exchange documents that were provided to Merrill Lynch, and as described to Gerald Levine in the conversations he had with Benistar's president and the attorney for one of Benistar's clients, Benistar served as an intermediary for Section 1031 transactions.

17.    Section 1031 of the Internal Revenue Code entitles taxpayers to defer capital gains taxes on the appreciation of commercial real estate by using the proceeds of a sale of such real estate to purchase like-kind property.

18.    The documents provided to Merrill Lynch explained that Benistar Property Exchange Trust Company held in escrow for its clients the proceeds of real estate sales made by its clients and that Benistar agreed to hold these funds in escrow pending its clients' need for those funds to acquire replacement property.

19.    Despite their knowledge that the money in the Benistar accounts belonged to Benistar's clients and was to be held in escrow, the Merrill Lynch brokers approved the Benistar accounts for highly speculative option trading.

20.    Benistar lost millions through the option trading and, despite demands by plaintiffs, failed to return approximately $8.7 million to plaintiffs.

21.    In 2001, plaintiffs sued Benistar and served a third party subpoena on Merrill Lynch seeking all documents relating to the Benistar accounts.

22.    Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients.

3

23.    Later in 2001, Merrill Lynch was added as a party in this Massachusetts litigation and plaintiffs served discovery requests on Merrill Lynch seeking all information and all documents relating to the Benistar accounts.

24.    Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients, nor did it identify these documents and communications.

25.    Merrill Lynch lied about its involvement with the Benistar accounts and destroyed, concealed and/or failed to produce the documents evidencing its participation with Benistar in the misuse of Benistar's clients' funds.

26.    Plaintiffs discovered the documents evidencing Merrill Lynch's participation with Benistar in the misuse of its clients' funds after Merrill Lynch's brokers testified under oath that they had no knowledge that the Benistar accounts contained other people's money.

27.    Despite the testimony by Merrill Lynch's brokers denying their knowledge of and participation with Benistar in the misuse of Benistar's clients' funds, a jury found Merrill Lynch liable for colluding with Benistar and found that Merrill had violated New York and Connecticut consumer protection statutes.

28.    A judgment entered on that verdict prior to the award of damages based on Merrill Lynch's violation of the New York and Connecticut consumer protection statutes.  The present judgment has a value of more than $26,000,000.

29.    Merrill Lynch has persisted in its denial of liability despite the discovery by plaintiffs of the documents that Merrill Lynch destroyed, concealed and/or failed to produce and despite its own knowledge that the testimony provided at trial by its brokers was perjurious.

30.     Merrill has pursued litigation in an attempt to harass plaintiffs, to impose financial costs and emotional distress on the plaintiffs and to extort plaintiffs to settle for less then they are owed.

31.     As a result of the unfair and deceptive conduct described above, plaintiffs have suffered damages in the form of the attorneys' fees, the loss of use of money, tax liabilities, accountants' fees and emotional distress.

32.     Merrill's Lynch's Board of Director's has adopted *Merrill Lynch's Code of Ethics for Financial Professionals* and which states: "All financial professionals must . . .[e]ngage in and promote honest and ethical conduct . . . [and] act in good faith, responsibly, with due care, competence, prudence and diligence, without misrepresenting material facts or allowing one's independent judgment or decisions to be subordinated."

### COUNT I – UNFAIR AND DECEPTIVE ACTS PROHIBITED BY G.L. c. 93A

33.     Plaintiffs restate the allegations set forth in paragraphs 1-32 above and incorporate them by reference as though fully set forth herein.

34.     Merrill Lynch has willfully and knowingly engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

35.     Plaintiffs have been injured by Merrill Lynch's willful and knowing engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

36.     Plaintiffs are entitled to compensatory damages, punitive damages and attorneys fees based on Merrill Lynch's willful and knowing unfair and deceptive conduct.

### COUNT II - FRAUD

37.     Plaintiffs restate the allegations set forth in paragraphs 1-36 above and incorporate them by reference as though fully set forth herein.

38.    Merrill Lynch's willfully and knowingly engaging in unfair and deceptive conduct constitutes fraud.

39.    Plaintiffs have been injured by Merrill Lynch's fraudulent conduct.

40.    Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's fraudulent conduct.

## COUNT III – MALICIOUS DEFENSE

41.    Plaintiffs restate the allegations set forth in paragraphs 1-40 above and incorporate them by reference as though fully set forth herein.

42.    In support of Merrill Lynch's defense to plaintiffs' claims based on its collusion with Benistar in the improper use of plaintiffs' escrow funds, Merrill Lynch created false material evidence and gave false testimony advancing such evidence.

43.    Plaintiffs have been injured by Merrill Lynch's malicious defense.

44.    Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's malicious defense.

WHEREFORE, plaintiffs demand judgment against Merrill Lynch in an amount sufficient to compensate them for the injuries caused by Merrill Lynch, for punitive damages in the amount of three times the amount of the judgment on all claims arising out of the same and underlying transactions or occurrences, for costs and attorneys fees, and for all other relief the court may deem appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

JOSEPH IANTOSCA, Individually and as Trustee
of the Faxon Heights Apartments Realty Trust and
Fern Realty Trust, BELRIDGE CORPORATION,
GAIL A. CAHALY, JEFFREY M. JOHNSTON,
BELLEMORE ASSOCIATES, LLC, and
MASSACHUSETTS LUMBER COMPANY, INC.

By their attorneys,

Anthony R. Zelle, BBO No. 548141
**ZELLE MCDONOUGH LLP**
Four Longfellow Place, 35th Floor
Boston, MA 02114
Tel: (617) 742-6520
Fax: (617) 973-1562

William C. Nystrom, BBO No. 559656
Colleen C. Cook, BBO No. 636359
**NYSTROM BECKMAN & PARIS LLP**
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100

7

# EXHIBIT TWO

Gerald R. Levine
Stern, Fischler & Levine Group
717 Fifth Avenue
8th floor
New York, New York 10022
Phone: 212-415-7486
Fax: 212-415-7934

 **Merrill Lynch**

December 6, 2000

Mr. Dan Carpenter
% Benistar Ltd.
507 Hopmeadow Street
Simsbury, CT 06070

Dear Dan:

I am so very glad to hear that yesterday, you had a good day in the options market. This has been one of the most unpredictable and unkind of year's, since I began on the street 20 years ago.

At your request I have enclosed 3 sets of documents necessary to open an options trading account. The usual familiar booklet is for a LLC account, and the CMA form would be used for a Trust account.

If you have any questions as to where to sign, just call me at the old familiar number. I appreciate this particular account, and look forward very much to keeping in more constant contact with you.

Finally, with regard to our current selections, (and this can always change by next week), we like LEH over C or AMX, we agree with you on SUNW and EMC, would not use TXN in our strategy, and would definitely include the following: AOL, AETH, JDSU, and VRSN. These are the best stocks and option possibilities today, based on a minimum of a $100,000 account, which is now Merrill's new minimum size.

Warmest Regards,

Jerry

# EXHIBIT THREE

FOCUS - 1 of 14 DOCUMENTS

## GAIL A. CAHALY & others[1] vs. BENISTAR PROPERTY EXCHANGE TRUST COMPANY, INC., & others.[2]

1 Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber Company, Inc.; Joseph Iantosca, individually and as trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust; and Belridge Corporation.

2 Benistar Ltd.; Benistar Employer Services Trust Corporation; Benistar Admin. Services, Inc.; Carpenter Financial Group, LLC; Molly Carpenter; Daniel E. Carpenter (collectively, the Benistar defendants); Merrill Lynch, Pierce, Fenner & Smith, Inc.; and U.S. Property Exchange; Bingham McCutchen LLP, intervener in the sanctions proceedings.

No. 12-P-956.

APPEALS COURT OF MASSACHUSETTS

2014 Mass. App. LEXIS 62

December 2, 2013, Argued
June 6, 2014, Decided

**NOTICE:**

THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE MASSACHUSETTS REPORTER USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**PRIOR HISTORY:** [*1]
**Suffolk.** Civil actions commenced in the Superior Court Department on January 9, 16, 22, and 23, 2001; February 6, 2001; September 20, 2001; and April 30, 2002. Following review by the Supreme Judicial Court, 451 Mass. 343 (2008), motions for sanctions and for a new trial were heard by Stephen E. Neel, J.

**CORE TERMS:** site, work product doctrine, intermediary', work product, discovery, new trial, good faith, disclosure, trading, visited, impression, adequate basis, qualification, con-

sultant, withhold, escrow, fax, legal standards, anticipation of litigation, interrogatory, preparation, intervener, nonlawyer, belonged, in-house, patent, real estate transactions, law firm, relevant facts, issue of sanctions

**HEADNOTES**

*Attorney at Law*, Work product. *Penalty. Practice, Civil*, New trial.

**COUNSEL:** Anthony R. Zelle for Gail A. Cahaly & others.

Michael B. Keating for the intervener.

Brooks L. Glahn for Benistar Property Exchange Trust Company, Inc., & others.

**JUDGES:** Present: Kantrowitz, Graham, & Meade, JJ.

**OPINION BY:** MEADE

**OPINION**

MEADE, J. The plaintiffs appeal from the denial of their motion for sanctions against Bingham McCutchen LLP (Bingham), intervener, the law firm that defended Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill), in the 2002 jury trial of this action. The plaintiffs claim that in that litigation Bingham wrongfully withheld documents relevant to the issue whether Merrill, in handling the accounts of Benistar Property Exchange Trust Company, Inc. (Benistar), knew that Benistar was trading with money belonging to third parties. We hold that Bingham lacked an adequate legal basis, under the guise of the work product doctrine, for its decisions to withhold information that Merrill employees   [*2] had viewed certain Benistar Web pages describing its business as an intermediary for third-party funds and then to present a defense claiming that no Merrill employees had viewed the very same Web pages.[3] As a result, we vacate that portion of the final judgment entering judgment in favor of Bingham on the plaintiffs' motion for sanctions.[4] As explained below, there remain certain issues that require resolution by a fact finder, and thus, we remand for further proceedings consistent with this opinion.[5]

3 Also before us is the Benistar defendants' appeal from the denial of their motion for a new trial.

4 Final judgment entered on February 7, 2011. Paragraph E pertains to the issue of sanctions.

5 The plaintiffs prevailed on their claims against Merrill at the new trial. The plaintiffs and Merrill have since settled all claims between them.

*Background.* For background regarding the 2002 trial and the underlying dispute, we refer to *Cahaly* v. *Benistar Property Exch. Trust Co.*, 451 Mass. 343 (2008) (*Cahaly*),[6] in which the Supreme Judicial Court affirmed the order of the Superior Court judge granting the plaintiffs a new trial. The documents at issue here came to light during the preparation of [*3] the second trial in 2009, when Merrill, then represented by different counsel, produced the documents as responsive to document requests served by the plaintiffs in 2001. As a result, after the second trial, the plaintiffs moved for sanctions against Merrill and Bingham, intervener on the issue of sanctions, and the judge conducted an eight-day evidentiary hearing on the motion. He adopted most of the 334 stipulated facts submitted by the parties and made comprehensive additional findings of fact, set out in his January 11, 2011, memorandum and order. We summarize those facts here, adding additional materials from the record where noted.

> 6 The basis of the motion for a new trial in *Cahaly* was certain documents provided by attorney David Patterson. See *Cahaly, supra* at 362-368. The plaintiffs have never contended that Bingham had possession of these documents or wrongly withheld them, and the documents Patterson supplied are not the subject of this appeal.

Merrill retained Bingham in June, 2001, to represent it in connection with the complaints filed by the plaintiffs, who were former clients of Benistar and who claimed losses of $8 million as a result of Benistar's wrongdoing in investing [*4] the plaintiffs' funds. John R. Snyder, a Bingham partner and experienced trial attorney, became Merrill's lead trial counsel, and proceeded to gather information in response to discovery requests. In speaking with Merrill employees involved with the Benistar accounts, Snyder was informed that none of them knew that the money in those accounts belonged to third parties, and that on September 20, 2000, Benistar's trading was restricted because of losses rather than because of concerns that the accounts contained third-party funds. Snyder also determined that none of Merrill's employees had visited the § 1031 pages of the Benistar Web site,[7] which explained that Benistar's business was to serve as an intermediary for third-party funds.

> 7 Section 1031 refers to a section of the Internal Revenue Code, 26 U.S.C. § 1031 (2006), that permits tax advantages for certain like-kind property exchanges and requires that the proceeds be placed in an escrow account, a qualified trust, or with a qualified intermediary. See *Cahaly, supra* at 345 n.4.

On July 15, 2002, Snyder received a file from Joseph Pash, a Merrill in-house lawyer, which Pash had obtained from Martin Malia, an options specialist in Merrill's [*5] compliance department. The file contained documents indicating that on the morning of September 20,

2000, the day Merrill ordered Benistar's trading restricted, Malia had visited the § 1031 pages of the Benistar Web site. Those pages contained information about § 1031 property exchanges and revealed that Benistar's business was as an intermediary to hold funds for clients engaged in § 1031 property exchanges. The pages contained a question and answer section, including the following:

> "Can I trust Benistar Property Exchange with My Money? . . . [W]e protect your assets: We have accounts with major banking and investment firms -- accounts under our sole control, as required for these exchanges. . . . Our accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner. We distribute funds only at your written request."

The judge found that the § 1031 pages of the Benistar Web site disclosed that Benistar handled other people's money and caused Malia to suspect that Benistar was trading other people's money through its Merrill accounts. The judge also found that this information concerned Malia because of the losses in Merrill's [*6] Benistar accounts, but that the Web site did not inform Malia that Benistar's options trading was a breach of Benistar's duty to its clients to hold their funds in low-risk escrow accounts. Also in the file was a facsimile transmission (fax) from Malia to Thomas Rasmussen, a Merrill administrative manager, sent at 11:04 A.M. on September 20, 2000, attaching the § 1031 Web site pages.[8]

> 8 The Malia file also included, among other things, a September 27, 2000, electronic mail message from Hassan Tabbath, a Merrill vice-president, requesting that brokers involved with the Benistar account send a letter, "Confidential to Counsel," concerning their "knowledge about the client managing other people's money." The file also contained the brokers' October 2, 2000, "Confidential to Counsel" memorandum, stating that "[a]s far as we know [Carpenter's] major source of business is: estate planning, insurance, pension management and real estate transactions. We have been under the assumption that the money he has been investing has been his own." (Carpenter refers to Daniel E. Carpenter, Benistar's chairman and sole shareholder.)

Upon reviewing the Malia file, Snyder thought that some of the documents [*7] might be protected under the work product doctrine. When he spoke with Malia, Malia indicated that he performed the Web site search before he made the decision to restrict the accounts and that the information on the question and answer page gave him some suspicion of embezzlement. Malia also told Snyder that in September, 2000, he reported to Dennis Pape, an attorney working as a compliance supervisor at Merrill, and after September 22, 2000, he was working with an in-house lawyer of Merrill's office of general counsel.[9]

9 September 22, 2000, is the date on which Daniel Carpenter wrote to Merrill protesting the trading restrictions placed on the Benistar accounts and stating, among other things: "We have chosen Merrill [Lynch] as our depository for our clients so we cannot move the funds elsewhere." Benistar moved its funds to an account at UBS Paine Webber, Inc., in October, 2000.

Snyder discussed with Merrill's in-house lawyers whether the Malia file was protected from disclosure under the work product doctrine. They considered that Malia operated under the umbrella of the office of general counsel, that he acted on occasion when litigation was anticipated, and that he was generally   [*8] under the direction of attorneys. Pash determined that the documents were protected work product, and Snyder agreed.[10] We add that Snyder testified at the evidentiary hearing that he did not know whether he conducted legal research in making the work product determination, but he did not think that Bingham's billing records would reflect such research.

10 Snyder also considered whether to call Malia as a witness, as his testimony might have been useful to rebut certain arguments made by Benistar against Merrill. It was determined that Merrill would waive its work product protection for the Malia file by so doing, and the decision was made not to call him.

On June 19, 2002, the trial judge granted the plaintiffs' emergency motion to compel evidence of visits by Merrill employees to the Benistar Web site. Merrill responded that no nonprivileged documents had been found. In October, 2002, after receiving the Malia file, Bingham drafted supplements to several of Merrill's interrogatory answers concerning Merrill's knowledge of Benistar's business and visits to the Web site. Those responses would have disclosed the fact that Malia had viewed the § 1031 pages. In the end, Snyder decided not [*9] to serve the supplemental answers, following his determination that the Malia file was protected work product.

We also add from the record that prior to receiving the Malia file, Bingham had filed a motion for summary judgment, which contained the following representation: "At no time prior to the transfer of the accounts did any employee at Merrill Lynch learn that the funds in the Benistar accounts were being held by Benistar as a third party intermediary for real estate transactions or that those funds were Benistar client escrowed funds." In addition, the parties stipulated that Merrill's portion of the first revised joint pretrial memorandum, dated September 25, 2002, included the following: "At no time prior to the transfer of the Benistar accounts from Merrill Lynch to Paine Webber did any employee at Merrill Lynch learn that the funds in the accounts were being held by Benistar as a third party intermediary for real estate transactions or that those funds were Benistar client escrow funds."

At the hearing on the motion for sanctions, the parties stipulated that at the 2002 trial, Snyder, in examining Rasmussen, asked whether Rasmussen knew in 2000 that Benistar acted as a

third-party **[\*10]** intermediary or escrow agent handling other people's money, and Rasmussen testified that he did not. Rasmussen also testified that he never visited the Benistar Web site before the accounts were transferred to UBS Paine Webber, Inc., and that he had never thought to do so. The record further discloses that Snyder told the jury, in closing, that "the Merrill people" did not know that the funds in the accounts belonged to third parties, and that the witnesses all said they did not know what a § 1031 exchange was and that there was no reason for them to go to the § 1031 "button" on the Web site. According to the record, in Merrill's motion for judgment notwithstanding the verdict, Merrill argued that the plaintiffs "have failed even to present sufficient evidence to support a reasonable inference that Merrill knew that the Benistar accounts contained third party funds."

Following the sanctions hearing, the judge concluded that Snyder acted in good faith in failing to disclose the Malia file and in presenting a defense at the 2002 trial that included the claim that Merrill employees had not viewed the § 1031 pages of the Benistar Web site.

*Discussion.* The plaintiffs maintain that Snyder **[\*11]** was prohibited from not disclosing the fact, under the work product doctrine, that certain Merrill employees had seen the § 1031 pages of the Benistar Web site, and then asserting, as part of Merrill's defense, that Merrill employees had not seen the § 1031 pages of the Benistar Web site. We agree.

We review the judge's decision regarding sanctions for abuse of discretion. "[O]ur function is to determine whether the judge abused that discretion, which includes considering whether proper legal standards were applied and whether there was reasonable support for the judge's evaluation of the facts." *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. 110, 114 (2004), quoting from *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. 410, 417 (1998). In so doing, we accept the judge's findings of fact as true unless they are clearly erroneous. "On the other hand, to ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Selvaggio*, 413 Mass. 619, 621 (1992). See *Panagakos* v. *Collins*, 80 Mass. App. Ct. 697, 702 (2011) (clearly erroneous standard does not protect findings based **[\*12]** on incorrect legal standard).

1. *The work product doctrine.* The Massachusetts work product doctrine derives from *Hickman* v. *Taylor*, 329 U.S. 495 (1947), and may be invoked to protect from discovery certain types of documents prepared by a party's attorney, or nonlawyer representative, in anticipation of litigation. "The work product doctrine is codified in Mass.R.Civ.P. 26(b)(3), [365 Mass. 772 (1974)]. . . ." *McCarthy* v. *Slade Assocs.*, 463 Mass. 181, 194 (2012). The doctrine is intended "to prevent one party from piggybacking on the adversary's preparation," *Commissioner of Rev.* v. *Comcast Corp.*, 453 Mass. 293, 312 (2009) (*Comcast Corp.*), quoting from *United States* v. *Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995), and thus protects from disclosure the attorney's "mental impressions, conclusions, opinions, or legal theories" regarding the litigation. Mass.R.Civ.P. 26(b)(3).

The judge correctly cited the legal principle from *Comcast Corp.*, i.e., that the work product doctrine may be invoked to protect documents that a party's nonlawyer representative pre-

pared, or obtained, in anticipation of litigation. Much of the judge's analysis focused on whether Snyder reasonably believed that Malia's [*13] investigation of the Benistar account in September, 2000, was undertaken in his role as Merrill's legal representative and in anticipation of litigation, and the judge credited both Snyder and Bingham's expert in concluding that Snyder's decision to withhold the documents on those grounds had an adequate basis in the law and was made in good faith.

However, in *Comcast Corp.*, the Supreme Judicial Court went further and identified two important qualifications to the work product doctrine that bear directly on the facts of this case and were absent from the judge's analysis. First, the court noted that work product may be subject to disclosure upon a showing of a substantial need for the material and that its equivalent cannot be obtained by other means. *Comcast Corp., supra* at 314. See *Chambers* v. *Gold Metal Bakery, Inc.*, 464 Mass. 383, 391 n.22 (2013). Substantial need is shown where, as here, the work product at issue is central to the parties' substantive claims. See *McCarthy* v. *Slade Assocs., supra* at 195, citing *Madanes* v. *Madanes*, 199 F.R.D. 135, 150 (S.D.N.Y 2001). In fact, the plaintiffs specifically sought, and the trial judge ordered, that Merrill produce evidence of Web site [*14] visits.

The second qualification noted by the court is that the doctrine encompasses two types of work product, fact and opinion. *Comcast Corp., supra*. The court distinguished the degree of protection afforded each type, explaining that the rule affords protection primarily against disclosure of an attorney's opinion, that is, "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Ibid.*, quoting from Mass.R.Civ.P. 26(b)(3). Fact work product, on the other hand, receives far less protection. *Comcast Corp., supra*. It has long been held that "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." *Hickman* v. *Taylor*, 329 U.S. at 511. See *Fleet Natl. Bank* v. *The Gloucester Corp.*, 150 F.R.D. 10, 14-15 n.6 (D. Mass. 1993) (litigants cannot use work product doctrine to shield relevant facts from discovery). See also *Resolution Trust Corp.* v. *Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) (doctrine principally guards against disclosing attorney's strategies and legal impressions, [*15] and does not protect "facts concerning the creation of work product or facts contained within work product"); *Koch Materials Co.* v. *Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 122 (D.N.J. 2002).

With these qualifications in mind, we conclude that Snyder lacked an adequate basis in law to support his decision to withhold, as protected work product, the significant facts that Malia visited the § 1031 pages on the Benistar Web site on September 20, 2000, and then sent those pages by fax to Rasmussen. "Simply identifying what documents an attorney reviewed, what documents were provided by a consultant, or what documents were provided to the client, in each instance without any requirement to describe content, reveals nothing about the attorney's (or the consultant's or the client's) opinion or impression of any of the documents, or any conclusions the attorney (or consultant or client) drew from them." *McCarthy* v. *Slade Assocs.*, 463 Mass. at 201, citing *Bamberg* v. *KPMG LLP*, 219 F.R.D. 33, 36 (D. Mass. 2003).

See *In re San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1014-1018 (1st Cir. 1988). Snyder's failure to supplement the interrogatories seeking that factual information, and [*16] his continued assertion, in pleadings and at trial, that Merrill employees had not visited the § 1031 Web site, were without legal justification.

Even assuming, without deciding, that Snyder was reasonable in his belief that Malia's visit to the § 1031 Web site pages, and Malia's fax to Rasmussen containing those pages, revealed Malia's mental impressions, we discern no adequate basis in the law for Snyder's belief that he could withhold the information and still assert a defense claiming just the opposite.

Plainly, whether Merrill employees had visited the Benistar Web site, and what knowledge they gleaned therefrom, were significant points of contention in the parties' dispute. In *Ward* v. *Peabody*, 380 Mass. 805, 817-818 (1980), the court explained that protection for work product does not extend to evidence of the "words and deeds" of an attorney when the inquiry bears on an issue in dispute, in that case the activities of a contractor and its law firm alleged to have improperly influenced the award of public contracts. "[W]hen the activities of counsel are inquired into because they are at issue in the action before the Court, there is cause for production of documents that deal with   [*17] such activities, though they are 'work product.' 4 Moore's, Federal Practice par. 26.62[4] at 26-447 (2d ed. 1979)." *Id.* at 818.[11] More recently, in *McCarthy* v. *Slade Assocs.*, 463 Mass. at 195, the Supreme Judicial Court reiterated that work product was not shielded from discovery if the parties' dispute "puts in play" the knowledge of the plaintiff and her attorney, in that case knowledge of the location of a parcel of land, which was pertinent to the discovery rule asserted by the plaintiffs in response to a statute of limitations defense.

> 11 See *Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.*, 296 F. Supp. 979, 982 (E.D. Wis. 1969) (cited in *Ward* v. *Peabody, supra*) (production of work product documents required where claim of unclean hands in patent procurement called into question relationship between plaintiff and its patent consultant, a former patent office employee). See also *Gulf Constr. Co.* v. *St. Joe Paper Co.*, 24 F.R.D. 411, 414-415 (S.D. Tex. 1959) (best evidence of mitigation involved communications between attorneys); *Bourget* v. *Government Employees Ins. Co.*, 48 F.R.D. 29, 33 (D. Conn. 1969) (insurer's attorney's knowledge as to severity of plaintiff's injuries subject   [*18] to disclosure in failure to settle case).

The fact that a Merrill employee, lawyer or nonlawyer, knew that Benistar's business was as an intermediary for third-party funds was significant to the plaintiffs in making out their claim for aiding and abetting against Merrill. Moreover, the evidence of Malia's visit to the § 1031 pages of the Benistar Web site on September 20, 2000, and his transmission of those pages by fax to Rasmussen, ran directly counter to the heart of Merrill's defense that it had no such knowledge. Indeed, the plaintiffs' failure to provide such evidence was repeatedly highlighted by Merrill as a fatal flaw in the plaintiffs' case throughout the 2002-2003 proceedings. Its

disclosure would have revealed facts that would have contradicted the observations of the trial judge,[12] this court,[13] and the Supreme Judicial Court,[14] in their respective rulings, that evidence of Merrill's knowledge of the nature of Benistar's business was lacking in the 2002 trial. See Mass. R. Prof. C. 3.3(a)(1), 426 Mass. 1383 (1998) (lawyer shall not knowingly make false statement of material fact or law to tribunal). It likely would have led the plaintiffs to the existence of other relevant   **[*19]** facts and would have been useful in cross-examining the Merrill witnesses, Rasmussen in particular, who denied ever seeing the information. See *Hickman* v. *Taylor*, 329 U.S. at 511. See also Mass. R. Prof. C. 3.3(a)(4), 426 Mass. 1383 (1998) (lawyer shall not knowingly offer evidence that lawyer knows to be false).

> 12 In ruling on Merrill's motion for judgment notwithstanding the verdict in the 2002 trial, the trial judge observed that while certain Merrill employees looked at the Benistar Web site homepage and one employee looked at information about "§ 419" employee benefit plans under the Internal Revenue Code, "[i]t is the case that the Benistar.com website contains information about Benistar Property Exchange Trust Company and its role as a 'qualified intermediary' for purposes of property exchanges under § 1031 of the Internal Revenue Code, but this appears in a separate, discrete part of the website that is not visible on the home page or in connection with any information about § 419 plan administration."

> 13 "The judge found scant evidence that Merrill Lynch had actual knowledge that Benistar was using funds belonging to third parties . . . ." *Cahaly* v. *Benistar Property Exch. Trust Co.*, 68 Mass. App. Ct. 668, 671 (2007).

> 14 "Testimony   **[*20]** from several Merrill Lynch employees that they viewed the Benistar Web site homepage (which did not contain a description of Benistar Trust's business) and a linked page that had nothing to do with § 1031 like-kind exchanges has no probative value in establishing Merrill Lynch's knowledge of the primary wrongdoing." *Cahaly, supra* at 356. The court also observed: "Several witnesses for Merrill Lynch testified that not only did they not know the actual nature of Benistar Trust's business as a 'qualified intermediary' under § 1031, but they also had no understanding of § 1031 or its requirements until the first of the plaintiffs' lawsuits was filed in January, 2001." *Id.* at 354 n.24.

These important qualifications to the work product doctrine, which relate directly to the undisputed facts of this case, were not addressed in the judge's rulings when he relied on *Comcast Corp.* to conclude that Snyder had an adequate basis in law to support his work product determination. We are also of the view that Snyder's persistence in pursuing a defense that included Merrill's lack of knowledge of the nature of Benistar's business and the § 1031 Web site pages calls into question his good faith. Accordingly,   **[*21]** the judge's ultimate finding that Snyder acted reasonably and in good faith in withholding critical documents as

work product must be reassessed in light of the legal principles we have set out here. Nevertheless, reasonableness and good faith are determinations we leave to the fact finder, who is in a better position to assess the credibility of witnesses and to weigh the evidence, in the context of the applicable law. See *Cahaly, supra* at 369. See, e.g., *Psy-Ed Corp*. v. *Klein*, 62 Mass. App. Ct. at 114. For that reason, the matter is remanded for further proceedings consistent with this opinion.

2. *Authority for imposition of sanctions*. The plaintiffs no longer press the ground of fraud on the court as a basis for imposing sanctions. But the plaintiffs maintain that Bingham's conduct was sufficiently egregious to warrant sanctions pursuant to the inherent power of the trial court. See generally *Sommer* v. *Maharaj*, 451 Mass. 615, 621-622 (2008); *Munshani* v. *Signal Lake Venture Fund II, LP*, 60 Mass. App. Ct. 714, 719 n.6 (2004) (court's inherent power to impose sanctions for attorney misconduct was not limited to instances of fraud on the court).

The plaintiffs additionally rely on Mass.R.Civ.P. 11, [*22] 365 Mass. 753 (1974), requiring that pleadings be based on an attorney's reasonable inquiry and an absence of bad faith. See *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 142 (1996). The rule requires "at least some level of reasonable inquiry" into the factual and legal basis supporting the pleading. *Psy-Ed Corp*. v. *Klein*, 62 Mass. App. Ct. at 113. See *Van Christo Advertising, Inc*. v. *M/A-COM/LCS*, 426 Mass. at 416-417 (we do not condone "an attorney's 'wilful ignorance' of facts and law which would have been known had the attorney simply not consciously disregarded them"). In ruling on a motion for rule 11 sanctions, a judge may consider whether the attorney's misconduct was the result of a "genuine, professional judgment," see *Psy-Ed Corp*. v. *Klein, supra* at 117, or was instead to secure a tactical advantage by hampering the opposing party's presentation of its case, in violation of the rules of court and of professional conduct. *Munshani* v. *Signal Lake Venture Fund II, PL, supra* at 720.

Finally, the plaintiffs urge that sanctions be imposed against Bingham for discovery violations, for its failure to supplement the plaintiffs' interrogatories in 2002. See, e.g., *Keene* v. *Brigham & Women's Hosp., Inc*., 56 Mass. App. Ct. 10, 21 (2002), [*23] *S.C.* 439 Mass. 223, 235 (2003); *Short* v. *Marinas USA Ltd. Partnership*, 78 Mass. App. Ct. 848, 853 & n.7 (2011). We defer to the judge on remand to determine whether sanctions are warranted on any of those grounds, as determined by the judge's further findings on Bingham's good faith and the nature and effect of the violations.[15]

15 We reject Bingham's suggestion that it produced enough information to the plaintiffs prior to the 2002 trial to alert them to Malia's role -- that the fault somehow belonged to the plaintiffs. As the court observed in *Cahaly, supra* at 367, "the plaintiffs' repeated efforts at increasingly tailored discovery were impeded at nearly every turn by Merrill Lynch."

3. *Benistar defendants' appeal*. The Benistar defendants appeal from the judge's denial of their motion for a new trial. The judge relied principally on *Cahaly, supra* at 362-368,

wherein the court denied Benistar's motion for a new trial based on the newly discovered evidence addressed in that case. We agree with the judge that the Benistar defendants have not demonstrated that the documents produced by Merrill in 2009 require a different outcome.

*Conclusion.* The order denying the Benistar defendants' motion **[*24]** for a new trial is affirmed. Paragraph E of the final judgment entered on February 7, 2011, is vacated as to intervener Bingham only, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.[16]

16 Because the judge who decided the plaintiffs' motion for sanctions has retired, the judge deciding the motion on remand may, in his or her discretion, hear additional evidence and receive additional submissions from the parties.

*So ordered.*



xpress

Extremely Urgent

Page 1 of 1

From: (860) 408-7000    Origin ID: MPEA    FedEx Express    Ship Date: 12JUN14
Joe Castagno                                                 ActWgt: 1.0 LB
                                                             CAD: 103918885/INET3490
100 Grist Mill Plaza

Simsbury, CT 06070                                           Delivery Address Bar Code

                          

SHIP TO: (617) 748-9057    BILL SENDER       Ref #
**Chief Judge Sandra L. Lynch**              Invoice #
**Office of the Clerk**                      PO #
**US Court of Appeals**                      Dept #
**1 Courthouse Way, Suite 2500**
**BOSTON, MA 02210**
                                             FRI - 13 JUN AA
                                             STANDARD OVERNIGHT

                            TRK#  7702 8780 5717              02210
                            0201                             MA-US

                            EM LWMA                           BOS

                                  

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.